**EXHIBIT C**

1

```
1              UNITED STATES DISTRICT COURT
                  DISTRICT OF NEW JERSEY
2                    CIVIL ACTION NO.
                   1:24-CV-09005-RMB-MJS
3

4      MICHELE AND FRANK           :
       TEDESCO, et. al             :
5                 Plaintiffs       :
                                   :
6                 vs.              :      JODI MELLUL
                                   :
7      BOROUGH OF HADDONFIELD      :
       AND NEW JERSEY AMERICAN     :
8      WATER COMPANY, INC.         :
                  Defendants       :
9

10             Stenographic deposition of JODI MELLUL,

11     taken before Kathleen S. Bowe, a Registered

12     Professional Reporter, Certified Court Reporter

13     and Notary Public, License No. 1312, at the Law

14     Offices of Brown & Connery, 360 Haddon Avenue,

15     Westmont, New Jersey, on Friday, October 17,

16     2025, commencing at 11:55 a.m., in the

17     above-entitled cause of action.

18

19

20

21     -----------------------------------------------
                 KATHY BOWE COURT REPORTERS
22              * Certified Court Reporters *
             * Registered Professional Reporters *
23                 240 West 22nd Street
               Ship Bottom, New Jersey  08008-4302
24                   [609] 513-0196
                  Kathybowecsr@aol.com
25
```

2

1        APPEARANCES:

2

3                     WEIR LLP
                      BY:  JENNIFER HILLER-NIMEROFF, ESQ.
4                     35 Kings Highway East
                      Haddonfield, New Jersey  08033
                      Counsel for Plaintiffs

5

6                     BROWN & CONNERY, LLP
                      BY:  WILLIAM F. COOK, ESQ.
7                     360 Haddon Avenue
                      Westmont, New Jersey  08108
8                     Counsel for Defendant, Borough of
                      Haddonfield
9
                      MARSHALL DENNEHEY
10                    BY:  PAUL C. JOHNSON, ESQ.
                      15000 Midlantic Drive, Suite 200
11                    Mount Laurel, New Jersey  08054
                      Counsel for Defendant, NJ American Water
12                    Company

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X
                                 - - -
2

3        WITNESS           EXAMINATION          PAGE NO.

4
         JODI MELLUL
5
                           By Mr. Cook                5
6

7

8                           E X H I B I T S

9

10       EXHIBIT NO.          DESCRIPTION        PAGE MKD.

11       Mellul-1      Civil Complaint           11

12       Mellul-2      Rule 26 Disclosures       13

13       Mellul-3      Rule 26 Disclosures       13

14       Mellul-4      Responses to Document
                       Requests                  14
15
         Mellul-5      Responses to Document
16                     Requests for Production
                       of Documents              14
17
         Mellul-6      Interrogatory Responses   14
18
         Mellul-7      Responses to Requests
19                     for Admission             15

20       Mellul-8      Responses to Requests
                       for Admission             15
21
         Mellul-9      Subdivision Plan with
22                     Deed                      15

23       Mellul-10     Deed dated 1/16/14        15

24       Mellul-11     Documents including
                       Deed dated 3/29/24        16
25

1    Mellul-12       Documents                       16

2    Mellul-13       E-mail Correspondence
                     September 2023 to
3                    July 2024                       16

4    Mellul-14       E-mail Correspondence           17

5    Mellul-15       E-mail Correspondence           17

6    Mellul-16       Photos                          17

7    Mellul-17       Folder of Videos                17

8    Mellul-18       Folder - Damage Claim           17

9    Mellul-19       Folder marked Borough
                     Documents                       18
10
     Mellul-20       Doug Johnson Documents          18
11
     Mellul-21       House Calls LLC,
12                   55-page document                25

13   Mellul-22       June 2008 photo                 85

14   Mellul-23       August 2012 photo               88

15   Mellul-24       August 2013 photo               89

16   Mellul-25       July 2018 photo                 94

17   Mellul-26       September 2019 photo           103

18   Mellul-27       September 2022 photo           109

19   Mellul-28       September 2022 photo           112

20
                     DOCUMENT REQUESTS
21
     1.   Name of realtor.  (Page 19)
22
     2.   Homeowner's carriers.  (Page 36)
23
     3.   Flooding insurance.  (Page 36)
24

25

1                    S T I P U L A T I O N

2                    (It is hereby stipulated by and

3      between counsel for the respective parties

4      that the reading and signing are waived; and

5      that all objections, except as to the form of the

6      questions, are reserved until the time of trial.)

7                              - - -

8                         JODI MELLUL, sworn.

9                              - - -

10     BY MR. COOK:

11       Q.    Good morning, ma'am.  My name is Bill

12     Cook.  I'm an attorney.  I represent the Borough

13     of Haddonfield in a lawsuit that has been filed

14     in the US District Court for the District of New

15     Jersey.

16                    We're here today for your

17     deposition.  I should further add for the record

18     I appreciate your accommodation this morning.  I

19     had another deposition and you and your attorney

20     were kind enough to accommodate, so I thank you

21     for that.

22                    Have you ever had a deposition

23     before?

24       A.    No.

25       Q.    I'm going to go through a number of

J. Mellul                                                  6

1        instructions as to what will be guiding us today

2        with the deposition.

3                        First of all, this is a formal

4        proceeding in that you have been placed under

5        oath.  And so everything that I ask you today

6        will have the same weight and effect as if we

7        were in a court of law.

8                        Do you understand that?

9        A.      Yes.

10       Q.      The oath that you have taken requires

11       you to tell us the truth, the whole truth and

12       nothing but the truth.

13                        Do you understand that?

14       A.      Yes.

15       Q.      Ma'am, I'll be asking you a number of

16       questions today.  I have a responsibility to be

17       sure that you understand my questions.  If for

18       whatever reason you do not understand my

19       questions, or you need some form of

20       clarification, by all means please let me know

21       that.

22                        Do you understand that?

23       A.      Yes.

24       Q.      Also today we have a court reporter who

25       is here who is taking down everything that I say

J. Mellul                                              7

1     and everything that you say and everything that

2     anybody says.  And so for that reason, please be

3     sure that all of your answers are verbal.

4                 Do you understand that?

5        A.    Yes.

6        Q.    And the reason for that is in everyday

7     conversation, we may nod our heads, shrug our

8     shoulders, things like that do not get picked up

9     by the court reporter.  It's just something that

10    we do with depositions.  So please make sure that

11    all of the answers are verbal.

12                Do you understand that?

13       A.    Yes.

14       Q.    It's very important that you do not

15    guess or speculate today.  If any of my questions

16    require that you guess or speculate, please let

17    me know that.

18                Do you understand that?

19       A.    Yes.

20       Q.    It may very well happen and probably

21    will happen today that there is an objection

22    either by Ms. Hiller or Mr. Johnson.  That

23    happens in every deposition.  You did nothing

24    wrong.  That is just attorneys stating their

25    position on the record.  I would just simply ask

J. Mellul                                    8

1    that you wait for the objection to be stated

2    before you continue with your answer.

3                    Do you understand that?

4        A.    Yes.

5        Q.    I should further advise and state that

6    99 percent of the time, if there is an objection,

7    you still have to answer the question.  And the

8    reason for that is, is that the attorneys are

9    simply placing an objection on the record for

10   purposes of later use at trial.

11                   So even if you hear the word

12   objection, you are still going to have to answer

13   the question unless Ms. Hiller tells you not to

14   answer the question for some legal reason which

15   we can discuss.

16                   Do you understand that?

17       A.    Uh-huh.  Yes.

18       Q.    I tend to take breaks every hour or so.

19   If you need a break for any reason, by all means

20   please let me know.  The exception to -- well,

21   the rule for that are as follows:

22                   If there's a pending question, you

23   have to answer the question before we take the

24   break.

25                   Do you understand that?

J. Mellul                                        9

1      A.      Yes.

2      Q.      And the second instruction is that since

3   we have now started the deposition, you are not

4   to confer with counsel as to any substantive

5   testimony or how you should answer questions or

6   whether you should change your testimony.

7                Things like that cannot be

8   discussed with counsel during the break since we

9   have now started the deposition.

10                Do you understand that?

11     A.      Yes.

12     Q.      Are you under the influence today of any

13   medication or anything else that would affect

14   your ability to remember or tell the truth?

15     A.      No.

16     Q.      Do you have any questions of me

17   regarding these instructions?

18     A.      No.

19     Q.      Ma'am, by whom are you employed?

20     A.      Inspira Medical Center.

21     Q.      What is it that you do there?

22     A.      I'm a doctor.

23     Q.      What type of doctor?

24     A.      Endocrinology.

25     Q.      Do you have your M.D.?

J. Mellul                                    10

1        A.      Yes.

2        Q.      And how long have you served as a doctor

3    of endocrinology at Inspira?

4        A.      11, 12 years.  12 years.

5        Q.      From where did you get your medical

6    degree?

7        A.      Ben-Gurion University and Columbia

8    University in New York.

9        Q.      And your undergrad was where?

10        A.      McGill University, Montreal.

11        Q.      Do you work out of a certain Inspira

12    location?

13        A.      Deptford.  There's an office in

14    Deptford.

15        Q.      I ask this at every deposition.  Have

16    you ever been convicted of a crime?

17        A.      No.

18        Q.      Are you a veteran?

19        A.      No.

20        Q.      I'm going to show you a few exhibits,

21    ma'am.  We'll be going through a number of

22    exhibits today.

23                    The first is a Civil Complaint.

24    This is the lawsuit that has been filed in this

25    matter.  We're going to mark this as Mellul-1 for

J. Mellul                               11

1          the record.

2                          (Mellul-1, Civil Complaint, marked

3          for identification.)

4          BY MR. COOK:

5          Q.      And I take it you go by Dr. Mellul; is

6          that right, or Dr. Fox?

7          A.      Dr. -- well, Dr. Fox.  But my name is

8          Dr. Fox.  Everyone says Fox.

9          Q.      What is your full name?  I should have

10         asked that before.

11         A.      Jodi Fox-Mellul, it's hyphenated.

12         Q.      Currently married of course to Steven

13         Mellul?

14         A.      Yes.

15         Q.      When were you married?

16         A.      Oh, in 2010.

17         Q.      Now, your husband is also a doctor;

18         right?

19         A.      Yes.

20         Q.      What type of doctor is he?

21         A.      Oculofacial plastics.

22         Q.      Where is his practice?

23         A.      Haddonfield.  He's self-employed.

24         Q.      Got it.  What is the name of his

25         practice?

J. Mellul                            12

1        A.      Mellul Eye and Facial Plastic Surgery.

2        Q.      Where in Haddonfield is that located?

3        A.      Kings Highway.

4        Q.      How long has he been in practice there

5    at Kings Highway?

6        A.      I think it's been about two, three years

7    now.  Two years that he moved there.

8        Q.      Where was his practice before that?

9        A.      On Kings Highway but further down near

10   Ponzio's.  He just moved.

11       Q.      Understood.  And am I saying this right,

12   that his business and his medical practice is

13   plastic surgery?

14       A.      No.  It's like facial cosmetic,

15   oculofacial cosmetic surgery.

16       Q.      I'm going to ask you to say it again.

17       A.      Oculo, O-C-U-L-O.

18       Q.      L-O?

19       A.      Yeah.  Eyes.

20       Q.      How long has he been a medical doctor?

21       A.      Longer than me.  I don't know when he

22   graduated, to be honest.  I could do the math,

23   but...

24       Q.      You currently reside at 80 Chews

25   Landing; correct?

J. Mellul                                    13

1          A.      Yes.

2          Q.      We are going to go through and mark as

3     Exhibit 2, this is what we call Rule 26

4     Disclosures.  It is more or less a legal

5     document.  I'm marking it for purposes of the

6     record.

7                     These were served by Mr. Johnson

8     who is seated to my left today.  He represents

9     New Jersey American Water.

10                    MS. HILLER-NIMEROFF:  They were

11    served by whom?

12                    MR. COOK:  The responses, the Rule

13    26 Disclosures -- strike that.

14                    They were the Rule 26 Disclosures

15    of the plaintiffs in this matter and sent to, it

16    appears to be Mr. Johnson, if I'm reading this

17    right.  This is Exhibit 2.

18                    (Mellul-2, Rule 26 Disclosures,

19    marked for identification.)

20    BY MR. COOK:

21         Q.      Exhibit 3, Rule 26 Disclosures that were

22    submitted to the Borough of Haddonfield by your

23    attorneys.

24                    (Mellul-3, Rule 26 Disclosures,

25    marked for identification.)

J. Mellul                                        14

1      BY MR. COOK:

2        Q.      Mellul-4 are the responses to document

3      requests of New Jersey American Water by you and

4      Dr. Mellul.

5                    (Mellul-4, Responses to Document

6      Requests of New Jersey American Water, marked for

7      identification.)

8      BY MR. COOK:

9        Q.      Exhibit 5 are the responses to requests

10     for production of documents submitted by your

11     attorneys on your behalf to my office, the

12     Borough of Haddonfield.

13                   (Mellul-5, Responses to Requests

14     for Production of Documents, marked for

15     identification.)

16     BY MR. COOK:

17       Q.      Exhibit 6 are the Interrogatory

18     responses of you and Dr. Mellul that were

19     submitted to myself and Mr. Johnson.

20                   (Mellul-6, Interrogatory Responses,

21     marked for identification.)

22     BY MR. COOK:

23       Q.      Exhibit 7 are responses to requests for

24     admission.  These requests were tendered by my

25     office.

J. Mellul                           15

1                    (Mellul-7, Responses to Requests

2        for Admission, marked for identification.)

3        BY MR. COOK:

4            Q.     Exhibit 8 are responses to requests for

5        admissions.  These requests were submitted by

6        Mr. Johnson on behalf of New Jersey American

7        Water.

8                    (Mellul-8, Responses to Requests

9        for Admissions, marked for identification.)

10       BY MR. COOK:

11           Q.     Exhibit 9 is a subdivision plan with a

12       corresponding deed from a Mr. John Canuso to an

13       entity called Three Guys Associates.  We'll be

14       talking about that.

15                    (Mellul-9, Subdivision Plan with

16       Deed, marked for identification.)

17       BY MR. COOK:

18           Q.     Mellul-10 is a deed dated January 16,

19       2014 between John Marquess, M-A-R-Q-U-E-S-S, and

20       Carol Marquess to you and Steven Mellul.

21                    (Mellul-10, Deed Dated January 16,

22       2014, marked for identification.)

23       BY MR. COOK:

24           Q.     Exhibit 11 is a series of documents that

25       we received in response to a subpoena that I sent

J. Mellul                        16

1    to the County of Camden.  It includes a deed

2    dated March 29, 2024 between you and Steven

3    Mellul to you.

4                    (Mellul-11, Documents including

5    Deed dated March 29, 2024, marked for

6    identification.)

7    BY MR. COOK:

8       Q.    Mellul-12 is a series of documents that

9    have been produced by you and your attorneys in

10   this matter in date order, which we will be going

11   through.

12                    MS. HILLER-NIMEROFF:  Is that 12?

13                    MR. COOK:  Yes, ma'am.

14                    (Mellul-12, Documents, marked for

15   identification.)

16   BY MR. COOK:

17      Q.    13 is an E-mail correspondence between

18   Mr. Sandmeyer and Steven Mellul in that time

19   frame of September '23 and July of 2024.

20                    (Mellul-13, E-mail Correspondence

21   September 2023 to July 2024, marked for

22   identification.)

23   BY MR. COOK:

24      Q.    14 is a document we'll have to come back

25   to.  But this appears to be E-mail correspondence

J. Mellul                                17

1        that we're going to have to address, the printing

2        is very small.

3                      (Mellul-14, E-mail Correspondence,

4        marked for identification.)

5        BY MR. COOK:

6          Q.      Same thing for Mellul-15.  I represent

7        it is E-mail correspondence but the type is very

8        small.

9                      (Mellul-15, E-mail Correspondence,

10       marked for identification.)

11       BY MR. COOK:

12         Q.      16 is a number of photos that were

13       produced in discovery.  This is actually a

14       283-page document that we'll be talking about.

15                      (Mellul-16, Photographs, marked for

16       identification.)

17       BY MR. COOK:

18         Q.      Exhibit 17 is a folder which has a

19       number of videos that we'll be going through.

20                      (Mellul-17, Folder of Videos,

21       marked for identification.)

22       BY MR. COOK:

23         Q.      18 is a folder that was produced in

24       discovery.  It is 80 Chews damage claim.

25                      (Mellul-18, 80 Chews Damage Claim,

J. Mellul                                18

1      marked for identification.)

2                      MS. HILLER-NIMEROFF:  By your

3      office; correct?

4                      MR. COOK:  Right.

5      BY MR. COOK:

6        Q.    19 is a folder that we have marked

7      Borough documents.  These are a number of

8      different documents that have been produced in

9      discovery that we'll be going through.

10                     (Mellul-19, Borough Documents,

11     marked for identification.)

12     BY MR. COOK:

13       Q.    20 is a folder marked Doug Johnson

14     documents.  These documents have also been

15     produced in discovery.  It includes a number of

16     folders.  And again, we'll be addressing those.

17     And those are the documents that I'm marking

18     right now.  There will be additional but we'll

19     start with them.

20                     (Mellul-20, Doug Johnson Documents,

21     marked for identification.)

22     BY MR. COOK:

23       Q.    So turning to the deed that we have

24     marked as Exhibit 10.

25                     Am I correct that you moved into

J. Mellul                                    19

1       the property on or about January 16th of 2014?

2            A.       We took possession, yes.

3            Q.       Did you have a realtor with that

4       transaction?

5            A.       So the realtor was the original owner's

6       realtor, so we did not have our own.

7            Q.       Who was the realtor that was used by the

8       original owner?

9            A.       I'm blanking on her name.  She's the one

10      for all of Haddonfield.  I'm forgetting, I'm

11      blanking right now.  It will come to me.

12           Q.       I'm just going to see if I can find it

13      here in the document.  I'm scrolling through the

14      document.  This is, again, Exhibit 10.  I'm not

15      seeing a realtor there.

16                    What I'm going to ask, and this

17      will be by way of follow-up, if we can identify

18      the name of the realtor who was involved here.

19                    Were you represented by an

20      attorney, ma'am?

21           A.       No.

22           Q.       You and Dr. Mellul purchased the

23      property for a price of 850,000 dollars; is that

24      right?

25           A.       Yes.

J. Mellul                                    20

1      Q.      Was that paid in cash or a mortgage or

2    both?

3      A.      Mortgage.

4      Q.      Who was the mortgage with?

5      A.      What bank?  TD Bank.

6      Q.      Do you have a memory of the amount of

7    the mortgage at the time of purchase?

8      A.      No, we had to put 20 percent down.

9      Q.      20 percent down was put down in terms of

10   the -- your contribution, and the remainder was

11   funded by the mortgage from TD Bank; is that

12   right?

13     A.      Yes.

14     Q.      Do you still have the same mortgage --

15     A.      Yes.

16     Q.      -- with TD Bank.

17             Do you have knowledge as to the

18   amount remaining on the mortgage?

19     A.      I could round, somewhere in the fives.

20     Q.      500,000?

21     A.      Somewhere.  I would have to look.  I

22   haven't looked in a while.  We just pay it every

23   month.

24     Q.      What is the monthly payment on the

25   property?

J. Mellul                                          21

1       A.      3,000, I think, for the mortgage.  Not

2   the taxes.  That's just the mortgage.

3       Q.      Is there anyone that resides with you

4   and Dr. Mellul at the property?

5       A.      My two children.

6       Q.      Approximately how old are each of them?

7       A.      11 and 13.

8       Q.      Where did you and Dr. Mellul live before

9   you moved into this property?

10      A.      We were renting in Marlton.

11      Q.      How did you come to find out about this

12  property, was it through just research, just a

13  listing, Zillow?

14      A.      My husband's office manager was friendly

15  or knew of the Marquesses, and told us that the

16  house was for sale.  And that's how we made the

17  connection.

18      Q.      Got it.  Was there a closing that was

19  undertaken somewhere for this?

20      A.      Yes.

21      Q.      Where was the closing conducted?

22      A.      It was on Route 70.  I don't remember.

23      Q.      Somewhere on Route 70; right?

24      A.      Route 70.  Near the fish market.

25  There's a building there.

J. Mellul                                    22

1          Q.      Prior to moving into the property, I

2     take it you had -- obviously there being a

3     mortgage, do you know whether there was an

4     appraisal done on the property by the mortgage

5     company?

6          A.      I'm sure.  I do not know the amount.

7     But I'm sure.  I think that has to be done every

8     time you get a mortgage.

9          Q.      Right.  Do you know what the -- was this

10    like a public listing property or was this done

11    sort of off the books?

12         A.      It was listed -- no, it was listed

13    publicly.  So they had an agent.  And she's the

14    number one agent in town.  Her name is all over

15    all the signs.  I don't remember now.

16         Q.      Lisa Wolschina?

17         A.      Yes.

18         Q.      Okay.  Got it.

19         A.      Lisa.

20         Q.      Lisa Wolschina?

21         A.      Yes.

22         Q.      So Lisa was the listing agent for the

23    Marquess family; is that right?

24         A.      Yes.

25         Q.      The Marquess family, was that just

J. Mellul                           23

1    husband and wife or did they have kids there?  Do

2    you have any idea of their -- who they had

3    living --

4         A.     They raised kids there.  I believe the

5    kids had married or moved out or were in college

6    but...

7         Q.     Do you know whether Mr. and Mrs.

8    Marquess are still alive?

9         A.     I can't answer that.

10        Q.     Pardon me?

11        A.     I have no idea.

12        Q.     Do you know where they moved to?

13        A.     They moved, to my knowledge, to another

14   house in Haddonfield.  I believe they downsized.

15        Q.     They downsized?

16        A.     That's what we were told.

17        Q.     Since you moved into the property in

18   2014, have you spoken with either Mr. or

19   Mrs. Marquess?

20        A.     Never.

21        Q.     Do you know what the property was listed

22   for?

23        A.     I do not recall.

24        Q.     Do you have a memory of whether you

25   purchased the property above listing price?

J. Mellul                                            24

1          A.      No, we did not.

2          Q.      Were you -- prior to purchasing the

3     property, were you looking in Haddonfield for

4     other properties, was that something that was on

5     your radar?

6          A.      We were looking all over the area.

7     Cherry Hill, Voorhees, Haddonfield.

8          Q.      Prior to moving into the property -- let

9     me step back a second.

10                 You have a closing, of course; is

11    that right?

12         A.      Yes.

13         Q.      How soon approximately after the closing

14    did you move into the property?

15         A.      Couple months later.  We were renovating

16    the interior.

17         Q.      Renovating the interior, you said?

18         A.      Yes, the interior.

19         Q.      Prior to the closing, do you remember

20    having a home inspection undertaken?

21         A.      Yes.

22         Q.      And was that a home inspector that you

23    had -- you and Dr. Mellul had retained on your

24    own?

25         A.      I do not remember that.  I don't

J. Mellul                                    25

1       remember that.  You would have to ask my husband.

2       I'm not sure if it was ours or the sellers.

3           Q.     One way or another there was a home

4       inspection, at least one home inspection

5       performed before the closing, to the best of your

6       memory; is that right?

7           A.     Yes.

8           Q.     We're going to mark this as 21.

9                  (Mellul-21, House Calls LLC 55-page

10      Document, marked for identification.)

11      BY MR. COOK:

12          Q.     Dr. Fox, we have on the screen here,

13      this is a 55-page document.  It is marked House

14      Calls LLC home inspection company.  It has a

15      document date of, or printed at least, November

16      24, 2013.  Do you see that?

17          A.     Yes.

18          Q.     I'll represent to you this is a 55-page

19      document.  It references an inspection that was

20      undertaken on November 24th of 2013 in connection

21      with this property, 80 Chews.  Do you understand

22      that?

23          A.     Yes.

24          Q.     Would this have been the home inspection

25      that was undertaken prior to your moving into the

J. Mellul                                    26

1        property?

2            A.      I can only assume yes.

3            Q.      Do you have any memory sitting here

4        today of ever having reviewed this document?

5            A.      I must have.  My husband must have.

6            Q.      Do you have a memory, Dr. Fox, of

7        learning through this report that this property

8        was riddled with issues before you moved into it?

9                    MS. HILLER-NIMEROFF:  Objection.

10       BY MR. COOK:

11           Q.      You can answer it.

12           A.      Should I answer?

13           Q.      Yes.

14           A.      No.  I mean, not riddled.  Every home

15       inspection has issues.  But if it was riddled, we

16       wouldn't have purchased it.

17           Q.      Let me ask you this.  Were you informed

18       by anyone prior to moving into the property, and

19       by that I mean the closing, that there were any

20       kind of flooding issues on the property?

21           A.      Absolutely not.

22           Q.      You're sure of that?

23           A.      Absolutely not.

24           Q.      So your testimony is that before you and

25       Dr. Mellul closed on the property, you had no

J. Mellul                              27

1       knowledge whatsoever of any flooding issues on

2       the property; is that your testimony?

3           A.      We were not made aware of flooding

4       issues from the street into the house.

5           Q.      Nobody ever told you that; right?

6           A.      No.  No.  We were very naive.

7           Q.      Is there a reason why you did not use a

8       realtor in connection with this closing?

9           A.      So, again, my husband's office manager

10      knew the Marquesses and we didn't have a real

11      estate agent at the time.  I think the

12      Marquesses, and we were negotiating a better

13      price.  And that's just how it came about, to

14      omit the real estate agent.

15                  I think they retained theirs.  I

16      think they were friendly -- again, I don't want

17      to make any assumptions.  But I believe they were

18      friendly with Lisa Wolschina.

19          Q.      Who was friendly?

20          A.      The Marquesses.

21          Q.      The Marquesses were friendly with the

22      realtor for their family?

23          A.      Right.  And I believe she offered to

24      just represent both of us to limit cost.

25          Q.      And that was Lisa Wolschina; right?

J. Mellul                                    28

1      A.      Yes.  Again, I don't recall the details.

2      Q.      Well, let me ask you this, because it is

3   important.  And if you remember, that's fine.  If

4   you don't, that's okay as well.

5              But are you telling me that there

6   was a retention by you and Dr. Mellul of Lisa

7   Wolschina?  And by that I mean that you retained

8   Lisa Wolschina as some kind of joint realtor?

9      A.      I wouldn't use the word retain because

10  that would mean that I'm assuming there's some

11  monetary gain.  We did not pay Lisa anything.

12     Q.      Got you.

13     A.      But she was at closing.

14     Q.      I understand.  Did you -- or strike

15  that.  We'll start with you.

16              Did you know Lisa Wolschina before

17  the closing?  No?

18     A.      She -- just during the house -- when she

19  was showing us the house.

20     Q.      Is it fair to say that that would have

21  been the first time that you dealt with Lisa

22  Wolschina, was at the showing?

23     A.      Yes, I didn't know her.  She didn't show

24  me any other homes.

25     Q.      Now, remind me again, you said that

J. Mellul                                29

1      somebody in your husband's office --

2          A.      Introduced us.

3          Q.      -- introduced you and who?

4          A.      My husband.

5          Q.      No.

6          A.      The Marquesses.

7          Q.      Introduced you -- I want to be sure I'm

8      understanding the chronology.

9                  MS. HILLER-NIMEROFF:  Let him ask

10     the question.

11     BY MR. COOK:

12         Q.      You learned about the listing through

13     your husband who learned through somebody in his

14     office; is that right?

15         A.      (Witness nods head.)

16         Q.      You just have to say yes.

17         A.      Oh, I'm sorry.  Yes.

18         Q.      Who was it in his office that learned of

19     this?

20         A.      His office manager.

21         Q.      And that is who?

22         A.      They don't -- it's been ten years since

23     she's worked there.  So you'll have to ask...

24         Q.      I need to ask you.

25         A.      Schaeffer -- something Schaeffer.

J. Mellul                                30

1       Q.      What's her name?

2       A.      Mrs. Schaeffer.

3       Q.      Mrs. Schaeffer.  Right.  And where is

4    she currently?

5       A.      I have no idea.

6       Q.      When was she -- when did she cease to be

7    the office manager for your husband?

8       A.      Many years ago.  You'll have to ask him.

9    I'm sorry.

10      Q.      That's okay.  Now, Mrs. Schaeffer, was

11   she -- if you know, was she friendly with the

12   Marquesses?

13      A.      They knew each other.  I do not know the

14   extent of their relationship.

15      Q.      And to be clear, neither you nor your

16   husband knew the Marquess family before the

17   closing, before this listing; is that right?

18      A.      That's correct.

19      Q.      Do you know whether Mrs. Schaeffer, I

20   mean, did she give your husband the number for

21   the Marquesses or how did the connection start

22   there?

23      A.      I do not recall.  I believe the house

24   was listed at the time.  We could have

25   potentially called for a viewing and somehow the

J. Mellul                                    31

1        connection was made afterwards versus them -- I

2        don't remember the sequence of events.

3            Q.      That's quite all right.  Approximately

4        how long was it between the time that you started

5        discussions with respect to the purchase of this

6        property and the time that you closed on it?

7                        And by that I mean, you learned of

8        the listing in October, for example, and you

9        closed in January?  Or was it a longer time

10       frame, shorter time frame?  If you remember.

11           A.      I don't remember.  I don't think it was

12       very long.  But I don't think it was overnight

13       either.

14           Q.      That's fine.  Do you have a memory of

15       whether there were other bids on the property?

16       In other words, did you come to learn that there

17       were, or not, other offers on the property?

18           A.      I don't recall.  I don't know the answer

19       to that.

20           Q.      Would it be fair to say that the person

21       primarily responsible for the negotiations and

22       the purchase of the house was your husband?

23           A.      I think he was the primary negotiator.

24       But I was involved at the time.  Again, this was

25       over ten years ago, so I'm sure neither one of us

J. Mellul

32

1       remembers the details precisely.

2                       MS. HILLER-NIMEROFF:  Keep your

3       voice up because sometimes you're trailing off,

4       for the court reporter.

5                       THE WITNESS:  Sorry.

6       BY MR. COOK:

7          Q.      Have you gone back, Dr. Fox, through all

8       of your E-mails, text messages, social media,

9       physical documents, electronic documents, and

10      anything else by way of writings to review

11      everything you have relating to anything

12      concerning your purchase of this property, the

13      flooding issues on this property, the alleged

14      damages?  Have you gone through all of that?

15         A.      Most of it.

16         Q.      What about all of it?

17         A.      Whatever exists that I have privy to,

18      yes.

19         Q.      Do you remember having any E-mail

20      communications or text communications with Mrs.

21      Wolschina in reference to the purchase of the

22      property?

23         A.      I cannot recall that.

24         Q.      Were you of the belief that Mrs.

25      Wolschina was representing you and Dr. Mellul in

J. Mellul                                    33

1        this transaction?

2        A.      No.  I understood that she was

3   representing the Marquesses, and I thought she

4   was just doing us a favor.

5        Q.      In what respect was she doing you a

6   favor?

7        A.      Hopefully looking out for our best

8   interest as well since we did not have a realtor.

9        Q.      And do you believe she did that for you?

10       A.      After the fact, since the flooding was

11  not disclosed, I'm going to say no.

12       Q.      Explain your answer.

13       A.      We were unaware of the flooding that was

14  occurring at our corner prior to purchasing the

15  property.

16       Q.      Fair to say there was some degree of

17  frustration with Mrs. Wolschina?

18       A.      That's anticipated.

19       Q.      Pardon me?

20       A.      I would say yes.

21       Q.      I mean, your testimony is she never said

22  anything to you about the flooding; right?

23       A.      That's correct.

24       Q.      And neither did Mr. or Mrs. Marquess;

25  right?

J. Mellul                                    34

1      A.      That is correct.

2      Q.      Knowing what you know now about

3      conditions at that property, you certainly would

4      have expected the Marquess family to provide you

5      with that information; is that fair?

6                  MS. HILLER-NIMEROFF:  Objection.

7      BY MR. COOK:

8      Q.      You can answer it.

9      A.      I think that's an ethical question.  I

10     would only hope that they were righteous enough

11     to have told us.  I know that my husband and I

12     going forward have not opted to sell the property

13     because we would have wanted to disclose the

14     information to any potential seller (sic).

15                  But again, I cannot speak to their

16     character.  It would have been nice had it been

17     disclosed.

18     Q.      That's fair.  Same question for Mrs.

19     Wolschina.  Knowing what you know now about

20     certain conditions at that property, do you have

21     an expectation that she should have disclosed to

22     you that there was a flooding issue at that

23     property?

24     A.      I understand now it's a legal

25     requirement for realtors to disclose flooding,

J. Mellul                           35

1    potential flooding issues.  So had it been in

2    place back then, I would have expected her to

3    tell me, yes.

4        Q.    Sitting here today, do you have regrets

5    in the fact that you and Dr. Mellul did not use a

6    realtor in this transaction?

7        A.    The realtor would had to have been aware

8    of the flooding situation as well for that to

9    have benefited us.  So I cannot answer that

10   question.

11       Q.    Well, would you have had an expectation

12   that a realtor in the regular course of due

13   diligence would have conducted at least some

14   degree of research to see whether there was any

15   potential flooding issues?

16                MS. HILLER-NIMEROFF:  Objection.

17   BY MR. COOK:

18       Q.    You can answer it.

19       A.    That's conjecture as far as the ability

20   and competency of the realtor that we did not

21   hire at the time.

22       Q.    After you closed on the property,

23   Dr. Fox, did you and Dr. Mellul obtain

24   homeowner's insurance?

25       A.    Yes.

J. Mellul                               36

1     Q.    Do you know who your -- well, is it the

2     same homeowner's carrier today?

3     A.    I think we changed along the way.  So I

4     don't... I don't remember.

5     Q.    That's okay.  That's okay.  I'm going to

6     add that to my list because I do want to know who

7     your homeowner's carriers were since you

8     purchased the property.  Do you understand that?

9     A.    Sure.

10    Q.    I'll follow-up with Ms. Hiller.  Okay?

11    A.    Yeah.

12    Q.    At any point in time since you closed on

13    this property, and Dr. Mellul, have you ever

14    obtained flood insurance?

15    A.    That came years later, yes.

16    Q.    Approximately when?

17    A.    After the bigger storm in 2019, I want

18    to say.

19    Q.    And do you still have flooding insurance

20    to this day?

21    A.    Yes.

22    Q.    Is that through FEMA?

23    A.    I do not know.

24    Q.    So we'll add that to the list.

25          In the time since you and

J. Mellul                          37

1      Dr. Mellul closed on the property, have you --

2      and by you I mean a collective you, you or him --

3      have you submitted any claims to any insurance or

4      flooding carrier?

5          A.    To a flooding carrier?

6          Q.    Really -- maybe it was more complicated

7      than it had to be.  I'm just asking whether you

8      submitted any insurance claims on the property in

9      connection with flooding concerns.

10         A.    We did recently.

11         Q.    Okay.

12         A.    That was after the 2023 flood.

13         Q.    Any others?

14         A.    (Witness nods head.)  Not that I can

15     recall.

16         Q.    Not that you can recall?

17         A.    Roofing stuff, but as far as flooding,

18     2023.

19         Q.    So we'll go back and just be sure.  It

20     may actually be in the Interrogatories, but we'll

21     look at that.

22               I'm showing you, Dr. Fox, what has

23     been marked as Mellul-11.  And this is a deed.

24     It was prepared by Hilary Fuelleborn, Esquire,

25     H-I-L-A-R-Y, of Yorkway Law Group.  It's a

J. Mellul                                    38

1        six-page document.  I obtained this from the

2        County of Camden.  And it is between you and,

3        Dr. Mellul and yourself, again bearing a date of

4        March 29, 2024; is that right?

5        A.    Yes.

6        Q.    It appears that this was a deed which

7        transferred the property of 80 Chews from you and

8        Dr. Mellul as husband and wife to you for a sum

9        of one dollar.  Do you see that?

10       A.    Yes.

11       Q.    So am I correct that since March 29 of

12       2024, you have been the sole owner of 80 Chews;

13       is that right?

14       A.    Yes.

15       Q.    Why was this transfer made as of March

16       29 of 2024?

17       A.    My husband started a -- he ventured off

18       to a side business.  And we just wanted to

19       protect our assets.

20       Q.    And that side business was what?

21       A.    It was Haddonfield Development.

22       Q.    Haddonfield Development Corporation?

23       A.    Uh-huh.

24       Q.    Yes?

25       A.    Yes.

J. Mellul                          39

1       Q.      When was Haddonfield Development

2    Corporation formed?

3       A.      You'll have to ask him the exact date.

4    I was not involved.

5       Q.      Do you have an understanding of

6    approximately when that was formed?

7       A.      Two years ago.  2023.

8       Q.      Who are his partners with Haddonfield

9    Development Group?

10      A.      I believe it's Victor Palladino.

11      Q.      Anyone else?

12      A.      Not to my knowledge.

13      Q.      Was there a particular circumstance that

14   led to a concern by Dr. Mellul that he needed to

15   protect the asset of your property?

16      A.      No.  I think it was more me just being

17   nervous with what ifs and concerns.

18              MR. COOK:  Can you read that back,

19   please.

20                          - - -

21              (Whereupon the pending answer was

22   read back by the reporter.)

23                          - - -

24   BY MR. COOK:

25      Q.      Isn't it true that your husband ran into

J. Mellul                                          40

1       a very serious problem with a property that he

2       was seeking to develop on Homestead Avenue?

3                       MS. HILLER-NIMEROFF:  Objection.

4       BY MR. COOK:

5           Q.    You can answer it.

6           A.    I'm not aware of that, and that was not

7       part of the reason the transfer was done.

8           Q.    You're aware that he was at least at one

9       point in time a partner involved in the

10      construction of a property on Homestead Avenue?

11          A.    Yes.

12          Q.    The property that has long languished

13      with a litany of problems in its construction and

14      development?

15                      MS. HILLER-NIMEROFF:  Objection.

16      BY MR. COOK:

17          Q.    You can answer it.

18          A.    You'll have to ask him about that.

19          Q.    I will.  Is it correct that that

20      Homestead property has been the subject of

21      potential litigation due to the multiple issues

22      associated with its development?

23                      MS. HILLER-NIMEROFF:  Objection.

24          A.    Honestly, I don't think there's any

25      mention of litigation.  I haven't heard of any

J. Mellul                                    41

1       litigation.

2           Q.      Okay.  You know what property I'm

3       talking about, though; right?

4           A.      Yes.

5           Q.      What do you know about that property --

6                   MS. HILLER-NIMEROFF:  Let him

7       finish his question.  Can you repeat the

8       question, please?

9       BY MR. COOK:

10          Q.      Sure.  What do you know about that

11      property and the issues at that property?

12          A.      I don't know much about the details.

13          Q.      Well, tell me what you do know.

14                  MS. HILLER-NIMEROFF:  Bill, I will

15      allow her to answer this question.  But this

16      whole line of questioning I think is irrelevant

17      to this lawsuit.  So I'm going to give you some

18      latitude.  But I think that, you know, it's

19      certainly going down an irrelevant path.

20          A.      You'd have to ask my husband.

21                  MR. COOK:  Well, you can object to

22      the relevance.

23      BY MR. COOK:

24          Q.      But you can answer it, ma'am.

25          A.      I wasn't involved in the day-to-day.  So

J. Mellul                                    42

1     you're going to have to ask my husband those

2     questions.

3          Q.     I will be asking him those questions.

4     But what I want to know is what you know about

5     that property and the issues of that property,

6     which were long-standing and continuing before

7     you transferred this property of yours into your

8     name.  That's what I need to know.

9                    MS. HILLER-NIMEROFF:  Objection.

10    If you know.

11         A.     I don't honestly know, I mean, the

12    details.  I really don't.

13         Q.     What is it that you know about the major

14    issues with that Homestead property?

15         A.     Just -- I'm going to infer from what I

16    have seen, is that the buyers were requesting way

17    more than what the contractors were able to do

18    for the price that was originally negotiated.

19                    They were very unreasonable with

20    their demands and their changes and what they

21    expected.  And that's all I know.

22         Q.     What exactly was the interest of your

23    husband in that property?  Was it that he

24    purchased it with Mr. Palladino?

25                    MS. HILLER-NIMEROFF:  Objection.

J. Mellul                           43

1        I'm going to stop this line of questioning.

2                    MR. COOK:  On what basis?

3                    MS. HILLER-NIMEROFF:  This has

4        nothing to do with this lawsuit.

5                    MR. COOK:  That's not an issue of

6        instruction not to answer.

7                    MS. HILLER-NIMEROFF:  Well, it's

8        irrelevant.  It's irrelevant.  Listen, if you

9        want to discuss -- ask these questions to

10       Dr. Mellul, you know, that's for another day.  If

11       that's even permitted.

12                   MR. COOK:  It's not even an

13       appropriate objection.

14                   MS. HILLER-NIMEROFF:  It's

15       irrelevant and I'm going to stop this line of

16       questioning.

17                   MR. COOK:  Then I will have to file

18       a motion.

19                   MS. HILLER-NIMEROFF:  Okay.

20                   MR. COOK:  I am going to have to

21       file a motion to compel testimony and to bring

22       Dr. Fox back to discuss this, which is -- we are

23       entitled to our theory of the case.  We are

24       entitled to our deposition testimony here and

25       examination as to why this property of 80 Chews

J. Mellul                                    44

1    was deeded out on March 29th of 2024, when

2    Dr. Mellul was facing a very serious litany of

3    issues related to this Homestead property.

4      A.    We weren't --

5              MR. COOK:  Excuse me.  That is fair

6    game.  That is not a proper basis for objection.

7              MS. HILLER-NIMEROFF:  I completely

8    disagree with what you put on the record.

9              MR. COOK:  You can disagree all you

10   want.  It's not a basis to --

11             MS. HILLER-NIMEROFF:  That's fine,

12   if you would like to file a motion, go ahead.

13             MR. COOK:  All I'm trying to --

14   just get a direct answer as to what the witness

15   knows about this.

16             MS. HILLER-NIMEROFF:  She just said

17   she didn't know details.

18     A.    I --

19             MS. HILLER-NIMEROFF:  Stop.  Stop.

20     A.    Okay.

21             MR. COOK:  And then I followed up

22   to that, what was Dr. Mellul's interest in this

23   property.  It was a very simple question.  Was he

24   a buyer, was he a developer, what was he.  That's

25   all I was asking.  I'm ready to move on.  That's

J. Mellul                              45

1      all I was trying to determine.  What was his

2      interest in the property, what was Palladino's

3      interest in the property.

4                  MS. HILLER-NIMEROFF:  Well,

5      interest can be interpreted in different ways.

6      So if you clear up your question, maybe you can

7      ask it.  We'll see.

8                  MR. COOK:  I think it's pretty

9      understandable.

10                 MS. HILLER-NIMEROFF:  I don't know,

11     are you talking percentage interest?  Or what

12     role they played?  I mean, it could be subject to

13     numerous interpretations, Bill.  So I don't know

14     what you're asking.

15                 MR. COOK:  It could be.  Well, the

16     issue is what the witness understands, not you.

17                 MS. HILLER-NIMEROFF:  So it's a

18     guess?

19                 MR. COOK:  You know, Jennifer, you

20     can object to the form at this point.  Here is my

21     question.

22                 MS. HILLER-NIMEROFF:  I object to

23     the form and I object to this whole line of

24     questioning.  If you have one more question about

25     what his role was, then you can ask it.  But

J. Mellul                                  46

1          after that, you know, if you want to continue

2          with this line of questioning, you'll have to

3          file a motion.

4                    MR. COOK:  I have absolutely no

5          idea how you can object to that.

6                    MS. HILLER-NIMEROFF:  That's fine.

7                    MR. COOK:  That's okay.

8     BY MR. COOK:

9        Q.     Here is the thing, Dr. Fox, what was

10        your husband's interest in this property?

11        A.     He was a partner.

12        Q.     He was a partner.  Okay.  He was a

13        partner in the purchase of the property or the

14        development of the property or both?

15        A.     I think both.

16        Q.     Okay.

17        A.     And whatever happened with that property

18        had nothing to do with the transfer of the house.

19        Q.     You told me that he had a concern about

20        protecting the assets --

21        A.     No.

22        Q.     -- of 80 Chews?

23                    MS. HILLER-NIMEROFF:  Objection.

24        That's not what she testified to.

25        A.     That's not what I said.

J. Mellul                               47

1    Q.      I thought you told me that the reason

2    this 80 Chews was deeded out of your joint

3    husband and wife interest to you was to protect

4    assets.

5                    MS. HILLER-NIMEROFF:  Objection.

6    The record will speak for itself.

7                    MR. COOK:  It will speak for

8    itself.

9    BY MR. COOK:

10   Q.      Tell me why it is that you transferred

11   this out with your husband to your name only.

12                   MS. HILLER-NIMEROFF:  She already

13   testified to that.

14   Q.      Answer it, please, ma'am.

15   A.      I chose to do it to protect my assets.

16   It wasn't my husband's decision.  We're both

17   physicians.  And I feel like being a doctor is a

18   secure job.  And I was raised by parents who said

19   the house always have to be on the wife's name.

20                   And it was a joint at first, the

21   house was in both our names.  We were both

22   doctors.  He went off and he started doing

23   another business.  And me myself just wanted to

24   protect me and my children in case maybe there

25   were other future projects he wanted to do.  I

J. Mellul                                    48

1          didn't know.

2                    It had nothing to do with any

3          specifics about his current situation.  It was

4          just me being a woman who actually just wanted

5          the house in her name.

6          Q.    Got it.  Right.  You seem to have had a

7          concern in the fact that he was developing these

8          projects; is that a fair statement?

9                    MS. HILLER-NIMEROFF:  Objection.

10         BY MR. COOK:

11         Q.    You can answer it.

12         A.    There's always a concern when somebody

13         starts something that they had never done before.

14         So I'm a very one step ahead sometimes.  And I

15         just wanted to be one step ahead.

16         Q.    Got you.  Okay.  Thank you.

17                    Is the Haddonfield Development

18         Corporation still an entity that's in business?

19         A.    To my knowledge, no.

20         Q.    When did that terminate?

21         A.    You would have to ask him.  I'm going to

22         say recent.  Maybe, what, 2025 sometime.  If, in

23         fact, it's terminated.

24         Q.    All right.

25         A.    You have to understand --

J. Mellul                           49

1                    MS. HILLER-NIMEROFF:   There's no

2     question.

3     BY MR. COOK:

4       Q.     What do I have to understand?

5       A.     I'm not very involved in my husband's

6     business affairs.   Therefore, I want to protect

7     my own.

8       Q.     Well, it certainly seems that the

9     impetus for this transaction was some degree of,

10    I guess, uncertainty as to the impact of Mr. --

11    or Dr. Mellul's continued interest in development

12    is; that a fair question?

13                   MS. HILLER-NIMEROFF:   Objection.

14    It's not a fair question; it's not a fair

15    conclusion.

16                   MR. COOK:   You know, Jennifer, you

17    are not the witness.   And you absolutely know

18    that.

19    BY MR. COOK:

20      Q.     Here is the question, Dr. Fox.   Is it

21    fair to say certainly that this transaction of

22    March 29th of 2024 was motivated by some pretty

23    serious uncertainty and concern on your part by

24    Dr. Mellul's interest in real estate development?

25      A.     Not a serious concern, the answer is no.

J. Mellul

50

1     We were having the discussion even before he

2     purchased those two properties.  So when he was

3     venturing out of his field being a doctor, which

4     is, I believe, a safe economic field, I started

5     bringing up the discussion.

6               So it might have taken a year or

7     two to actually complete the transfer.  But it

8     wasn't something that happened because something

9     terrible happened and we decided to do that.

10    Q.    Got it.  What was the other property

11    that was involved in his ventures?

12    A.    Hinchman.

13    Q.    I think you said there were two

14    properties.  We talked about the Homestead

15    property.

16    A.    Hinchman and --

17    Q.    Pardon me?

18    A.    Homestead and Hinchman, there was a lot

19    on Hinchman.

20    Q.    Hinchman, that's the property that has

21    been sitting vacant for years; is that right?

22    A.    I don't know how long it was vacant for.

23    They purchased it and they have since sold it.

24    Q.    Who's "they"?

25    A.    Haddonfield Development Group.

J. Mellul                    51

1        Q.      That being Dr. Mellul and Mr. Palladino?

2        A.      Yes.

3        Q.      So I'm clear, then, Dr. Mellul and

4    Mr. Palladino through this entity, which is now

5    defunct, Haddonfield Development Corporation

6    purchased the Hinchman property; is that right?

7                MS. HILLER-NIMEROFF:  Objection.

8    BY MR. COOK:

9        Q.      You can answer it.

10       A.      Yes.

11       Q.      They no longer have an interest in that

12   property; is that fair?

13       A.      Yes.

14       Q.      That was sold to Tri-State Development?

15       A.      I don't know who it was sold to.

16       Q.      Who -- do you have any idea or -- strike

17   that.

18                Have you ever heard of Tri-State

19   Development?

20       A.      No.  Maybe in passing, I don't know.

21       Q.      Do you know a James Tarzy?

22       A.      No.

23       Q.      Never heard of the name Tarzy before?

24       A.      (Witness nods head.)

25       Q.      You shrugged your shoulders and are sort

J. Mellul                                    52

1          of hesitating.

2                    Have you ever heard of anyone with

3          the last name of Tarzy?

4              A.     I don't know James Tarzy.  No, I never

5          heard of the name Tarzy.  I could have heard it

6          on TV or in a phone book.  So again, no, I don't

7          know James Tarzy.

8              Q.     What do you know of the -- did

9          Dr. Mellul and Mr. Palladino sell the Hinchman

10         property?

11             A.     I don't know to who or when.

12             Q.     Pardon me?

13             A.     I believe it was sold, yes.  That was

14         sold.

15             Q.     All right.  It was sold.  Do you know

16         who it was sold to?

17             A.     No.  What does this have to do with

18         flooding?

19             Q.     We can certainly agree that as of March

20         29th of 2024, you are the outright and sole owner

21         of 80 Chews Landing Road; is that right?

22             A.     Yes.

23             Q.     Now, you told me that after you closed

24         on the property in 2014, there was some work done

25         on the property.  Do you remember that?

J. Mellul                                53

1    A.      Yes.

2    Q.      What was the nature of the work that was

3    done on the property?

4    A.      We renovated the kitchen, flooring,

5    walls, bathrooms.  Renovations to the first and

6    second floor.  Interior.

7    Q.      Interior only; is that right?

8    A.      Yes.

9    Q.      And then you eventually moved into the

10   property, I think you said several months after

11   the closing; is that right?

12   A.      Yes.

13   Q.      Upon moving into the property, when was

14   the first time that there was a flooding event?

15   A.      So I recall prior to moving in that

16   there was a flooding event, because the garage

17   flooded and our new cabinets were in the garage

18   and they got damp.  So it was before we moved in

19   that something wasn't right.

20   Q.      Got you.  The closing was in 2014.  Is

21   it your testimony that you would have moved in to

22   the property, and by moving in I mean physically

23   moving in, in 2014?

24   A.      Yes.

25   Q.      Do you have a memory if it was in the

J. Mellul                                      54

1         spring --

2            A.      Summer.

3            Q.      It was in the summer.

4                    So sometime between the closing and

5         at some point in the summer of 2014, there was a

6         flooding event where you had not yet moved in,

7         but nonetheless there was some damage to some

8         cabinets that were in the garage; is that right?

9            A.      Yes.

10           Q.      After that happened, what was it that

11        you did, if anything, to address it?  And what I

12        mean by that is, for example, did you reach out

13        to Mrs. Wolschina, did you reach out to the

14        Marquess family to say, hey, we never were

15        disclosed or this was never disclosed to us,

16        anything like that?

17           A.      No.  Maybe we thought it was a one-off

18        back then.

19           Q.      Say that again.

20           A.      I think we thought maybe, oh, this was

21        not a common phenomenon back then prior to us

22        moving in.

23           Q.      Got it.  At any point in time since your

24        ownership, have you ever made any inquiry to Mrs.

25        Wolschina to say, you know, we were never told

J. Mellul                          55

1      this, you never said anything about it, anything

2      like that?

3          A.      No.

4          Q.      When was the next time that you

5      experienced a flooding event of some form at the

6      property?

7          A.      So I can't recall details of dates.

8      Definitely would have been after we moved in.  We

9      were living there.  And we started to notice that

10     even simple rain would cause an immense amount of

11     water accumulation in the streets that would pour

12     down our driveway and flood our garage.

13                 Depending on the degree of the rain

14     and the elevation of the water, it was happening

15     pretty frequently.  I wasn't writing down dates

16     or times.  But it was soon after we moved in.  We

17     weren't on the premises for the first few months.

18         Q.      Say that part again, I'm sorry.

19         A.      While the renovations were going on, we

20     weren't living in the house.

21         Q.      Now, before you closed on the property,

22     you told me that you did -- actually I don't know

23     if I asked this.  Did you do a walk-through of

24     the property?

25         A.      Yeah.

J. Mellul                                          56

1       Q.      Was it one walk-through or more than

2    one?

3       A.      Maybe one or two.

4       Q.      Prior to the closing and at the time of

5    the walk-throughs, did you notice that the

6    curbing at the intersection of Chews and Station

7    seems to be elevated?

8       A.      No.  It didn't dawn on me to pay

9    attention to that.

10      Q.      At some point did you notice that?

11      A.      After we moved in, potentially.  There

12   was a lot of shrubbery.  A lot of shrubbery.

13      Q.      Right.  Prior to the closing, did you

14   notice or observe that the property seems to sit

15   much lower than the street line?

16              MS. HILLER-NIMEROFF:  Objection.

17   BY MR. COOK:

18      Q.      You can answer.

19      A.      I guess, yes.

20      Q.      What do you mean, you guess?  I mean --

21      A.      Yes, it sits lower.

22      Q.      I know, but when was the first time that

23   you noticed that?

24      A.      Probably after rain.  After the flooding

25   started.

J. Mellul                          57

1      Q.      Okay.

2      A.      Because water would flood down it.

3      Q.      Well, before you closed on the property,

4   did you ever at least take notice that when

5   you're driving by the property, either on Chews

6   or Station, that that property sits very much

7   below the street line?

8              MS. HILLER-NIMEROFF:  Objection.

9   BY MR. COOK:

10     Q.      Is that something that you noticed

11  before the closing?

12     A.      Very much below, no.  It didn't -- I

13  wasn't too bothered by it to take notice.  The

14  house was very beautiful and that's really what

15  struck me.

16     Q.      Do you agree with the statement that the

17  property sits very much below the street line at

18  Chews from the perspective of Chews and Station?

19     A.      Yes.  The property sits below.

20     Q.      And do you have an understanding that

21  that is how the property was originally

22  constructed?

23     A.      I believe that's how the property was

24  originally constructed.

25     Q.      Well, then, what is it -- do you believe

J. Mellul                                    58

1        that the property has --

2            A.      Sunken?

3            Q.      -- moved downward?

4            A.      I have no idea.

5            Q.      Have you ever done any research to go

6        back and determine who built the property?

7            A.      No.  But you can ask my husband.  He

8        might have.

9            Q.      Sitting here today, do you have any idea

10       who constructed the property?

11           A.      I've heard of the name Canuso Builders,

12       I'm not sure if they're the ones that built it.

13           Q.      What about Three Guys Associates, do you

14       have any idea who that is?

15           A.      No.

16           Q.      Have you ever heard of that entity

17       before?

18           A.      Not to my knowledge.

19           Q.      Has Frank Tedesco ever told you that he

20       was involved in the purchase of that subdivision?

21           A.      No.

22           Q.      Is today the first time that you're

23       learning that Frank Tedesco was a partner with

24       Three Guys Associates?

25                   MS. HILLER-NIMEROFF:  Objection.

J. Mellul                                59

1      BY MR. COOK:

2          Q.      You can answer.

3          A.      Yes.  But I don't know who Three Guys

4      Associates is.

5          Q.      I'm sorry, I can't hear you.

6          A.      I don't know who Three Guys Associates

7      is.

8          Q.      Am I correct that Frank Tedesco never

9      told you that he was one of the partners who

10     purchased the subdivision of both your property

11     and his in or about 1984?

12         A.      No.  I did not know.

13         Q.      Were you aware before today that your

14     property at 80 Chews and Mr. Tedesco's property

15     at 315 Station were part of a 1984 subdivision?

16                 MS. HILLER-NIMEROFF:  Objection.

17     BY MR. COOK:

18         Q.      You can answer.

19         A.      No, I do not know.

20         Q.      Were you aware before today that your

21     property at 80 Chews and Mr. Tedesco's property

22     at 315 Station were built in or about 1984?

23         A.      Yes.  I was aware my property was built

24     in the 1980s.

25         Q.      Since you moved into the property, you

J. Mellul                               60

1        told me that -- actually even before you moved

2        in, but after you closed on the property, there

3        was an initial flooding event that you told me

4        about where there was some cabinets damaged.  Do

5        you remember that?

6            A.      Yes.

7            Q.      And then I think you told me that after

8        that there was another flooding event.  Would

9        that have been in 2014?

10           A.      I had said that after we moved in in

11       2014, physically moved in, we noticed flooding on

12       a regular basis.

13           Q.      Now, would that have been in 2014, that

14       same year, or would it have been at some year

15       thereafter?

16           A.      No, it would have been in 2014.  Because

17       every time it rains, our property would flood.

18       Most of the time.  I'm sure it rained in 2014.

19           Q.      Pardon me?

20           A.      I'm sure it rained in 2014.

21           Q.      Absolutely.  But I guess what I'm

22       getting at is, the next time that you remember

23       there being some event where you sustained

24       flooding, and by that I mean into the property,

25       the residence, that would have been in 2014?

J. Mellul                                        61

1     A.      Yes.

2                   MS. HILLER-NIMEROFF:  When you say

3     residence, do you also mean the garage?

4                   MR. COOK:  Yes.

5     A.      Yes.

6     Q.      That's a fair question.  I'm going to

7     define that.  What I mean as residence, I mean

8     anything interior of the structure; is that fair?

9     This is going to be my definition.

10    A.      For sure.  That is fair.  Because in

11    2014, my husband had to purchase 30 sand bags.

12    And every time it would rain, run out with heavy

13    sand bags to cover the driveway and then remove

14    the sand bags.  And this happened almost

15    immediately after we moved in.  So he was trying

16    to protect our house in 2014.

17    Q.      I understand.  And we can agree that

18    this flooding has occurred obviously since that

19    time; is that right?

20    A.      On a regular basis.

21    Q.      Now, are you able to tell me, if you

22    know, whether the frequency of these flooding

23    events, and I'm defining this to be situations

24    where you have water coming into some portion of

25    your house, including the garage, has the

J. Mellul                                    62

1      frequency increased since you moved in in 2014,

2      decreased or stayed about the same?

3          A.    I mean, it's a constant stressor.  So I

4      want to say about the same.

5          Q.    Have you gained some understanding of

6      when it is that it will actually make it into the

7      house?  And what I mean is do you do any type of

8      sort of we have a rainstorm, it's going to be a

9      more serious rainstorm, we're likely to get water

10     in the house.  Do you have anything that goes

11     into that that you sort of use as a rule of

12     thumb?

13         A.    If it's going to rain, one of us does

14     not leave the property.  Okay.

15         Q.    Now, over the course of time, and you've

16     been in the property now for about, I guess, 11

17     years, have you had an opportunity to take a look

18     outside and see how these events unfold?

19               And what I mean by that is this.

20     Have you ever stood by a window and say I'm going

21     to see kind of how this water starts to rise and

22     then end up where it is.  Have you ever done

23     that?

24         A.    Yes.

25         Q.    Can you describe for me in your own

J. Mellul                                    63

1      words how it is that one of these events will

2      progress from the start of the rain --

3          A.      Right.

4          Q.      -- until the point where you experience

5      water --

6          A.      Right.

7          Q.      -- into your residence.

8          A.      So I usually see Station filling up with

9      water.  And Chews filling up with water.  And

10     depending on where our curb is with the road, as

11     the water level rises, it would then start to

12     come over onto our property.

13                 It would rise so high that if there

14     is a 2-foot curb, it would rise above that.  And

15     if cars are driving by, they usually try to get

16     through at high speed, it would cause a tsunami

17     on top of that onto the property.

18                 So with heavy rains, I would see

19     the water level rise on Station, the water level

20     rise on Chews, and it would come over.  Sometimes

21     from hydrostatic pressure it would come into our

22     basement.

23                 The water would come over to the

24     point where our house is surrounded 360 degrees

25     by water, so it would be impossible not to get

J. Mellul                                    64

1      into the house.

2          Q.      I understand.  Are you done explaining

3      to me, in general terms at least, how you see

4      these events start and unfold?

5          A.      Yes.

6          Q.      Now, you told me that the first stage of

7      these types of events is that you see water out

8      on Station and Chews.  That's what you told me;

9      right?  Correct?

10         A.      Yes.  I mean, it comes from other areas.

11     But I'm usually looking out Station and Chews.

12         Q.      I'm going to ask a more specific

13     question, and if you can answer it, you can, if

14     you can't, you can't.

15                 Do you have any recollection or

16     sort of observation as to whether the start of

17     the flooding will start on Chews versus Station?

18                 In other words, I'm starting from

19     like point zero of a storm.  Do you notice that

20     the water starts to accumulate on Chews and then

21     onto Station, or Station onto Chews, or something

22     else?

23         A.      So it's such -- it's a corner that's --

24     if it's happening on one, it's kind of happening

25     on the other.  But I've seen water come out of

J. Mellul                                    65

1     the storm drains there.  It is not only coming

2     from the rain and coming from the streets but

3     it's coming out of the storm drain.

4         Q.     Tell me about that part of it, what you

5     have seen there.

6         A.     Bubbling of water coming out.  It's

7     coming from every angle.

8         Q.     I got it.  Now, in terms --

9         A.     And we live right on the corner, so it's

10    happening both.

11        Q.     You have Station in front and then Chews

12    to the side; correct?

13        A.     Right.

14        Q.     Your property, in your own words, is --

15    the front door is on Station; is that right?

16        A.     No.  The front door is on Chews.  But

17    the driveway is on Station.

18        Q.     Right.  So if we were going to your

19    house, going on your driveway, but the entrance,

20    the front door entrance actually faces Chews

21    Landing; is that right?

22        A.     Yes.

23        Q.     We're going to take a break.  We've been

24    going for a while.  We'll take a break for about

25    ten minutes and then we'll restart.  Okay?

J. Mellul                                    66

1      A.      Sure.

2                  (Recess taken.)

3    BY MR. COOK:

4      Q.      Dr. Fox, getting back to the home

5    inspection which we talked about earlier, did you

6    yourself attend that home inspection?

7      A.      No, I don't think I was there.  I don't

8    remember.  But I don't think I was there.

9      Q.      Do you know if your husband was?

10     A.      I don't remember.  But I think -- I have

11   no idea.  I honestly don't remember.

12     Q.      Did you become aware at some point that

13   that inspection revealed mold-like substance in

14   the basement?

15     A.      Yes.

16     Q.      Did you know that before you purchased

17   the property?

18     A.      It was in the inspection.

19     Q.      So I guess my question is this.  Did you

20   review the inspection before you closed on the

21   property?

22     A.      Yes.

23     Q.      So you were aware before you closed on

24   the property that there was molding in the

25   basement; right?

J. Mellul                          67

1        A.      Yes.

2        Q.      Including a molding in the sheathing and

3    the framing of the property?

4                MS. HILLER-NIMEROFF:   Objection.

5        A.      That, I do not recall.

6        Q.      Were you aware that under the inspection

7    report, and this is located at Page MELL 380,

8    this is in reference to service repair areas.

9    And I have that on the screen.  Do you see that?

10       A.      Yes.

11       Q.      In fact, it's actually on 378.  We're

12   going back to 378.  We're looking at service

13   repair areas, basement.  Do you see that?

14       A.      Yes.

15       Q.      And the report indicates under comment,

16   "mold-like substances on the subfloor/framing

17   surfaces are a definite indication of water

18   issues at some point in time."

19               Do you see where I'm reading?

20       A.      Yes.

21       Q.      So you were aware of that before you

22   moved into the property; right?

23       A.      Can I say more than yes or no or should

24   I just say yes or no?

25       Q.      Well, the question is you were aware of

J. Mellul                                              68

1     this before you moved into the property; right?

2          A.      Yes.  Wet basement.

3          Q.      Pardon me?

4          A.      We just assumed it was a damp basement.

5          Q.      I'm really having a problem hearing you.

6     Can you say that again?

7          A.      Yes.  But not that there was flooding

8     from the street into the basement.  We just

9     assumed that, oh, maybe, there was some dampness

10    in the basement, there was a little bit of mold.

11         Q.      Got it.  Well, you were also aware prior

12    to the closing that there had been a failed sump

13    pump, a leaking water heater, boiler leaks from

14    the plumbing, damaged sewer lines, and water

15    entering the foundation walls.  You were aware of

16    all that; right?

17         A.      I -- it's in the report, so I'm going to

18    say yes.  But we were -- just assumed that this

19    was nothing significant.

20         Q.      Well, you also were aware before you

21    purchased the property that there was poor

22    grading, poor roof drainage techniques, open

23    water joints, and damaged foundation to the wall.

24    You were aware of all that; right?

25         A.      In a small area of the basement.  It

J. Mellul                          69

1        wasn't a large area.  We just, again, did not

2        think this was from massive water flooding every

3        surface of the house from the outside.  That was

4        not brought to our attention.

5            Q.    Well, did you ask about it?  Did you

6        follow up with the --

7            A.    You would have to ask my husband.

8            Q.    Doctor, I know that you may anticipate,

9        but it's very important that you wait until I

10       finish my question.

11           A.    Sorry.

12           Q.    Do you understand that?

13           A.    Yes.

14           Q.    Did you ask anyone, the home inspector

15       or anyone else about these issues that were

16       clearly identified in the home inspection report,

17       that there had been a definite indication of

18       water issues?  Do you have any memory of asking

19       anybody about that before you closed on the

20       property?

21               MS. HILLER-NIMEROFF:  Objection.

22       You can answer.

23           A.    I'm going to assume since my husband

24       took care of this that he had a conversation with

25       the inspector.  Again, if it was anything

J. Mellul                                70

1      significant, we would not have closed.  To my

2      understanding at the time, this was minor, small

3      issues that was easily fixed with some remedy.

4          Q.     Here is my question.  Who told you that

5      these were minor issues?

6          A.     The homeowner inspector did not make it

7      seem like this was anything big.

8          Q.     Well, they indicate here, don't you

9      agree, that the issues that caused the water

10     entry and subsequent mold-like substances must

11     also be corrected.  Do you see where I'm reading?

12              I'm standing up to point to the

13     section under comment.  "The issues that caused

14     the water entry and subsequent mold-like

15     substances must also be corrected."

16              Do you see where I'm reading?

17         A.     Yes.

18         Q.     That was in the inspection report;

19     correct?

20         A.     Yes.

21         Q.     Which you reviewed before the closing;

22     correct?

23         A.     Yes.

24         Q.     Did you follow up with the home

25     inspector or anyone else to say what is it that

J. Mellul                    71

1      we need to do to correct these issues of water

2      entry and subsequent mold?

3          A.    I'm sure my husband did, and I'm sure

4      whatever was recommended was done at the time.

5          Q.    Well, let me break that down.  I have to

6      really caution and instruct you.  You cannot

7      assume.  Do you understand that?

8          A.    Okay.  My husband was the one that was

9      communicating regarding the inspection and making

10     sure everything was adequate.  So knowing my

11     husband, I'm sure there was a conversation about

12     this.

13         Q.    Let me ask you this.  Do you have a

14     memory of your husband telling you that he, in

15     fact, had followed up with the home inspector to

16     further evaluate how it is that these issues that

17     have caused water entry and subsequent mold

18     should be corrected?  Do you have any memory of

19     him saying that to you?

20         A.    I remember there being a little bit of

21     mold that was made not a big deal about from the

22     homeowner inspector.  That's what I remember in

23     the basement.

24         Q.    Well, are you saying that there was a

25     conversation with the home inspector about the

J. Mellul                                        72

1      mold?

2          A.      I'm assuming from the report.

3          Q.      I don't want you to assume.

4          A.      I can't answer.  I was not involved in

5      this.  My husband took care of this part.

6          Q.      Okay.  You certainly did not have any

7      conversation with the home inspector?

8          A.      No, I definitely did not.

9                  MS. HILLER-NIMEROFF:  Let him

10     finish, please.

11     BY MR. COOK:

12         Q.      Please make sure I am finished my

13     question.

14                 Dr. Fox, you had no conversation

15     yourself with the home inspector?

16         A.      No.

17         Q.      Of any kind; is that right?

18         A.      Of any kind.

19         Q.      Pardon me?

20         A.      Of any kind.

21         Q.      Turning further in the inspection report

22     to Page 380.  By the way, I think you may have

23     told me this already, but this home inspector was

24     retained through Lisa Wolschina; right?

25         A.      I said I think.  I don't know.  You

J. Mellul                          73

1      would have to ask my husband.

2          Q.      Let's go up for a second.  I'm looking

3      at the first page, it references Steve Mellul,

4      and then Lisa Wolschina, Keller Williams.  Do you

5      see that?

6          A.      Yes.

7          Q.      And that's all under referral

8      information.  Do you see that?

9          A.      Yes.

10         Q.      Do you actually remember meeting with a

11     gentleman Charles Chick Torrence,

12     T-O-R-R-E-N-C-E?

13         A.      I remember the name.

14         Q.      How do you remember that name?

15         A.      He was the homeowner inspector.

16         Q.      Under the definition of limitations,

17     this is at Page 369 of this same exhibit, there's

18     a reference to service/repair.  And I have my

19     cursor around it.  Do you see that?

20         A.      Yes.

21         Q.      And service/repair is defined as, "an

22     item in need of immediate repair/has material

23     defects.  Also noted may be some inaccessible

24     items or items not working."

25                      Do you see that?

J. Mellul                          74

1      A.      Yes.

2      Q.      And I'll represent to you, in fact, show

3  you that the items that we just talked about as

4  far as the mold in the basement, at Page 378, are

5  under service repair areas.  Do you see that?

6      A.      Yes.

7      Q.      Am I correct that you had an

8  understanding prior to the closing that these

9  concerns with the mold in the subfloor and the

10  framing surfaces were material defects?  Is that

11  something that you understood?

12      A.      I don't remember or recall.

13      Q.      Let me ask you this.  Do you have any

14  memory prior to the closing of the water entry

15  and mold issues that were clearly identified in

16  this home inspection report of having -- those

17  having been corrected prior to the closing?

18              MS. HILLER-NIMEROFF:  Objection.

19  You can answer.

20  BY MR. COOK:

21      Q.      You can answer.

22      A.      Again, you have to ask my husband.  I

23  don't know what him and the Marquesses negotiated

24  prior to closure.

25      Q.      What about after the closing, do you

J. Mellul                                    75

1     have any knowledge or understanding as to whether

2     any of these very serious material issues that

3     were identified in the home inspection report,

4     whether they were ever corrected?

5                    MS. HILLER-NIMEROFF:  Objection.

6     BY MR. COOK:

7        Q.     After the closing.

8                    MS. HILLER-NIMEROFF:  Objection.

9        A.     We would not have moved in with any

10    mold.  I was pregnant.  So any mold would have

11    had to have been rectified before we moved in.

12       Q.     You told me that there was some interior

13    work that was done after the closing.  Do you

14    remember telling me that?

15       A.     Yes.

16       Q.     Did that interior work include

17    remediation of the basement, and more

18    specifically mold-related remediation?

19       A.     To the best of my knowledge, anything

20    associated with mold was remediated before

21    closure.

22       Q.     And that would have been done, then, by

23    the Marquess family?

24       A.     Marquesses, to the best of my knowledge.

25       Q.     Okay.  What about the sump pump, do you

J. Mellul                                    76

1      know if that was addressed prior to the closing?

2         A.     I don't know.  I do know that it's been

3      replaced and repaired.  It's not the initial sump

4      pump.

5         Q.     When did that repair --

6         A.     You have to ask my husband.

7         Q.     Continuing on in the report.  This is at

8      Page 380.  Under service repair areas, which were

9      previously defined as areas that are material

10     defects or require immediate response.  This

11     references mold at the top of the page.  This is

12     at 380.  Do you see where I'm circling?

13        A.     Yes.

14        Q.     Under comment, the inspector indicates,

15     "a mold-like substance on the sheathing framing

16     surfaces is most often from inadequate

17     ventilation, although mold-like substances can

18     also form from some form of roof leaks, water."

19              Do you see where I'm reading?

20        A.     Yes.

21        Q.     Continuing on at 384.  You told me you

22     don't remember when the sump pump was -- or

23     whether it was replaced before or after the

24     closing; is that what you told me?

25        A.     I don't know.

J. Mellul                                77

1      Q.      Turning to 387.  This is under concern

2   areas of the report.  And let me go back to the

3   beginning under definitions.

4              I'm at Page 2 of the report which

5   is cross-reference of MELL, M-E-L-L, 369.  This

6   is under definitions, report definitions,

7   limitations.  Concern is defined as "an item that

8   will require immediate maintenance or should be

9   carefully monitored, maintained to avoid larger

10  problems.  Concern areas may have minor

11  inexpensive repairs or issues/material defects.

12  Concern areas also include budgeting for

13  replacement of aged systems (furnace, roof, et

14  cetera)."

15             Do you see where I'm reading?

16     A.      Uh-huh.

17     Q.      Yes?

18     A.      Yes.

19     Q.      We then turn to Page 387, which is at

20  Page 18 of the -- actually, it's Page 20 of 55 of

21  the report.  Under grading landscaping.  Top of

22  the page, it states, "a negative pitch, a level

23  pitch, or an improper positive pitch was noted

24  within 10 feet of the foundation at the perimeter

25  of the home which will cause ponding (standing

J. Mellul                            78

1    water) and eventual water entry into the

2    foundation."

3                Do you see where I'm reading?

4    A.    Uh-huh.  Yes.

5    Q.    So you and Dr. Mellul were very well

6    aware prior to the closing on this property that

7    there was an improper pitch associated with this

8    property; is that right?

9                MS. HILLER-NIMEROFF:  Objection.

10   BY MR. COOK:

11   Q.    You can answer.

12   A.    No.

13   Q.    Well, did you read this portion of the

14   report?

15   A.    I did, but that shows you a small little

16   window.  It doesn't show about the grading of the

17   entire property.

18   Q.    Did you know one way or the other

19   whether these improper pitch issues were

20   addressed prior to the closing?

21                MS. HILLER-NIMEROFF:  Objection.

22   You can answer.

23   A.    You can ask my husband.  But I know that

24   he's very involved in grading properties.  So I'm

25   not sure what was done.  But again, that's one

J. Mellul                                79

1    small area.

2        Q.    What do you mean that he is very

3    involved in the grading of properties?

4        A.    Once he realized that there was a huge

5    flooding property, he took it upon himself to

6    make sure that he can grade our property to the

7    best of the ability, of its ability.  And it

8    doesn't rectify the flooding problem.

9        Q.    This is something that he knows how to

10   do?

11       A.    Or hired or researched.  Again, you

12   would have to ask my husband.

13       Q.    Do you know one way or the other whether

14   he undertook or utilized any of that experience

15   before -- well, after you closed on this

16   property?

17       A.    No.  It was something that he over the

18   course of the ten years after we moved in, he

19   took upon himself.  So no.  But I don't know how

20   this was rectified after that report was

21   submitted.  You would have to ask my husband.

22       Q.    I will be asking him.

23       A.    And the mold was of the attic, not the

24   basement, in one of the photos.

25       Q.    Got you.  Do you remember either your

J. Mellul                                    80

1    husband or yourself making any inquiry to the

2    Marquesses, Ms. Wolschina or anyone else prior to

3    the closing, what was going to be done to address

4    the grading problems that were identified as

5    concern areas in this inspection report?

6        A.    You would have to ask my husband.  He

7    will know the answer to that.

8        Q.    As a general matter, do you have any

9    knowledge of what was done by the Marquesses

10   after the issuance of this inspection report and

11   prior to the closing, if anything?

12       A.    I believe some mold remediation was done

13   on their part.

14       Q.    And you would have remembered that

15   because you had a personal concern in that you

16   were expecting at the time and you wanted to make

17   sure that was dealt with before you moved into

18   the property?

19       A.    Of course.

20       Q.    Do you remember whether any steps were

21   taken prior to the closing or afterwards to

22   address what is identified in this inspection

23   report as the flower box effect?

24       A.    You would have to ask my husband.  He

25   really was the one that dealt with this.

J. Mellul                                81

1        Q.      Got you.  Do you see that according to

2     this home inspection report, "a concern area was

3     identified as the flower box effect (contained

4     areas) will allow moisture and insects into the

5     foundation.  We recommend removal or sloping the

6     grade away from the foundation."

7              Do you see where I'm reading?

8        A.      Yes.

9        Q.      Do you remember whether or not you or

10    Dr. Mellul made any demand on the Marquesses to

11    address the flower box effect of this property

12    before the closing?

13       A.      I don't recall who addressed it and who

14    paid for it.

15       Q.      Well, do you know whether it was

16    addressed at all?

17       A.      I'm pretty sure that's been addressed.

18       Q.      Well, I want to be specific.  Do you

19    know one way or the other whether that was

20    addressed before the closing?

21       A.      I don't remember.  I really don't

22    remember.

23       Q.      All right.  We're at Page 24 of 55 of

24    the inspection record, MELL 391.  This is in

25    reference to crawl space foundation walls.  Do

J. Mellul                                        82

1          you see where I'm reading here?

2             A.     Uh-huh.

3             Q.     Yes?

4             A.     Yes.  Sorry.

5             Q.     Now, according to this portion of the

6          report, a concern area was identified in the

7          crawl space related to efflorescence.

8                       Do you see where I'm reading?

9             A.     Yes.

10            Q.     And do you acknowledge and understand

11         that according to this home inspection report, a

12         concern area was identified in the crawl space

13         foundation walls with efflorescence being noted

14         on the foundation walls?  Do you understand that

15         that was identified in the home inspection

16         report?

17            A.     Yes.

18            Q.     And did you further understand that the

19         home inspection report had identified that this

20         efflorescence was a whitish mineral deposit often

21         seen on the interior foundation walls.

22                       And that the presence of

23         efflorescence indicates water penetration.

24         Although it does not tell a great deal about the

25         severity of the problem or whether the problem is

J. Mellul                                    83

1    active.

2                    All of this was identified in the

3    inspection report.  Do you understand that?

4        A.    Yes.

5        Q.    Do you have any knowledge one way or the

6    other whether or not this issue of efflorescence,

7    indicating water penetration, whether that was

8    ever followed up on in any way, shape or form

9    prior to the closing?

10       A.    You have to ask my husband.

11       Q.    I'm looking at MELL 396, which is under

12   the section for gutters.  There was a general

13   comment under this section relating to the

14   gutters.  And then under the comment, "90 percent

15   of water penetration issues in a basement crawl

16   space are due to poor grading/roof drainage

17   techniques."

18                   Do you see where I'm reading?

19       A.    Yes.

20       Q.    So you and Dr. Mellul were certainly

21   aware prior to the closing that 90 percent of

22   water penetration issues in a basement crawl

23   space were due to poor grading/roof drainage

24   techniques?

25                   MS. HILLER-NIMEROFF:  Objection.

J. Mellul                              84

1    BY MR. COOK:

2        Q.      Is that fair?

3        A.      I'm assuming that's a general comment

4    that appears on all homeowner inspections.

5        Q.      Well, let me ask you this.  Did you ask

6    anyone to confirm your belief that this was just

7    a general statement as opposed to a specific

8    concern?

9        A.      I have no idea.

10       Q.      Do you remember asking anybody prior to

11   the closing, what was going to be done to fix the

12   clear grading problems on this property?

13              MS. HILLER-NIMEROFF:  Objection.

14   BY MR. COOK:

15       Q.      You can answer.

16       A.      I have no idea.

17       Q.      Let me ask you this.  Prior to the

18   closing, did you believe just looking at the

19   property that there was a major grading problem

20   with the property?

21              MS. HILLER-NIMEROFF:  Objection.

22       A.      I had no idea what a grading issue was,

23   to be honest, before.  It was my first home and I

24   was very naive when I bought it.  So I didn't

25   know what a grading issue was.  I did not know

J. Mellul                                    85

1      that it meant flooding.

2          Q.      I'm going to go through some additional

3      exhibits which I have marked.  Exhibit Mellul-22

4      is a screenshot from Google of a June 2008 photo

5      of 80 Chews.  Do you see that?

6          A.      Yes.

7                  (Mellul-22, June 2008 Google

8      Screenshot, marked for identification.)

9                  MS. HILLER-NIMEROFF:  2008, you

10     said?

11                 MR. COOK:  2008.

12         A.      Yes, I see it.

13         Q.      Have you ever gone back on Google and

14     looked at these various photos of the property?

15         A.      No.

16         Q.      You would agree with me that there are

17     very large number of trees, bushes, et cetera on

18     that property?

19                 MS. HILLER-NIMEROFF:  Objection.

20     BY MR. COOK:

21         Q.      You can answer.

22         A.      Yes.

23         Q.      Is this the first time that you're

24     seeing how many trees and bushes were on this

25     property?

J. Mellul                          86

1      A.      I don't like trees and bushes, so that

2    was one of the things that I didn't love about

3    the property.  But I thought that was the

4    preference of the Marquesses.

5      Q.      Let me ask you about that.  Is that

6    something that you decided just for cosmetic

7    reasons you just don't like trees and bushes,

8    that you might have wanted to have them removed?

9      A.      It was wild ivy.

10     Q.      And so at some point in time, you and

11   Dr. Mellul had that removed?

12     A.      The trees and bushes, most of them.

13     Q.      When did that happen?

14     A.      You would have to ask my husband

15   details.  I can't recall dates.

16     Q.      I don't need like an exact date.  But

17   are you able to tell me -- I mean, you lived

18   there --

19     A.      It wasn't immediate.

20     Q.      Please let me finish the question.

21             Ma'am, you live at this property.

22     A.      Yes.

23     Q.      Can you tell me approximately when it is

24   that you had the trees and bushes removed?

25             MS. HILLER-NIMEROFF:  Objection.

J. Mellul                                    87

1      BY MR. COOK:

2          Q.      You can answer it.

3                       MS. HILLER-NIMEROFF:  Which trees

4      and bushes?

5                       MR. COOK:  She can specify.

6          A.      It was in stages.

7          Q.      Pardon me?

8          A.      It was in stages.  It didn't all happen

9      all at once.

10         Q.      Okay.  Well, when did it start?

11         A.      Probably within the year or two after we

12     moved in, it started.

13         Q.      And what was in that first phase?

14         A.      Probably the ivy.

15         Q.      Anything else?

16         A.      I can't recall the order.

17         Q.      What about the next phase, you said it

18     was stages.  In the next stage, what was removed?

19         A.      We took away some of those big trees.

20         Q.      How many?

21         A.      I don't know.  I can't count.  You would

22     have to have a bigger photo.

23         Q.      Pardon me?

24         A.      I don't know how many.

25         Q.      Was it more than five?

J. Mellul                               88

1    A.    Five large -- some of them are bushes.

2    So you have bush and a tree.  I don't think it

3    was more than five trees.  A lot of those are

4    just bushes.  And some still remain.  So no, I

5    don't think we took off five big trees from the

6    front lawn.  I don't think there were five big

7    trees.

8    Q.    Got you.

9    A.    We still have two, so...

10   Q.    There's a lot more than two here, aren't

11   there?

12   A.    Yeah.  Like I said, a lot of those are

13   bushes.

14   Q.    What about the third phase, when did

15   that -- what was involved in that?

16   A.    I don't know what was part of the third

17   phase.

18   Q.    Are you able to tell me how many phases

19   there were in terms of the removal of trees and

20   bushes?

21   A.    No.  Because over the course of ten

22   years, we did projects slowly.

23   Q.    Got you.  I'll show you what I marked as

24   Mellul-23.

25             (Mellul-23, August 2012 Photograph,

J. Mellul                                          89

1        marked for identification.)

2        BY MR. COOK:

3            Q.      This is a photo from August of 2012.

4        Have you seen this photo before?

5            A.      No.  But there are less trees.

6            Q.      There's a sales sign here, do you see

7        that?

8            A.      Yeah.

9                        MS. HILLER-NIMEROFF:  What year was

10       this photo?  I'm sorry.

11                       MR. COOK:  August of 2012.

12       BY MR. COOK:

13           Q.      Mellul-24 is an August 2013 screenshot

14       from Google.  Do you see that, ma'am?

15                       (Mellul-24, August 2013 Google

16       Screenshot, marked for identification.)

17           A.      What year is this, 2013?

18           Q.      This is August of 2013.

19           A.      Okay.  Yeah, I see it.

20           Q.      You see it?

21           A.      Uh-huh.

22           Q.      Have you ever had occasion to see the

23       August 2013 image from Google of 80 Chews?

24           A.      No.

25           Q.      And I think you told me, again, that you

J. Mellul                                    90

1     purchased the property -- I guess you initially

2     had discussions to purchase the property sometime

3     in late 2013, and then you purchased the property

4     in January of 2014; is that right?

5          A.     Yes.

6          Q.     Looking at this photo and recognizing

7     that it is August of 2013, which would have just

8     been a very few short months before you purchased

9     the property, does this photo at least conform to

10    your recollection of how the property looked

11    prior to your purchase of the property?

12         A.     I wouldn't have recollected ten years

13    ago, but you're showing me a photo, so I'm going

14    to say yes.

15         Q.     You have no reason to disagree that this

16    is --

17         A.     Right.

18         Q.     You have to let me finish, please.

19                You have no reason to disagree that

20    this is generally what the property looked like

21    in the time frame leading up to your purchase of

22    the property; is that fair?

23         A.     That's fair.

24         Q.     Do you remember -- I'm looking at the

25    ivy at the curb.  Do you see that?

J. Mellul                                     91

1      A.      Yes.

2      Q.      That ivy is situated on a -- was that

3   sitting on an elevated curb at that time?

4      A.      I don't know what it is sitting on.

5      Q.      Pardon me?

6      A.      I have no idea what it's sitting on.

7      Q.      Well, do you have a memory of how that

8   ivy was placed?  In other words, was it like

9   almost like an ivy hedge that was a freestanding

10  plant, or was that ivy on top of some type of

11  structure, like a wall?

12     A.      I don't recall.

13     Q.      Towards the right of this photo is --

14  along the curb line -- I'm standing up, for the

15  record.  There is a much larger -- I don't know

16  what this is.  Is that a -- do you remember that

17  being a bush or a tree?

18              MS. HILLER-NIMEROFF:  Objection.

19     A.      Honestly, I think it's a pole surrounded

20  by ivy.

21     Q.      Okay.  Am I correct that after you and

22  Dr. Mellul moved into this property, you had all

23  of that ivy removed?

24              MS. HILLER-NIMEROFF:  Objection.

25     A.      It was not immediate.

J. Mellul                                    92

1              MS. HILLER-NIMEROFF:  Which ivy are

2    you talking about?

3       A.      I think he means on Chews --

4       Q.      Isn't it ivy right in front of the photo

5    here?

6       A.      Yeah.

7              MS. HILLER-NIMEROFF:  But you also

8    said there was ivy on the pole, so I don't --

9       A.      There was ivy all over the property.

10      Q.      And you had all the ivy removed; is that

11   right?

12      A.      At some point.  But the flooding was

13   happening onto our property even in that current

14   stage.

15      Q.      I'm not asking that.  Here is my

16   question.

17              This ivy, we're looking at the

18   front of this photo, you and Dr. Mellul had that

19   ivy removed; right?

20      A.      Can I answer it?  At some point.

21      Q.      Yes.

22      A.      At some point --

23      Q.      Yes.

24      A.      -- after we moved in within the decade

25   that we've been there, yes.

J. Mellul                          93

1      Q.      Can you tell me approximately when you

2      had that ivy removed?

3      A.      No.

4      Q.      Was it within a year after you moved

5      into the property?

6      A.      Maybe within two years.

7      Q.      Okay.

8      A.      Maybe.

9      Q.      Having had that ivy removed in the

10     approximately two years after you moved into the

11     property, what was there?  Was it a curb?  Was it

12     a structure?  What was there?

13     A.      You'll have to ask the contractor or my

14     husband or whoever was there that did the work.

15     I don't know if it was earth.  I don't know what

16     was under the ivy.  Roots, trees, I don't know.

17     Q.      I'm trying to understand this.  This

18     ivy --

19             MS. HILLER-NIMEROFF:  Don't get

20     frustrated.

21             THE WITNESS:  But I don't know what

22     he's asking.  I don't know.

23     BY MR. COOK:

24     Q.      Doctor, this ivy is sitting on

25     something, it's growing on something.  What was

J. Mellul                                    94

1        it growing on?

2                    MS. HILLER-NIMEROFF:  Objection.

3        You can answer.

4           A.     Should I make something up?

5                    MS. HILLER-NIMEROFF:  No.

6           A.     What should I say if I don't know?

7           Q.     You can't ask your attorney that.

8                    What is it sitting on?

9           A.     I don't know.

10          Q.     You don't know?

11                   MS. HILLER-NIMEROFF:  It's been

12       asked and answered, Bill, she doesn't know.

13                   MR. COOK:  I don't think so.

14                   MS. HILLER-NIMEROFF:  I think so.

15       BY MR. COOK:

16          Q.     We're looking now at 80 Chews, a view

17       from the street of July 2018.  This is marked as

18       Mellul-25.

19                   (Mellul-25, July 2018 Google

20       Screenshot, marked for identification.)

21       BY MR. COOK:

22          Q.     Do you see that?

23                   MS. HILLER-NIMEROFF:  Objection.

24       I'm just going to object to your characterization

25       of it.  Go ahead.  Do you see it?

J. Mellul                                    95

1       A.      Yes.

2       Q.      This is a photo taken from Google

3    bearing an approximate date of July 2018.  It's a

4    screenshot.  Do you see that?

5       A.      Yes.

6       Q.      All of those bushes that we were looking

7    at earlier were removed; right?

8              MS. HILLER-NIMEROFF:  Objection.

9       A.      They're no longer there.

10      Q.      Well -- and they were removed after you

11   and Dr. Mellul moved into the property; right?

12      A.      Yes.

13      Q.      So much so that now, as of July 2018, we

14   can see directly through to the Palladino

15   property; right?

16      A.      I think they were doing some sort of

17   construction when they moved in.  I think that

18   was temporary.  Because that's not what the

19   property looked like for a long period of time.

20      Q.      Got it.  Maybe my question was unclear.

21   Let me be more specific.

22              In the prior snapshots that we

23   looked at from June 2008, August 2012, August

24   2013, from the street, you can't even see the

25   Palladino property because there's so many

J. Mellul                                    96

1    bushes, shrubbery and trees.  All of which were

2    subsequently removed by you and Dr. Mellul;

3    right?

4              MS. HILLER-NIMEROFF:  Objection.

5    BY MR. COOK:

6       Q.     You can answer it.

7       A.     This was in the process of us creating a

8    huge berm that surrounded our property, so the

9    trees had to be removed for us to create the

10   berm.

11             So you have a snap there of the

12   design and construction period.  But if you move

13   forward a couple months, you're going to see a

14   wall around our property.

15      Q.     Got it.  Doctor, my question was this.

16             All of the bushes, all of the

17   shrubbery and everything else that was

18   surrounding this property, all of that was

19   removed, with the exception of a few trees, by

20   you and Dr. Mellul; correct?

21             MS. HILLER-NIMEROFF:  Objection.

22   BY MR. COOK:

23      Q.     You can answer it.

24      A.     That side, we share with the Palladinos.

25   So I'm not sure if it was just us or if they were

KATHY BOWE COURT REPORTERS

J. Mellul                                        97

1    involved at the time.  Can I answer?

2        Q.    Let's be sure we have my question right

3    here.  Dr. Fox, isn't it true that after you and

4    Dr. Mellul moved into the property, you and

5    Dr. Mellul removed all of the shrubbery, all of

6    the trees, everything else that was on that

7    property with the exception of two or three

8    trees?

9        A.    No.

10       Q.    Explain your answer.

11       A.    The Palladinos were creating some sort

12   of drainage on that side.  The trees had to be

13   removed.  I believe they removed it.  And we

14   built a wall and a berm.  So the answer is no.

15       Q.    Well, you're referring to the side of

16   the photo on the -- let me finish.  You're

17   referring to the side of the photo on the

18   boundary line between your property and the

19   Palladinos; right?

20       A.    Yes.  Because you asked me why I could

21   see the Palladinos.  There used to be a row of

22   trees.  In the other photo you can't see the

23   Palladinos' home.  You started this by saying,

24   well, now you can see the Palladinos' home.

25                  That was removed for the water

J. Mellul

98

1     problems that were happening in the Township.

2         Q.    So would you agree with the statement

3     that Mr. Palladino removed a ton of trees that

4     were on that boundary line between you and his

5     property?

6                 MS. HILLER-NIMEROFF:  Objection.

7     BY MR. COOK:

8         Q.    You can answer.

9         A.    To create some sort of drainage system

10    because of the flooding that was happening when

11    the trees were in existence.

12        Q.    Right.  Mr. Palladino removed a ton of

13    trees between his property and yours; right?

14                MS. HILLER-NIMEROFF:  Objection.

15    BY MR. COOK:

16        Q.    You can answer.

17        A.    I don't how to define ton.  Do you want

18    to define ton.

19        Q.    All of them.

20        A.    Whatever was there.

21        Q.    He removed them; correct?

22        A.    It might have been something that him

23    and my husband jointly did.  Again, you would

24    have to ask my husband.

25        Q.    Well, let's put it this way.  After you

J. Mellul                          99

1       moved into the property, that whole boundary line

2       between you and Mr. Palladino were filled with

3       trees; right?

4           A.     So I don't know that the trees came all

5       the way to Chews.  I don't know how many trees

6       there were.

7           Q.     Well, there were a lot of them, weren't

8       there?

9           A.     There were.  But there was a lot of

10      water going in that area as well.  So we were

11      trying to elevate the ground.

12          Q.     Tell me what you were trying to do to

13      elevate the ground.

14          A.     We built a berm.

15          Q.     Where is the berm today?

16          A.     Surrounding the property.

17          Q.     All right.

18          A.     So we had to remove what the Marquesses

19      had in place to create something else and make it

20      aesthetic.

21          Q.     That was purpose, to make it aesthetic;

22      right?

23          A.     To create a berm to protect our property

24      because water was coming in as soon as we moved

25      in with whatever the Marquesses had in place.

J. Mellul                                    100

1      Q.      As to the boundary line between you and

2      Mr. Palladino, are you telling me that there was

3      some kind of joint plan between you and the

4      Palladinos to regrade the property?

5      A.      No, I'm not aware of that.

6      Q.      Isn't it true that at some point you and

7      Dr. Mellul threatened a lawsuit against

8      Mr. Palladino for his ongoing development of this

9      property?

10     A.      Not that I'm aware of.

11     Q.      Do you have a memory of your husband,

12     Dr. Mellul, filing a tort claim notice with the

13     Borough of Haddonfield over damages that were

14     caused to your property by Mr. Palladino?

15              MS. HILLER-NIMEROFF:  Objection.

16     BY MR. COOK:

17     Q.      You can answer it.

18     A.      Not that I'm aware of.

19     Q.      By the way, do you have an understanding

20     that Mr. Palladino is no longer the owner of 60

21     Chews?

22     A.      Not that I'm aware of.

23     Q.      How often is Mr. Palladino even there at

24     that property, if you know?

25     A.      I don't know.

J. Mellul                                101

1     Q.     Were you aware that he lives in the

2     state of Florida?

3     A.     I'm aware they have a house there.

4     Q.     Are you also aware that they have

5     another house at the shore?

6     A.     Yes.

7     Q.     Do you know how many houses

8     Mr. Palladino has?

9     A.     No.

10    Q.     Would you agree with the statement that

11    much of the landscaping by way of trees and

12    shrubbery that was on your property, not

13    Mr. Palladino's, but your property, were removed

14    for aesthetic reasons?

15    A.     Can I answer that?

16    Q.     Yes, please.

17    A.     They were not removed for aesthetic

18    reasons.  They were removed for grading purposes

19    to fix the water issues on our property.

20    Q.     Was that according to some

21    recommendation or plan that had been developed?

22    A.     You would have to ask my husband.  He

23    was involved in all that.

24    Q.     Did you and your husband retain any kind

25    of landscaping architect for the purpose of

J. Mellul                                    102

1        constructing this berm?

2            A.     You would have to ask my husband about

3        that.

4            Q.     Well, do you have any knowledge that

5        that ever happened, that there was a retained

6        landscaping architect of some kind to develop

7        this plan for the berm?

8            A.     Perhaps consulted, not retained.  I

9        don't know what was involved.  But my husband is

10       very intelligent when it comes to these things,

11       and he's not going to do something haphazard.

12                  So research was done prior.  You

13       would have to ask him the details.

14           Q.     Got it.  What was the regrading that was

15       done?

16           A.     You would have to ask him the details.

17           Q.     Okay.  I don't --

18           A.     I honestly don't know.  I'm sorry.

19           Q.     Well, don't you live there?

20           A.     I do.  And I come home and I see that

21       work is being done, but I don't sit and ask,

22       well, is this being elevated, is this being

23       lowered.  That's not my area of expertise.  I

24       left it up to my husband.

25           Q.     Dr. Fox, you live here and you're

J. Mellul                                     103

1      telling me you don't know whether your property

2      was somehow graded, regraded, et cetera?  I mean,

3      you live there.

4                  MS. HILLER-NIMEROFF:  Objection.

5          A.    I know it's been graded and regraded,

6      but I can't give you the details of the grading

7      and regrading.

8          Q.    Got it.  Well -- okay.  We're looking at

9      a screenshot.  This is going to be marked as

10     Mellul-26.

11                  (Mellul-26, 80 Chews Screenshot

12     September 2019, marked for identification.)

13     BY MR. COOK:

14         Q.    Do you see that, ma'am?

15         A.    Yes.

16         Q.    This is, I'll represent to you, a

17     screenshot of 80 Chews taken in September 2019.

18     I'm circling it at the top left-hand corner of

19     the screen.  Do you see that?

20         A.    Yes.

21         Q.    Where is the berm system that you're

22     referring to?

23         A.    Do you want me to come and show you?

24         Q.    Please.

25         A.    So we started -- so this is elevated,

J. Mellul                                    104

1        this is elevated, you can't see it from the road.

2        But this small -- not small, but this is all a

3        berm that was in the process of being raised and

4        raised.

5                     So I think maybe the trees were

6        being ordered and not planted yet.  But we

7        started with that.

8            Q.      Got you.  So we'll do this for the

9        record.  And I'm glad that you did that.

10                    You would agree with me that you

11       identified the left-hand side of the photo, which

12       is along Station Avenue, as one portion of this

13       berm system; is that right?

14           A.      Yeah.

15           Q.      And then next you went to the right-hand

16       side of the photo, which is the boundary line

17       between your house and Mr. Palladino as another

18       part of the berm system; is that right?

19           A.      Yes.

20           Q.      And then the last portion you identified

21       was the front of the photo which is along, I'll

22       say along the curb line but just maybe prior to

23       the curb line, as a third portion of the berm

24       system; is that right?

25           A.      Yes.  This is in its process of being

J. Mellul                                        105

1    constructed.

2        Q.     All right.  What was it that was done by

3    way of the -- I'm talking about the front end

4    that borders on Chews.  Are you telling me that

5    there was -- that area was built up in some way?

6        A.     Oh, yeah.

7        Q.     Explain what happened with that.

8        A.     So there -- if you -- in its evolution,

9    if you're going through photos, you will now see

10   that the berm is higher.  It has a row of

11   boxwoods, and now there is a brick wall all

12   along.

13              So this is in the evolution of the

14   steps going to building up the property.

15       Q.     So what we're looking at here, this is

16   in September of 2019, you're telling me that this

17   was -- what we're looking at here was sort of the

18   early stage of the building up of the berm along

19   Chews Landing; is that fair?

20       A.     Yes.

21       Q.     Do you know the name, if you know, of

22   the contractor who installed that berm system?

23       A.     You would have to ask my husband.

24       Q.     As of September 2019, looking at the

25   Station Avenue side, was that in its completed

J. Mellul                                              106

1          form at that point?

2              A.      No.

3              Q.      Same question for the Palladino

4          boundary, is that in its completed form?

5              A.      No.  Because the bushes now are like

6          three times that size.

7              Q.      It was actually a bad question.

8                      Is this after the berm was

9          constructed as to the boundary of the Palladinos?

10             A.      Yes.  That photo doesn't do it justice.

11         It is elevated if you are on the property.

12             Q.      That's okay.  Did you and Dr. Mellul

13         undertake that construction of the berm or was

14         that Mr. Palladino or was it both?

15             A.      You have to ask my husband.  I want to

16         say us.  But I don't know what was negotiated.  I

17         don't know.

18             Q.      Let me ask you this.  Are these bushes,

19         are they your bushes or are they Mr. Palladino's?

20             A.      They're ours.

21             Q.      At the front of the photo, and I'm

22         circling, there's a storm inlet there.  Do you

23         see that?

24             A.      There's a what?

25             Q.      A storm inlet?

J. Mellul                          107

1      A.      A storm drain, yes.

2      Q.      You told me earlier in the deposition

3    that that -- you've seen water coming out of the

4    system, I think, at some point.  Do you remember

5    telling me that?

6      A.      Not that one.  The one on Station.

7      Q.      That's what I was going to ask you.  So

8    what you told me about earlier was in relation to

9    a storm drain on Station Avenue; is that right?

10     A.      Yeah.  Because that's Chews Landing.

11     Q.      Has anyone ever told you that Chews

12   Landing is a county road?

13     A.      Yes.

14     Q.      Who told you that?

15     A.      My husband.

16     Q.      When did he tell you that?

17     A.      Probably in one of his desperate

18   complaints to the Township to try to get them to

19   help us.

20     Q.      Isn't it true that your husband did

21   actually reach out to the County of Camden with

22   respect to concerns with this street?

23     A.      My husband has reached out to so many

24   people in the past decade to help us.  I wouldn't

25   be surprised.  Surprised he hasn't reached out to

J. Mellul                                              108

1     the president.

2          Q.     Let me ask you this.  Have you learned

3     that it is the County of Camden that is

4     responsible for the construction and maintenance

5     of Chews Landing?

6                    MS. HILLER-NIMEROFF:  Objection.

7     BY MR. COOK:

8          Q.     You can answer.

9          A.     Perhaps.  But Chews Landing is not the

10    sole problem.  Station is a huge problem.  We

11    have a hundred acres of water coming down to our

12    property, which has just a few storm drains.  And

13    that's provided by the Township that we pay taxes

14    for.

15         Q.     But my question was actually a little

16    more simple.

17                    Have you been informed that the

18    Chews Landing -- I'm not talking about Station --

19    that Chews Landing is owned, operated and

20    maintained by the County of Camden?  Have you

21    been informed of that?

22                    MS. HILLER-NIMEROFF:  Objection.

23    BY MR. COOK:

24         Q.     You can answer.

25         A.     I've heard about that.  I don't know

J. Mellul                                    109

1          that I've been informed.  But I heard -- that's

2          what I've heard.

3              Q.     Have you ever spoken with any county

4          officials with respect to your concerns relating

5          to issues with Chews Landing?

6              A.     In Haddonfield or Camden?

7              Q.     In Camden County.

8              A.     No, I have not.

9              Q.     Now we're looking at Mellul-27.  This is

10         a screenshot.  It has a date from Google of

11         September of 2022.  Do you see that, Doctor?

12             A.     Yes.

13                    (Mellul-27, September 2022 Google

14         Screenshot, marked for identification.)

15         BY MR. COOK:

16             Q.     What we now see is a -- it looks like

17         brickwork that has been done to the front of the

18         property; is that fair?

19             A.     Yes.

20             Q.     What is that brickwork exactly?

21             A.     Masonry.  What does that mean?  I don't

22         understand your question.

23             Q.     Let's start with this.  When was that

24         installed?

25             A.     Within the past year or two.  Two years.

J. Mellul                                110

1       Q.      And this is 2025.  Well, it would have

2    been installed, what, within a year or two of

3    2022?

4       A.      When was this photo taken?

5       Q.      September of '22?

6       A.      So maybe right around then.  That might

7    be fresh.

8       Q.      And is this -- what was the purpose of

9    installing this brick wall?

10      A.      To protect our property from the water.

11      Q.      Who undertook the construction of that

12   work?

13      A.      My husband hired somebody.

14      Q.      Between the time of the September 2019

15   photo and the September '22 photo, were there any

16   other changes made to this -- to the side of the

17   property on Station or the side of the property

18   on the Palladinos?

19      A.      I don't know.  It's constantly just

20   trying to be built up and built up and built up.

21   So there's constant.

22      Q.      Got it.  Do you know whether your

23   property has a stormwater drainage system within

24   the property?

25      A.      I believe it does in the backyard.

J. Mellul                                    111

1      Q.      It does in the backyard?

2      A.      I believe it does.  And the driveway.

3    Backyard and driveway.

4      Q.      Was that stormwater drainage system

5    installed during the course of your ownership of

6    the property?

7      A.      No.

8      Q.      So that pre-existed your purchase of the

9    property?

10     A.      Yes.

11     Q.      You're not an expert, but do you know

12   what that stormwater drain -- there's actually

13   two systems you're telling me, there's one by the

14   driveway and one in the backyard?

15     A.      They're both towards the back of the

16   house.  My husband knows this all.

17     Q.      That's fine.

18     A.      I believe it's for the backup of the

19   water in the town or to drain our -- I have no

20   idea.

21     Q.      I got it.  Okay.

22     A.      I know that it backs up and it's been

23   backing up for ten years.  No matter how many

24   walls or bushes we put up or take down, it backs

25   up.

J. Mellul                                    112

1       Q.      Got it.  We're going to mark this as

2       Mellul-28.

3                       (Mellul-28, September 2022

4       Screenshot, marked for identification.)

5       BY MR. COOK:

6       Q.      This is a September 2022 screenshot, and

7       it's taken from the intersection of Chews Landing

8       and Station Avenue.  Do you see that, Doctor?

9       A.      Yes.

10      Q.      And it appears to be a continuation of

11      this brick wall system that was installed; is

12      that fair?

13      A.      Yes.

14      Q.      Then according to this photo, we can see

15      a storm drain along Chews.  Do you see that?

16      A.      Yes.

17      Q.      I'm pointing to it for the record.  Then

18      there's another storm drain along -- actually it

19      looks to be two storm grates along Station Avenue

20      on the side of your property; is that fair?

21      A.      Yes.

22      Q.      So when you were telling me earlier

23      about looking at the storm drain, it was this

24      one --

25      A.      Yes.

J. Mellul                                   113

1      Q.      -- on Station?

2      A.      Yes.

3              MS. HILLER-NIMEROFF:  Please allow

4      him to finish his question.

5    BY MR. COOK:

6      Q.      Now, this photo was taken in September

7    of 2022.  And I'm zooming in a little bit on the

8    photo.  Have you since undertaken improvements to

9    this berm system since September of 2022?

10     A.      To what we're seeing right now, the

11   brick wall is even higher.

12     Q.      That was something that was elevated?

13     A.      The water just keeps going over, so we

14   keep having to go higher and higher.

15     Q.      I got it.  All I'm asking is, so there

16   have been changes to this brick wall since

17   September of 2022; is that right?

18     A.      Yes.

19     Q.      Tell me what the changes have been.

20     A.      The brick wall is higher.

21     Q.      Was that as part of a single project or

22   multiple projects?

23     A.      I have to say that it has to do with

24   funds.  When we have enough money, we put it in.

25   So it's -- it's not -- it doesn't happen like

J. Mellul                                    114

1    this.

2        Q.    I'm not suggesting otherwise.  What I'm

3    asking simply is -- I guess my question is this.

4             Comparing the wall today to where

5    it is in this photo of September 2022, you're

6    telling me that wall has -- that brick wall has

7    been elevated; is that fair?

8        A.    More layers of brick have been added.

9        Q.    And was that as part of a single project

10   or was that part of multiple projects since

11   September of 2022?

12       A.    I'm going to say multiple.

13       Q.    And when you say multiple, it's

14   literally -- it's adding to the elevation of the

15   wall?

16       A.    I think one flood it was coming in so

17   bad on Station that we did Station first.  And

18   then maybe another year we added another row to

19   Chews.

20       Q.    The bushes that we're seeing here,

21   they're situated behind the wall; is that right?

22       A.    On a berm.

23       Q.    On a berm.  Okay.  So you have the brick

24   wall but then you also have a berm which is

25   basically elevated ground that you have installed

J. Mellul                                    115

1        as a protective measure; is that right?

2          A.      Yes.

3          Q.      I think we're at a good stopping point

4        for now.  I know you had a 2:30 stop.  The time

5        is currently 2:20.  So I appreciate your time

6        today, Doctor.  We'll have to resume at a later

7        time.  Okay?  It's just, you know, this is a good

8        breaking point for me.  All right.  Thank you.

9                      (Whereupon the witness was excused

10        and the deposition adjourned at 2:20 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

116

 1                    C E R T I F I C A T E

 2

 3     STATE OF NEW JERSEY    :

 4                            :   SS.

 5     COUNTY OF OCEAN        :

 6                    I, Kathleen S. Bowe, a Registered

 7     Professional Reporter, Certified Court Reporter

 8     and Notary Public in the State of New Jersey, do

 9     hereby certify that the foregoing deposition of

10     JODI MELLUL, was taken at the law offices of

11     Brown & Connery, 360 N. Haddon Avenue, Westmont,

12     NJ, on Friday, October 17, 2025; that said

13     witness was duly sworn before the commencement of

14     their testimony; that the testimony of said

15     witness was stenographically taken by myself and

16     reduced to print by the use of computer-aided

17     transcription; that the foregoing is a true and

18     correct transcription of the testimony; that I am

19     not related to or employed by any of the parties,

20     or their attorneys or agents, or interested

21     directly or indirectly in the matter in

22     controversy either as counsel, attorney, agent or

23     otherwise.

24                    *Kathleen S. Bowe*

25                    Kathleen S. Bowe, RPR, CCR
                      License No. 1312 - Notary Public

**'** [1]

**'22** [2] - 110:5, 110:15
**'23** [1] - 16:19

**0**

**08008-4302** [1] - 1:23
**08033** [1] - 2:4
**08054** [1] - 2:11
**08108** [1] - 2:7

**1**

**1** [1] - 4:21
**1/16/14** [1] - 3:23
**10** [3] - 18:24, 19:14, 77:24
**103** [1] - 4:17
**109** [1] - 4:18
**11** [5] - 3:11, 10:4, 15:24, 21:7, 62:16
**112** [1] - 4:19
**11:55** [1] - 1:16
**12** [3] - 10:4, 16:12
**13** [4] - 3:12, 3:13, 16:17, 21:7
**1312** [2] - 1:13, 116:25
**14** [4] - 3:14, 3:16, 3:17, 16:24
**15** [4] - 3:19, 3:20, 3:22, 3:23
**15000** [1] - 2:10
**16** [6] - 3:24, 4:1, 4:3, 15:18, 15:21, 17:12
**16th** [1] - 19:1
**17** [8] - 1:15, 4:4, 4:5, 4:6, 4:7, 4:8, 17:18, 116:12
**18** [4] - 4:9, 4:10, 17:23, 77:20
**19** [2] - 4:21, 18:6
**1980s** [1] - 59:24
**1984** [3] - 59:11, 59:15, 59:22
**1:24-CV-09005-RMB-MJS** [1] - 1:2

**2**

**2** [4] - 4:22, 13:3, 13:17, 77:4
**2-foot** [1] - 63:14
**20** [4] - 18:13, 20:8, 20:9, 77:20
**200** [1] - 2:10
**2008** [6] - 4:13, 85:4, 85:7, 85:9, 85:11, 95:23
**2010** [1] - 11:16

**2012** [5] - 4:14, 88:25, 89:3, 89:11, 95:23
**2013** [11] - 4:15, 25:16, 25:20, 89:13, 89:15, 89:17, 89:18, 89:23, 90:3, 90:7, 95:24
**2014** [19] - 15:19, 15:22, 19:1, 23:18, 52:24, 53:20, 53:23, 54:5, 60:9, 60:11, 60:13, 60:16, 60:18, 60:20, 60:25, 61:11, 61:16, 62:1, 90:4
**2018** [5] - 4:16, 94:17, 94:19, 95:3, 95:13
**2019** [7] - 4:17, 36:17, 103:12, 103:17, 105:16, 105:24, 110:14
**2022** [12] - 4:18, 4:19, 109:11, 109:13, 110:3, 112:3, 112:6, 113:7, 113:9, 113:17, 114:5, 114:11
**2023** [5] - 4:2, 16:21, 37:12, 37:18, 39:7
**2024** [11] - 4:3, 16:2, 16:5, 16:19, 16:21, 38:4, 38:12, 38:16, 44:1, 49:22, 52:20
**2025** [4] - 1:16, 48:22, 110:1, 116:12
**21** [1] - 25:8
**22nd** [1] - 1:23
**24** [2] - 25:16, 81:23
**240** [1] - 1:23
**24th** [1] - 25:20
**25** [1] - 4:12
**26** [8] - 3:12, 3:13, 13:3, 13:13, 13:14, 13:18, 13:21, 13:24
**283-page** [1] - 17:14
**29** [5] - 16:2, 16:5, 38:4, 38:11, 38:16
**29th** [3] - 44:1, 49:22, 52:20
**2:20** [2] - 115:5, 115:10
**2:30** [1] - 115:4

**3**

**3** [2] - 4:23, 13:21
**3,000** [1] - 21:1
**3/29/24** [1] - 3:24
**30** [1] - 61:11
**315** [2] - 59:15, 59:22
**35** [1] - 2:3
**36** [2] - 4:22, 4:23

**360** [4] - 1:14, 2:7, 63:24, 116:11
**369** [2] - 73:17, 77:5
**378** [3] - 67:11, 67:12, 74:4
**380** [4] - 67:7, 72:22, 76:8, 76:12
**384** [1] - 76:21
**387** [2] - 77:1, 77:19
**391** [1] - 81:24
**396** [1] - 83:11

**5**

**5** [2] - 3:5, 14:9
**500,000** [1] - 64:20
**513-0196** [1] - 1:24
**55** [2] - 77:20, 81:23
**55-page** [4] - 4:12, 25:9, 25:13, 25:18

**6**

**6** [1] - 14:17
**60** [1] - 100:20
**609** [1] - 1:24

**7**

**7** [1] - 14:23
**70** [3] - 21:22, 21:23, 21:24

**8**

**8** [1] - 15:4
**80** [17] - 12:24, 17:24, 17:25, 25:21, 38:7, 38:12, 43:25, 46:22, 47:2, 52:21, 59:14, 59:21, 85:5, 89:23, 94:16, 103:11, 103:17
**85** [1] - 4:13
**850,000** [1] - 19:23
**88** [1] - 4:14
**89** [1] - 4:15

**9**

**9** [1] - 15:11
**90** [2] - 83:14, 83:21
**94** [1] - 4:16
**99** [1] - 8:6

**A**

**a.m** [1] - 1:16
**ability** [4] - 9:14, 35:19, 79:7

**able** [4] - 42:17, 61:21, 86:17, 88:18
**above-entitled** [1] - 1:17
**absolutely** [5] - 26:21, 26:23, 46:4, 49:17, 60:21
**accommodate** [1] - 5:20
**accommodation** [1] - 5:18
**according** [5] - 81:1, 82:5, 82:11, 101:20, 112:14
**accumulate** [1] - 64:20
**accumulation** [1] - 55:11
**acknowledge** [1] - 82:10
**acres** [1] - 108:11
**ACTION** [1] - 1:2
**action** [1] - 1:17
**active** [1] - 83:1
**add** [3] - 5:17, 36:6, 36:24
**added** [2] - 114:8, 114:18
**adding** [1] - 114:14
**additional** [2] - 18:18, 85:2
**address** [5] - 17:1, 54:11, 80:3, 80:22, 81:11
**addressed** [6] - 76:1, 78:20, 81:13, 81:16, 81:17, 81:20
**addressing** [1] - 18:16
**adequate** [1] - 71:10
**adjourned** [1] - 115:10
**admission** [1] - 14:24
**Admission** [3] - 3:19, 3:20, 15:2
**admissions** [1] - 15:5
**Admissions** [1] - 15:9
**advise** [1] - 8:5
**aesthetic** [4] - 99:20, 99:21, 101:14, 101:17
**affairs** [1] - 49:6
**affect** [1] - 9:13
**afterwards** [2] - 31:1, 80:21
**aged** [1] - 77:13
**agent** [6] - 22:13, 22:14, 22:22, 27:11, 27:14, 116:22
**agents** [1] - 116:20
**ago** [4] - 30:8, 31:25, 39:7, 90:13

**agree** [8] - 52:19, 57:16, 61:17, 70:9, 85:16, 98:2, 101:10, 104:10
**ahead** [4] - 44:12, 48:14, 48:15, 94:25
**aided** [1] - 116:16
**al** [1] - 1:4
**alive** [1] - 23:8
**alleged** [1] - 32:13
**allow** [3] - 41:15, 81:4, 113:3
**almost** [2] - 61:14, 91:9
**American** [5] - 2:11, 13:9, 14:3, 14:6, 15:6
**AMERICAN** [1] - 1:7
**amount** [4] - 20:6, 20:18, 22:6, 55:10
**AND** [2] - 1:4, 1:7
**angle** [1] - 65:7
**answer** [52] - 8:2, 8:7, 8:12, 8:14, 8:23, 9:5, 23:9, 26:11, 26:12, 31:18, 33:12, 34:8, 35:9, 35:18, 39:21, 40:5, 40:17, 41:15, 41:24, 43:6, 44:14, 47:14, 48:11, 49:25, 51:9, 56:18, 59:2, 59:18, 64:13, 69:22, 72:4, 74:19, 74:21, 78:11, 78:22, 80:7, 84:15, 85:21, 87:2, 92:20, 94:3, 96:6, 96:23, 97:1, 97:10, 97:14, 98:8, 98:16, 100:17, 101:15, 108:8, 108:24
**answered** [1] - 94:12
**answers** [2] - 7:3, 7:11
**anticipate** [1] - 69:8
**anticipated** [1] - 33:18
**APPEARANCES** [1] - 2:1
**appraisal** [1] - 22:4
**appreciate** [2] - 5:18, 115:5
**appropriate** [1] - 43:13
**approximate** [1] - 95:3
**architect** [2] - 101:25, 102:6
**area** [24] - 24:6, 68:25, 69:1, 79:1, 81:2, 82:6, 82:12, 99:10, 102:23, 105:5
**areas** [11] - 64:10, 67:8, 67:13, 74:5,

76:8, 76:9, 77:2, 77:10, 77:12, 80:5, 81:4
**ask..** [1] - 29:23
**asset** [1] - 39:15
**assets** [4] - 38:19, 46:20, 47:4, 47:15
**associated** [3] - 40:22, 75:20, 78:7
**Associates** [5] - 15:13, 58:13, 58:24, 59:4, 59:6
**assume** [4] - 26:2, 69:23, 71:7, 72:3
**assumed** [3] - 68:4, 68:9, 68:18
**assuming** [3] - 28:10, 72:2, 84:3
**assumptions** [1] - 27:17
**attend** [1] - 66:6
**attention** [2] - 56:9, 69:4
**attic** [1] - 79:23
**attorney** [5] - 5:12, 5:19, 19:20, 94:7, 116:22
**attorneys** [6] - 7:24, 8:8, 13:23, 14:11, 16:9, 116:20
**August** [12] - 4:14, 4:15, 88:25, 89:3, 89:11, 89:13, 89:15, 89:18, 89:23, 90:7, 95:23
**Avenue** [10] - 1:14, 2:7, 40:2, 40:10, 104:12, 105:25, 107:9, 112:8, 112:19, 116:11
**avoid** [1] - 77:9
**aware** [25] - 27:3, 35:7, 40:6, 40:8, 59:13, 59:20, 59:23, 66:12, 66:23, 67:6, 67:21, 67:25, 68:11, 68:15, 68:20, 68:24, 78:6, 83:21, 100:5, 100:10, 100:18, 100:22, 101:1, 101:3, 101:4

**B**

**backing** [1] - 111:23
**backs** [2] - 111:22, 111:24
**backup** [1] - 111:18
**backyard** [4] - 110:25, 111:1, 111:3, 111:14

**bad** [2] - 106:7, 114:17
**bags** [3] - 61:11, 61:13, 61:14
**bank** [1] - 20:5
**Bank** [3] - 20:5, 20:11, 20:16
**basement** [15] - 63:22, 66:14, 66:25, 67:13, 68:2, 68:4, 68:8, 68:10, 68:25, 71:23, 74:4, 75:17, 79:24, 83:15, 83:22
**basis** [5] - 43:2, 44:6, 44:10, 60:12, 61:20
**bathrooms** [1] - 53:5
**bearing** [2] - 38:3, 95:3
**beautiful** [1] - 57:14
**become** [1] - 66:12
**beginning** [1] - 77:3
**behalf** [2] - 14:11, 15:6
**behind** [1] - 114:21
**belief** [2] - 32:24, 84:6
**below** [4] - 57:7, 57:12, 57:17, 57:19
**Ben** [1] - 10:7
**Ben-Gurion** [1] - 10:7
**benefited** [1] - 35:9
**berm** [22] - 96:8, 96:10, 97:14, 99:14, 99:15, 99:23, 102:1, 102:7, 103:21, 104:3, 104:13, 104:18, 104:23, 105:10, 105:18, 105:22, 106:8, 106:13, 113:9, 114:22, 114:23, 114:24
**best** [5] - 25:5, 33:7, 75:19, 75:24, 79:7
**better** [1] - 27:12
**between** [15] - 5:3, 15:19, 16:2, 16:17, 31:4, 38:2, 54:4, 97:18, 98:4, 98:13, 99:2, 100:1, 100:3, 104:17, 110:14
**bids** [1] - 31:15
**big** [5] - 70:7, 71:21, 87:19, 88:5, 88:6
**bigger** [2] - 36:17, 87:22
**Bill** [4] - 5:11, 41:14, 45:13, 94:12
**bit** [3] - 68:10, 71:20, 113:7
**blanking** [2] - 19:9, 19:11

**boiler** [1] - 68:13
**book** [1] - 52:6
**books** [1] - 22:11
**borders** [1] - 105:4
**Borough** [8] - 2:8, 4:9, 5:12, 13:22, 14:12, 18:7, 18:10, 100:13
**BOROUGH** [1] - 1:7
**bothered** [1] - 57:13
**Bottom** [1] - 1:23
**bought** [1] - 84:24
**boundary** [7] - 97:18, 98:4, 99:1, 100:1, 104:16, 106:4, 106:9
**Bowe** [3] - 1:11, 116:6, 116:25
**BOWE** [1] - 1:21
**box** [3] - 80:23, 81:3, 81:11
**boxwoods** [1] - 105:11
**break** [6] - 8:19, 8:24, 9:8, 65:23, 65:24, 71:5
**breaking** [1] - 115:8
**breaks** [1] - 8:18
**brick** [9] - 105:11, 110:9, 112:11, 113:11, 113:16, 113:20, 114:6, 114:8, 114:23
**brickwork** [2] - 109:17, 109:20
**bring** [1] - 43:21
**bringing** [1] - 50:5
**brought** [1] - 69:4
**BROWN** [1] - 2:6
**Brown** [2] - 1:14, 116:11
**bubbling** [1] - 65:6
**budgeting** [1] - 77:12
**Builders** [1] - 58:11
**building** [3] - 21:25, 105:14, 105:18
**built** [10] - 58:6, 58:12, 59:22, 59:23, 97:14, 99:14, 105:5, 110:20, 113:20
**bush** [2] - 88:2, 91:17
**bushes** [19] - 85:17, 85:24, 86:1, 86:7, 86:12, 86:24, 87:4, 88:1, 88:4, 88:13, 88:20, 95:6, 96:1, 96:16, 106:5, 106:18, 106:19, 111:24, 114:20
**business** [6] - 12:12, 38:18, 38:20, 47:23, 48:18, 49:6
**but..** [2] - 12:23, 23:6

**buyer** [1] - 44:24
**buyers** [1] - 42:16
**BY** [70] - 2:3, 2:6, 2:10, 5:10, 11:4, 13:20, 14:1, 14:8, 14:16, 14:22, 15:3, 15:10, 15:17, 15:23, 16:7, 16:16, 16:23, 17:5, 17:11, 17:17, 17:22, 18:5, 18:12, 18:22, 25:11, 26:10, 29:11, 32:6, 34:7, 35:17, 39:24, 40:4, 40:16, 41:9, 41:23, 46:8, 47:9, 48:10, 49:3, 49:19, 51:8, 56:17, 57:9, 59:1, 59:17, 66:3, 72:11, 74:20, 75:6, 78:10, 84:1, 84:14, 85:20, 87:1, 89:2, 89:12, 93:23, 94:15, 94:21, 96:5, 96:22, 98:7, 98:15, 100:16, 103:13, 108:7, 108:23, 109:15, 112:5, 113:5

**C**

**cabinets** [3] - 53:17, 54:8, 60:4
**Camden** [7] - 16:1, 38:2, 107:21, 108:3, 108:20, 109:6, 109:7
**cannot** [5] - 9:7, 32:23, 34:15, 35:9, 71:6
**Canuso** [2] - 15:12, 58:11
**care** [2] - 69:24, 72:5
**carefully** [1] - 77:9
**Carol** [1] - 15:20
**carrier** [3] - 36:2, 37:4, 37:5
**carriers** [2] - 4:22, 36:7
**cars** [1] - 63:15
**case** [2] - 43:23, 47:24
**cash** [1] - 20:1
**caused** [4] - 70:9, 70:13, 71:17, 100:14
**caution** [1] - 71:6
**CCR** [1] - 116:25
**cease** [1] - 30:6
**Center** [1] - 9:20
**certain** [2] - 10:11, 34:20
**certainly** [7] - 34:3, 41:19, 49:8, 49:21, 52:19, 72:6, 83:20

**Certified** [3] - 1:12, 1:22, 116:7
**certify** [1] - 116:9
**cetera** [2] - 85:17, 103:2
**cetera)** [1] - 77:14
**change** [1] - 9:6
**changed** [1] - 36:3
**changes** [4] - 42:20, 110:16, 113:16, 113:19
**character** [1] - 34:16
**characterization** [1] - 94:24
**Charles** [1] - 73:11
**Cherry** [1] - 24:7
**Chews** [46] - 12:24, 17:24, 17:25, 25:21, 38:7, 38:12, 43:25, 46:22, 47:2, 52:21, 56:6, 57:5, 57:18, 59:14, 59:21, 63:9, 63:20, 64:8, 64:11, 64:17, 64:20, 64:21, 65:11, 65:16, 65:20, 85:5, 89:23, 92:3, 94:16, 99:5, 100:21, 103:11, 103:17, 105:4, 105:19, 107:10, 107:11, 108:5, 108:9, 108:18, 108:19, 109:5, 112:7, 112:15, 114:19
**Chick** [1] - 73:11
**children** [2] - 21:5, 47:24
**chose** [1] - 47:15
**chronology** [1] - 29:8
**circling** [3] - 76:12, 103:18, 106:22
**circumstance** [1] - 39:13
**CIVIL** [1] - 1:2
**Civil** [3] - 3:11, 10:23, 11:2
**Claim** [2] - 4:8, 17:25
**claim** [2] - 17:24, 100:12
**claims** [2] - 37:3, 37:8
**clarification** [1] - 100:12
**clear** [4] - 30:15, 45:6, 51:3, 84:12
**clearly** [2] - 69:16, 74:15
**closed** [15] - 26:25, 31:6, 31:9, 35:22, 36:12, 37:1, 52:23, 55:21, 57:3, 60:2, 66:20, 66:23, 69:19,

70:1, 79:15
**closing** [38] - 21:18, 21:21, 24:10, 24:13, 24:19, 25:5, 26:19, 27:8, 28:13, 28:17, 30:17, 53:11, 53:20, 54:4, 56:4, 56:13, 57:11, 68:12, 70:21, 74:8, 74:14, 74:17, 74:25, 75:7, 75:13, 76:1, 76:24, 78:6, 78:20, 80:3, 80:11, 80:21, 81:12, 81:20, 83:9, 83:21, 84:11, 84:18
**closure** [2] - 74:24, 75:21
**collective** [1] - 37:2
**college** [1] - 23:5
**Columbia** [1] - 10:7
**coming** [10] - 61:24, 65:1, 65:2, 65:3, 65:6, 65:7, 99:24, 107:3, 108:11, 114:16
**commencement** [1] - 116:13
**commencing** [1] - 1:16
**comment** [6] - 67:15, 70:13, 76:14, 83:13, 83:14, 84:3
**common** [1] - 54:21
**communicating** [1] - 71:9
**communications** [2] - 32:20
**COMPANY** [1] - 1:8
**Company** [1] - 2:12
**company** [2] - 22:5, 25:14
**comparing** [1] - 114:4
**compel** [1] - 43:21
**competency** [1] - 35:20
**Complaint** [3] - 3:11, 10:23, 11:2
**complaints** [1] - 107:18
**complete** [1] - 50:7
**completed** [2] - 105:25, 106:4
**completely** [1] - 44:7
**complicated** [1] - 37:6
**computer** [1] - 116:16
**computer-aided** [1] - 116:16
**concern** [16] - 39:14, 46:19, 48:7, 48:12, 49:23, 49:25, 77:1,

77:7, 77:10, 77:12, 80:5, 80:15, 81:2, 82:6, 82:12, 84:8
**concerning** [1] - 32:12
**concerns** [5] - 37:9, 39:17, 74:9, 107:22, 109:4
**conclusion** [1] - 49:15
**conditions** [2] - 34:3, 34:20
**conducted** [2] - 21:21, 35:13
**confer** [1] - 9:4
**confirm** [1] - 84:6
**conform** [1] - 90:9
**conjecture** [1] - 35:19
**connection** [6] - 21:17, 25:20, 27:8, 30:21, 31:1, 37:9
**Connery** [2] - 1:14, 116:11
**CONNERY** [1] - 2:6
**constant** [1] - 62:3, 110:21
**constantly** [1] - 110:19
**constructed** [5] - 57:22, 57:24, 58:10, 105:1, 106:9
**constructing** [1] - 102:1
**construction** [7] - 40:10, 40:13, 95:17, 96:12, 106:13, 108:4, 110:11
**consulted** [1] - 102:8
**contained** [1] - 81:3
**continuation** [1] - 112:10
**continue** [2] - 8:2, 46:1
**continued** [1] - 49:11
**continuing** [3] - 42:6, 76:7, 76:21
**contractor** [2] - 93:13, 105:22
**contractors** [1] - 42:17
**contribution** [1] - 20:10
**controversy** [1] - 116:22
**conversation** [6] - 7:7, 69:24, 71:11, 71:25, 72:7, 72:14
**convicted** [1] - 10:16
**COOK** [94] - 2:6, 5:10, 11:4, 13:12, 13:20, 14:1, 14:8, 14:16, 14:22, 15:3, 15:10,

15:17, 15:23, 16:7, 16:13, 16:16, 16:23, 17:5, 17:11, 17:17, 17:22, 18:4, 18:5, 18:12, 18:22, 25:11, 26:10, 29:11, 32:6, 34:7, 35:17, 39:18, 39:24, 40:4, 40:16, 41:9, 41:21, 41:23, 43:2, 43:5, 43:12, 43:17, 43:20, 44:5, 44:9, 44:13, 44:21, 45:8, 45:15, 45:19, 46:4, 46:7, 46:8, 47:7, 47:9, 48:10, 49:3, 49:16, 49:19, 51:8, 56:17, 57:9, 59:1, 59:17, 61:4, 66:3, 72:11, 74:20, 75:6, 78:10, 84:1, 84:14, 85:11, 85:20, 87:1, 87:5, 89:2, 89:11, 89:12, 93:23, 94:13, 94:15, 94:21, 96:5, 96:22, 98:7, 98:15, 100:16, 103:13, 108:7, 108:23, 109:15, 112:5, 113:5
**Cook** [2] - 3:5, 5:12
**corner** [4] - 33:14, 64:23, 65:9, 103:18
**Corporation** [4] - 38:22, 39:2, 48:18, 51:5
**correct** [19] - 12:25, 18:3, 18:25, 30:18, 33:23, 34:1, 38:11, 40:19, 59:8, 64:9, 65:12, 70:19, 70:22, 71:1, 74:7, 91:21, 96:20, 98:21, 116:18
**corrected** [5] - 70:11, 70:15, 71:18, 74:17, 75:4
**Correspondence** [6] - 4:2, 4:4, 4:5, 16:20, 17:3, 17:9
**correspondence** [3] - 16:17, 16:25, 17:7
**corresponding** [1] - 15:12
**cosmetic** [3] - 12:14, 12:15, 86:6
**cost** [1] - 27:24
**counsel** [4] - 5:3, 9:4, 9:8, 116:22
**Counsel** [3] - 2:4, 2:8, 2:11
**count** [1] - 87:21

**County** [6] - 16:1, 38:2, 107:21, 108:3, 108:20, 109:7
**county** [2] - 107:12, 109:3
**COUNTY** [1] - 116:5
**couple** [2] - 24:15, 96:13
**course** [8] - 11:12, 24:10, 35:12, 62:15, 79:18, 80:19, 88:21, 111:5
**COURT** [2] - 1:1, 1:21
**court** [4] - 6:7, 6:24, 7:9, 32:4
**Court** [4] - 1:12, 1:22, 5:14, 116:7
**cover** [1] - 61:13
**crawl** [5] - 81:25, 82:7, 82:12, 83:15, 83:22
**create** [4] - 96:9, 98:9, 99:19, 99:23
**creating** [2] - 96:7, 97:11
**crime** [1] - 10:16
**cross** [1] - 77:5
**cross-reference** [1] - 77:5
**curb** [8] - 63:10, 63:14, 90:25, 91:3, 91:14, 93:11, 104:22, 104:23
**curbing** [1] - 56:6
**current** [2] - 48:3, 92:13
**cursor** [1] - 73:19

**D**

**damage** [2] - 17:24, 54:7
**Damage** [2] - 4:8, 17:25
**damaged** [3] - 60:4, 68:14, 68:23
**damages** [2] - 32:14, 100:13
**damp** [2] - 53:18, 68:4
**dampness** [1] - 68:9
**date** [7] - 16:10, 25:15, 38:3, 39:3, 86:16, 95:3, 109:10
**dated** [5] - 3:23, 3:24, 15:18, 16:2, 16:5
**Dated** [1] - 15:21
**dates** [3] - 55:7, 55:15, 86:15
**dawn** [1] - 56:8
**day-to-day** [1] - 41:25
**deal** [2] - 71:21, 82:24

**dealt** [3] - 28:21, 80:17, 80:25
**decade** [2] - 92:24, 107:24
**decided** [2] - 50:9, 86:6
**decision** [1] - 47:16
**decreased** [1] - 62:2
**Deed** [6] - 3:22, 3:23, 3:24, 15:16, 15:21, 16:5
**deed** [6] - 15:12, 15:18, 16:1, 18:23, 37:23, 38:6
**deeded** [2] - 44:1, 47:2
**defects** [4] - 73:23, 74:10, 76:10, 77:11
**Defendant** [2] - 2:8, 2:11
**Defendants** [1] - 1:8
**define** [3] - 61:7, 98:17, 98:18
**defined** [3] - 73:21, 76:9, 77:7
**defining** [1] - 61:23
**definite** [2] - 67:17, 69:17
**definitely** [2] - 55:8, 72:8
**definition** [2] - 61:9, 73:16
**definitions** [3] - 77:3, 77:6
**defunct** [1] - 51:5
**degree** [5] - 10:6, 33:16, 35:14, 49:9, 55:13
**degrees** [1] - 63:24
**demand** [1] - 81:10
**demands** [1] - 42:20
**DENNEHEY** [1] - 2:9
**deposit** [1] - 82:20
**deposition** [13] - 1:10, 5:17, 5:19, 5:22, 6:2, 7:23, 9:3, 9:9, 10:15, 43:24, 107:2, 115:10, 116:9
**depositions** [1] - 7:10
**Deptford** [2] - 10:13, 10:14
**describe** [1] - 62:25
**DESCRIPTION** [1] - 3:10
**design** [1] - 96:12
**desperate** [1] - 107:17
**details** [10] - 28:1, 32:1, 41:12, 42:12, 44:17, 55:7, 86:15, 102:13, 102:16,

103:6
**determine** [2] - 45:1, 58:6
**develop** [2] - 40:2, 102:6
**developed** [1] - 101:21
**developer** [1] - 44:24
**developing** [1] - 48:7
**Development** [9] - 38:21, 38:22, 39:1, 39:9, 48:17, 50:25, 51:5, 51:14, 51:19
**development** [6] - 40:14, 40:22, 46:14, 49:11, 49:24, 100:8
**different** [2] - 18:8, 45:5
**diligence** [1] - 35:13
**direct** [1] - 44:14
**directly** [2] - 95:14, 116:21
**disagree** [4] - 44:8, 44:9, 90:15, 90:19
**disclose** [2] - 34:13, 34:25
**disclosed** [5] - 33:11, 34:17, 34:21, 54:15
**Disclosures** [8] - 3:12, 3:13, 13:4, 13:13, 13:14, 13:18, 13:21, 13:24
**discovery** [4] - 17:13, 17:24, 18:9, 18:15
**discuss** [3] - 8:15, 43:9, 43:22
**discussed** [1] - 9:8
**discussion** [2] - 50:1, 50:5
**discussions** [2] - 31:5, 90:2
**District** [2] - 5:14
**DISTRICT** [2] - 1:1, 1:1
**Doctor** [3] - 109:11, 112:8, 115:6
**doctor** [11] - 9:22, 9:23, 10:2, 11:17, 11:20, 12:20, 47:17, 50:3, 69:8, 93:24, 96:15
**doctors** [1] - 47:22
**Document** [4] - 3:14, 3:15, 14:5, 25:10
**DOCUMENT** [1] - 4:20
**document** [12] - 4:12, 13:5, 14:2, 16:24, 17:14, 19:13, 19:14, 25:13, 25:15, 25:19, 26:4, 38:1
**documents** [10] -

14:10, 15:24, 16:8, 18:7, 18:8, 18:14, 18:17, 32:9
**Documents** [10] - 3:16, 3:24, 4:1, 4:9, 4:10, 14:14, 16:4, 16:14, 18:10, 18:20
**dollar** [1] - 38:9
**dollars** [1] - 19:23
**don't..** [1] - 36:4
**done** [6] - 22:4, 22:7, 22:10, 40:7, 48:13, 52:24, 53:3, 58:5, 62:22, 64:2, 71:4, 75:13, 75:22, 78:25, 80:3, 80:9, 80:12, 84:11, 102:12, 102:15, 102:21, 105:2, 109:17
**door** [3] - 65:15, 65:16, 65:20
**Doug** [3] - 4:10, 18:13, 18:20
**down** [12] - 6:25, 12:9, 20:8, 20:9, 41:19, 55:12, 55:15, 57:2, 71:5, 108:11, 111:24
**downsized** [2] - 23:14, 23:15
**downward** [1] - 58:3
**Dr** [54] - 11:5, 11:6, 11:7, 11:8, 14:4, 14:18, 19:22, 21:4, 21:8, 24:23, 25:12, 26:6, 26:25, 28:6, 32:7, 32:25, 35:5, 35:23, 36:13, 37:1, 37:22, 38:3, 38:8, 39:14, 43:10, 43:22, 44:2, 44:22, 46:9, 49:11, 49:20, 49:24, 51:1, 51:3, 52:9, 66:4, 72:14, 78:5, 81:10, 83:20, 86:11, 91:22, 92:18, 95:11, 96:2, 96:20, 97:3, 97:4, 97:5, 100:7, 100:12, 102:25, 106:12
**drain** [8] - 65:3, 107:1, 107:9, 111:12, 111:19, 112:15, 112:18, 112:23
**drainage** [7] - 68:22, 83:16, 83:23, 97:12, 98:9, 110:23, 111:4
**drains** [2] - 65:1, 108:12
**Drive** [1] - 2:10
**driveway** [7] - 55:12,

61:13, 65:17, 65:19, 111:2, 111:3, 111:14
**driving** [2] - 57:5, 63:15
**due** [4] - 35:12, 40:21, 83:16, 83:23
**duly** [1] - 116:13
**during** [3] - 9:8, 28:18, 111:5

## E

**E-mail** [10] - 4:2, 4:4, 4:5, 16:17, 16:20, 16:25, 17:3, 17:7, 17:9, 32:19
**E-mails** [1] - 32:8
**early** [1] - 105:18
**earth** [1] - 93:15
**easily** [1] - 70:3
**East** [1] - 2:3
**economic** [1] - 50:4
**effect** [4] - 6:6, 80:23, 81:3, 81:11
**efflorescence** [5] - 82:7, 82:13, 82:20, 82:23, 83:6
**either** [6] - 7:22, 23:18, 31:13, 57:5, 79:25, 116:22
**electronic** [1] - 32:9
**elevate** [2] - 99:11, 99:13
**elevated** [9] - 56:7, 91:3, 102:22, 103:25, 104:1, 106:11, 113:12, 114:7, 114:25
**elevation** [2] - 55:14, 114:14
**employed** [3] - 9:19, 11:23, 116:19
**end** [2] - 62:22, 105:3
**endocrinology** [2] - 9:24, 10:3
**entering** [1] - 68:15
**entire** [1] - 78:17
**entitled** [3] - 1:17, 43:23, 43:24
**entity** [4] - 15:13, 48:18, 51:4, 58:16
**entrance** [2] - 65:19, 65:20
**entry** [6] - 70:10, 70:14, 71:2, 71:17, 74:14, 78:1
**ESQ** [3] - 2:3, 2:6, 2:10
**Esquire** [1] - 37:24
**estate** [3] - 27:11,

27:14, 49:24
**et** [4] - 1:4, 77:13, 85:17, 103:2
**ethical** [1] - 34:9
**evaluate** [1] - 71:16
**event** [7] - 53:14, 53:16, 54:6, 55:5, 60:3, 60:8, 60:23
**events** [6] - 31:2, 61:23, 62:18, 63:1, 64:4, 64:7
**eventual** [1] - 78:1
**eventually** [1] - 53:9
**everyday** [1] - 7:6
**evolution** [2] - 105:8, 105:13
**exact** [2] - 39:3, 86:16
**exactly** [2] - 42:22, 109:20
**EXAMINATION** [1] - 3:3
**examination** [1] - 43:25
**example** [2] - 31:8, 54:12
**except** [1] - 5:5
**exception** [3] - 8:20, 96:19, 97:7
**excuse** [1] - 44:5
**excused** [1] - 115:9
**exhibit** [3] - 17:18, 73:17, 85:3
**Exhibit** [11] - 13:3, 13:17, 13:21, 14:9, 14:17, 14:23, 15:4, 15:11, 15:24, 18:24, 19:14
**EXHIBIT** [1] - 3:10
**exhibits** [3] - 10:20, 10:22, 85:3
**existed** [1] - 111:8
**existence** [1] - 98:11
**exists** [1] - 32:17
**expectation** [2] - 34:21, 35:11
**expected** [3] - 34:4, 35:2, 42:21
**expecting** [1] - 80:16
**experience** [2] - 63:4, 79:14
**experienced** [1] - 55:5
**expert** [1] - 111:11
**expertise** [1] - 102:23
**explain** [3] - 33:12, 97:10, 105:7
**explaining** [1] - 64:2
**extent** [1] - 30:14
**Eye** [1] - 12:1
**eyes** [1] - 12:19

## F

**faces** [1] - 65:20
**Facial** [1] - 12:1
**facial** [1] - 12:14
**facing** [1] - 44:2
**fact** [7] - 33:10, 35:5, 48:7, 48:23, 67:11, 71:15, 74:2
**failed** [1] - 68:12
**fair** [23] - 28:20, 31:20, 33:16, 34:5, 34:18, 44:5, 48:8, 49:12, 49:14, 49:21, 51:12, 61:6, 61:8, 61:10, 84:2, 90:22, 90:23, 105:19, 109:18, 112:12, 112:20, 114:7
**family** [7] - 22:23, 22:25, 27:22, 30:16, 34:4, 54:14, 75:23
**far** [3] - 35:19, 37:17, 74:4
**favor** [2] - 33:4, 33:6
**feet** [1] - 77:24
**FEMA** [1] - 36:22
**few** [5] - 10:20, 55:17, 90:8, 96:19, 108:12
**field** [2] - 50:3, 50:4
**file** [4] - 43:17, 43:21, 44:12, 46:3
**filed** [2] - 5:13, 10:24
**filing** [1] - 100:12
**filled** [1] - 99:2
**filling** [2] - 63:8, 63:9
**fine** [5] - 28:3, 31:14, 44:11, 46:6, 111:17
**finish** [7] - 41:7, 69:10, 72:10, 86:20, 90:18, 97:16, 113:4
**finished** [1] - 72:12
**first** [13] - 6:3, 10:23, 28:21, 47:20, 53:5, 53:14, 55:17, 56:22, 58:22, 64:6, 73:3, 84:23, 85:23, 87:13, 114:17
**fish** [1] - 21:24
**five** [5] - 87:25, 88:1, 88:3, 88:5, 88:6
**fives** [1] - 20:19
**fix** [2] - 84:11, 101:19
**fixed** [1] - 70:3
**flood** [6] - 36:14, 37:12, 55:12, 57:2, 60:17, 114:16
**flooded** [1] - 53:17
**flooding** [37] - 26:20, 27:1, 27:3, 32:13,

33:10, 33:13, 33:22, 34:22, 34:25, 35:1, 35:8, 35:15, 36:19, 37:4, 37:5, 37:9, 37:17, 52:18, 53:14, 53:16, 54:6, 55:5, 56:24, 60:3, 60:8, 60:11, 60:24, 61:18, 61:22, 64:17, 68:7, 69:2, 79:5, 79:8, 85:1, 92:12, 98:10
**Flooding** [1] - 4:23
**floor** [1] - 53:6
**flooring** [1] - 53:4
**Florida** [1] - 101:2
**flower** [1] - 80:23, 81:3, 81:11
**Folder** [4] - 4:7, 4:8, 4:9, 17:20
**folder** [4] - 17:18, 17:23, 18:6, 18:13
**folders** [1] - 18:16
**follow** [4] - 19:17, 36:10, 69:6, 70:24
**follow-up** [2] - 19:17, 36:10
**followed** [3] - 44:21, 71:15, 83:8
**follows** [1] - 8:21
**foregoing** [2] - 116:9, 116:17
**forgetting** [1] - 19:10
**form** [10] - 5:5, 6:19, 45:20, 45:23, 55:5, 76:18, 83:8, 106:1, 106:4
**formal** [1] - 6:3
**formed** [2] - 39:2, 39:6
**forward** [2] - 34:12, 96:13
**foundation** [10] - 68:15, 68:23, 77:24, 78:2, 81:5, 81:6, 81:25, 82:13, 82:14, 82:21
**Fox** [17] - 11:6, 11:7, 11:8, 11:11, 25:12, 26:6, 32:7, 35:23, 37:22, 43:22, 46:9, 49:20, 66:4, 72:14, 97:3, 102:25
**Fox-Mellul** [1] - 11:11
**frame** [4] - 16:19, 31:10, 90:21
**framing** [3] - 67:3, 74:10, 76:15
**Frank** [3] - 58:19, 58:23, 59:8
**FRANK** [1] - 1:4
**freestanding** [1] -

91:9
**frequency** [2] - 61:22, 62:1
**frequently** [1] - 55:15
**fresh** [1] - 110:7
**Friday** [2] - 1:15, 116:12
**friendly** [6] - 21:14, 27:16, 27:18, 27:19, 27:21, 30:11
**front** [11] - 65:11, 65:15, 65:16, 65:20, 88:6, 92:4, 92:18, 104:21, 105:3, 106:21, 109:17
**frustrated** [1] - 93:20
**frustration** [1] - 33:17
**Fuelleborn** [1] - 37:24
**full** [1] - 11:9
**funded** [1] - 20:11
**funds** [1] - 113:24
**furnace** [1] - 77:13
**future** [1] - 47:25

## G

**gain** [1] - 28:11
**gained** [1] - 62:5
**game** [1] - 44:6
**garage** [6] - 53:16, 53:17, 54:8, 55:12, 61:3, 61:25
**general** [5] - 64:3, 80:8, 83:12, 84:3, 84:7
**generally** [1] - 90:20
**gentleman** [1] - 73:11
**glad** [1] - 104:9
**Google** [10] - 85:4, 85:7, 85:13, 89:14, 89:15, 89:23, 94:19, 95:2, 109:10, 109:13
**grade** [2] - 79:6, 81:6
**graded** [2] - 103:2, 103:5
**grading** [12] - 68:22, 77:21, 78:16, 78:24, 79:3, 80:4, 84:12, 84:19, 84:22, 84:25, 101:18, 103:6
**grading/roof** [2] - 83:16, 83:23
**graduated** [1] - 12:22
**grates** [1] - 112:19
**great** [1] - 82:24
**ground** [3] - 99:11, 99:13, 114:25
**Group** [3] - 37:25, 39:9, 50:25
**growing** [2] - 93:25,

94:1
**guess** [11] - 7:15, 7:16, 45:18, 49:10, 56:19, 56:20, 60:21, 62:16, 66:19, 90:1, 114:3
**guiding** [1] - 6:1
**Gurion** [1] - 10:7
**gutters** [2] - 83:12, 83:14
**Guys** [5] - 15:13, 58:13, 58:24, 59:3, 59:6

## H

**Haddon** [3] - 1:14, 2:7, 116:11
**Haddonfield** [20] - 2:4, 2:8, 5:13, 11:23, 12:2, 13:22, 14:12, 19:10, 23:14, 24:3, 24:7, 38:21, 38:22, 39:1, 39:8, 48:17, 50:25, 51:5, 100:13, 109:6
**HADDONFIELD** [1] - 1:7
**hand** [3] - 103:18, 104:11, 104:15
**haphazard** [1] - 102:11
**head** [3] - 29:15, 37:14, 51:24
**heads** [1] - 7:7
**hear** [2] - 8:11, 59:5
**heard** [11] - 40:25, 51:18, 51:23, 52:2, 52:5, 58:11, 58:16, 108:25, 109:1, 109:2
**hearing** [1] - 68:5
**heater** [1] - 68:13
**heavy** [2] - 61:12, 63:18
**hedge** [1] - 91:9
**help** [2] - 107:19, 107:24
**hereby** [2] - 5:2, 116:9
**hesitating** [1] - 52:1
**high** [2] - 63:13, 63:16
**higher** [5] - 105:10, 113:11, 113:14, 113:20
**Highway** [4] - 2:3, 12:3, 12:5, 12:9
**Hilary** [1] - 37:24
**HILARY** [1] - 37:25
**Hill** [1] - 24:7
**Hiller** [3] - 7:22, 8:13, 36:10

**HILLER** [77] - 2:3, 13:10, 16:12, 18:2, 26:9, 29:9, 32:2, 34:6, 35:16, 40:3, 40:15, 40:23, 41:6, 41:14, 42:9, 42:25, 43:3, 43:7, 43:14, 43:19, 44:7, 44:11, 44:16, 44:19, 45:4, 45:10, 45:17, 45:22, 46:6, 46:23, 47:5, 47:12, 48:9, 49:1, 49:13, 51:7, 56:16, 57:8, 58:25, 59:16, 61:2, 67:4, 69:21, 72:9, 74:18, 75:5, 75:8, 78:9, 78:21, 83:25, 84:13, 84:21, 85:9, 85:19, 86:25, 87:3, 89:9, 91:18, 91:24, 92:1, 92:7, 93:19, 94:2, 94:5, 94:11, 94:14, 94:23, 95:8, 96:4, 96:21, 98:6, 98:14, 100:15, 103:4, 108:6, 108:22, 113:3
**HILLER-NIMEROFF** [77] - 2:3, 13:10, 16:12, 18:2, 26:9, 29:9, 32:2, 34:6, 35:16, 40:3, 40:15, 40:23, 41:6, 41:14, 42:9, 42:25, 43:3, 43:7, 43:14, 43:19, 44:7, 44:11, 44:16, 44:19, 45:4, 45:10, 45:17, 45:22, 46:6, 46:23, 47:5, 47:12, 48:9, 49:1, 49:13, 51:7, 56:16, 57:8, 58:25, 59:16, 61:2, 67:4, 69:21, 72:9, 74:18, 75:5, 75:8, 78:9, 78:21, 83:25, 84:13, 84:21, 85:9, 85:19, 86:25, 87:3, 89:9, 91:18, 91:24, 92:1, 92:7, 93:19, 94:2, 94:5, 94:11, 94:14, 94:23, 95:8, 96:4, 96:21, 98:6, 98:14, 100:15, 103:4, 108:6, 108:22, 113:3
**himself** [2] - 79:5, 79:19
**Hinchman** [7] - 50:12, 50:16, 50:18, 50:19, 50:20, 51:6, 52:9

**hire** [1] - 35:21
**hired** [2] - 79:11, 110:13
**home** [28] - 24:20, 24:22, 25:3, 25:4, 25:14, 25:24, 26:14, 66:4, 66:6, 69:14, 69:16, 70:24, 71:15, 71:25, 72:7, 72:15, 72:23, 74:16, 75:3, 77:25, 81:2, 82:11, 82:15, 82:19, 84:23, 97:23, 97:24, 102:20
**homeowner** [4] - 70:6, 71:22, 73:15, 84:4
**homeowner's** [3] - 35:24, 36:2, 36:7
**Homeowner's** [1] - 4:22
**homes** [1] - 28:24
**Homestead** [7] - 40:2, 40:10, 40:20, 42:14, 44:3, 50:14, 50:18
**honest** [2] - 12:22, 84:23
**honestly** [5] - 40:24, 42:11, 66:11, 91:19, 102:18
**hope** [1] - 34:10
**hopefully** [1] - 33:7
**hour** [1] - 8:18
**House** [3] - 4:11, 25:9, 25:13
**house** [25] - 21:16, 23:14, 27:4, 28:18, 28:19, 30:23, 31:22, 46:18, 47:19, 47:21, 48:5, 55:20, 57:14, 61:16, 61:25, 62:7, 62:10, 63:24, 64:1, 65:19, 69:3, 101:3, 101:5, 104:17, 111:16
**houses** [1] - 101:7
**huge** [3] - 79:4, 96:8, 108:10
**hundred** [1] - 108:11
**husband** [56] - 11:17, 23:1, 25:1, 26:5, 29:4, 29:13, 30:7, 30:16, 30:20, 31:22, 34:11, 38:8, 38:17, 39:25, 41:20, 42:1, 42:23, 47:3, 47:11, 58:7, 61:11, 66:9, 69:7, 69:23, 71:3, 71:8, 71:11, 71:14, 72:5, 73:1, 74:22, 76:6, 78:23, 79:12, 79:21, 80:1, 80:6,

80:24, 83:10, 86:14, 93:14, 98:23, 98:24, 100:11, 101:22, 101:24, 102:2, 102:9, 102:24, 105:23, 106:15, 107:15, 107:20, 107:23, 110:13, 111:16
**husband's** [6] - 21:14, 27:9, 29:1, 46:10, 47:16, 49:5
**hydrostatic** [1] - 63:21
**hyphenated** [1] - 11:11

## I

**idea** [14] - 23:2, 23:11, 30:5, 46:5, 51:16, 58:4, 58:9, 58:14, 66:11, 84:9, 84:16, 84:22, 91:6, 111:20
**identification** [28] - 11:3, 13:19, 13:25, 14:7, 14:15, 14:21, 15:2, 15:9, 15:16, 15:22, 16:6, 16:15, 16:22, 17:4, 17:10, 17:16, 17:21, 18:1, 18:11, 18:21, 25:10, 85:8, 89:1, 89:16, 94:20, 103:12, 109:14, 112:4
**identified** [13] - 69:16, 74:15, 75:3, 80:4, 80:22, 81:3, 82:6, 82:12, 82:15, 82:19, 83:2, 104:11, 104:20
**identify** [1] - 19:17
**ifs** [1] - 39:17
**image** [1] - 89:23
**immediate** [5] - 23:22, 76:10, 77:8, 86:19, 91:25
**immediately** [1] - 61:15
**immense** [1] - 55:10
**impact** [1] - 49:10
**impetus** [1] - 49:9
**important** [3] - 7:14, 28:3, 69:9
**impossible** [1] - 63:25
**improper** [3] - 77:23, 78:7, 78:19
**improvements** [1] - 113:8
**inaccessible** [1] - 73:23
**inadequate** [1] - 76:16

**INC** [1] - 1:8
**include** [2] - 75:16, 77:12
**includes** [2] - 16:1, 18:15
**including** [4] - 3:24, 16:4, 61:25, 67:2
**increased** [1] - 62:1
**indicate** [1] - 70:8
**indicates** [3] - 67:15, 76:14, 82:23
**indicating** [1] - 83:7
**indication** [2] - 67:17, 69:17
**indirectly** [1] - 116:21
**infer** [1] - 42:15
**influence** [1] - 9:12
**information** [3] - 34:5, 34:14, 73:8
**informed** [4] - 26:17, 108:17, 108:21, 109:1
**initial** [2] - 60:3, 76:3
**inlet** [2] - 106:22, 106:25
**inquiry** [2] - 54:24, 80:1
**insects** [1] - 81:4
**inspection** [28] - 24:20, 25:4, 25:14, 25:19, 25:24, 26:15, 66:5, 66:6, 66:13, 66:18, 66:20, 67:6, 69:16, 70:18, 71:9, 72:21, 74:16, 75:3, 80:5, 80:10, 80:20, 81:2, 81:24, 82:11, 82:15, 82:19, 83:3
**inspections** [1] - 84:4
**inspector** [13] - 24:22, 69:14, 69:25, 70:6, 70:25, 71:15, 71:22, 71:25, 72:7, 72:15, 72:23, 73:15, 76:14
**Inspira** [3] - 9:20, 10:3, 10:11
**installed** [6] - 105:22, 109:24, 110:2, 111:5, 112:11, 114:25
**installing** [1] - 110:9
**instruct** [1] - 71:6
**instruction** [2] - 9:2, 43:6
**instructions** [2] - 6:1, 9:17
**insurance** [6] - 4:23, 35:24, 36:14, 36:19,

37:3, 37:8
**intelligent** [1] - 102:10
**interest** [12] - 33:8, 42:22, 44:22, 45:2, 45:3, 45:5, 45:11, 46:10, 47:3, 49:11, 49:24, 51:11
**interested** [1] - 116:20
**interior** [9] - 24:16, 24:17, 24:18, 53:6, 53:7, 61:8, 75:12, 75:16, 82:21
**interpretations** [1] - 45:13
**interpreted** [1] - 45:5
**Interrogatories** [1] - 37:20
**Interrogatory** [3] - 3:17, 14:17, 14:20
**intersection** [2] - 56:6, 112:7
**introduced** [3] - 29:2, 29:3, 29:7
**involved** [15] - 19:18, 31:24, 39:4, 40:9, 41:25, 49:5, 50:11, 58:20, 72:4, 78:24, 79:3, 88:15, 97:1, 101:23, 102:9
**irrelevant** [5] - 41:16, 41:19, 43:8, 43:15
**issuance** [1] - 80:10
**issue** [6] - 34:22, 43:5, 45:16, 83:6, 84:22, 84:25
**issues** [29] - 26:8, 26:15, 26:20, 27:1, 27:4, 32:13, 35:1, 35:15, 40:21, 41:11, 42:5, 42:14, 44:3, 67:18, 69:15, 69:18, 70:3, 70:5, 70:9, 70:13, 71:1, 71:16, 74:15, 75:2, 78:19, 83:15, 83:22, 101:19, 109:5
**issues/material** [1] - 77:11
**item** [2] - 73:22, 77:7
**items** [3] - 73:24, 74:3
**itself** [2] - 47:6, 47:8
**ivy** [21] - 86:9, 87:14, 90:25, 91:2, 91:8, 91:9, 91:10, 91:20, 91:23, 92:1, 92:4, 92:8, 92:9, 92:10, 92:17, 92:19, 93:2, 93:9, 93:16, 93:18, 93:24

## J

**James** [3] - 51:21, 52:4, 52:7
**January** [5] - 15:18, 15:21, 19:1, 31:9, 90:4
**Jennifer** [2] - 45:19, 49:16
**JENNIFER** [1] - 2:3
**JERSEY** [3] - 1:1, 1:7, 116:3
**Jersey** [11] - 1:15, 1:23, 2:4, 2:7, 2:11, 5:15, 13:9, 14:3, 14:6, 15:6, 116:8
**job** [1] - 47:18
**Jodi** [1] - 11:11
**JODI** [5] - 1:6, 1:10, 3:4, 5:8, 116:10
**John** [2] - 15:12, 15:19
**JOHNSON** [1] - 2:10
**Johnson** [8] - 4:10, 7:22, 13:7, 13:16, 14:19, 15:6, 18:13, 18:20
**joint** [4] - 28:8, 47:2, 47:20, 100:3
**jointly** [1] - 98:23
**joints** [1] - 68:23
**July** [8] - 4:3, 4:16, 16:19, 16:21, 94:17, 94:19, 95:3, 95:13
**June** [4] - 4:13, 85:4, 85:7, 95:23
**justice** [1] - 106:10

## K

**Kathleen** [3] - 1:11, 116:6, 116:25
**KATHY** [1] - 1:21
**kathybowecsr@aol. com** [1] - 1:24
**keep** [2] - 32:2, 113:14
**keeps** [1] - 113:13
**Keller** [1] - 73:4
**kids** [3] - 23:1, 23:4, 23:5
**kind** [11] - 5:20, 26:20, 28:8, 62:21, 64:24, 72:17, 72:18, 72:20, 100:3, 101:24, 102:6
**Kings** [4] - 2:3, 12:3, 12:5, 12:9
**kitchen** [1] - 53:4
**knowing** [3] - 34:2, 34:19, 71:10
**knowledge** [12] -

20:17, 23:13, 27:1, 39:12, 48:19, 58:18, 75:1, 75:19, 75:24, 80:9, 83:5, 102:4
**knows** [3] - 44:15, 79:9, 111:16

## L

**Landing** [12] - 12:25, 52:21, 65:21, 105:19, 107:10, 107:12, 108:5, 108:9, 108:18, 108:19, 109:5, 112:7
**landscaping** [4] - 77:21, 101:11, 101:25, 102:6
**languished** [1] - 40:12
**large** [3] - 69:1, 85:17, 88:1
**larger** [2] - 77:9, 91:15
**last** [2] - 52:3, 104:20
**late** [1] - 90:3
**latitude** [1] - 41:18
**Laurel** [1] - 2:11
**law** [2] - 6:7, 116:10
**Law** [2] - 1:13, 37:25
**lawn** [1] - 88:6
**lawsuit** [5] - 5:13, 10:24, 41:17, 43:4, 100:7
**layers** [1] - 114:8
**leading** [1] - 90:21
**leaking** [1] - 68:13
**leaks** [2] - 68:13, 76:18
**learn** [1] - 31:16
**learned** [5] - 29:12, 29:13, 29:18, 31:7, 108:2
**learning** [2] - 26:7, 58:23
**least** [7] - 25:4, 25:15, 35:13, 40:8, 57:4, 64:3, 90:9
**leave** [1] - 62:14
**led** [1] - 39:14
**left** [4] - 13:8, 102:24, 103:18, 104:11
**left-hand** [2] - 103:18, 104:11
**legal** [3] - 8:14, 13:4, 34:24
**less** [2] - 13:4, 89:5
**level** [4] - 63:11, 63:19, 77:22
**License** [2] - 1:13, 116:25
**likely** [1] - 62:9

limit [1] - 27:24
limitations [2] - 73:16, 77:7
line [16] - 41:16, 43:1, 43:15, 45:23, 46:2, 56:15, 57:7, 57:17, 91:14, 97:18, 98:4, 99:1, 100:1, 104:16, 104:22, 104:23
lines [1] - 68:14
Lisa [13] - 22:16, 22:19, 22:20, 22:22, 27:18, 27:25, 28:6, 28:8, 28:11, 28:16, 28:21, 72:24, 73:4
list [2] - 36:6, 36:24
listed [4] - 22:12, 23:21, 30:24
listen [1] - 43:8
listing [7] - 21:13, 22:10, 22:22, 23:25, 29:12, 30:17, 31:8
litany [2] - 40:13, 44:2
literally [1] - 114:14
litigation [3] - 40:21, 40:25, 41:1
live [6] - 21:8, 65:9, 86:21, 102:19, 102:25, 103:3
lived [1] - 86:17
lives [1] - 101:1
living [3] - 23:3, 55:9, 55:20
LLC [3] - 4:11, 25:9, 25:14
LLP [2] - 2:2, 2:6
LO [1] - 12:18
located [2] - 12:2, 67:7
location [1] - 10:12
long-standing [1] - 42:6
look [3] - 20:21, 37:21, 62:17
looked [6] - 20:22, 85:14, 90:10, 90:20, 95:19, 95:23
looking [19] - 24:3, 24:6, 33:7, 64:11, 67:12, 73:2, 83:11, 84:18, 90:6, 90:24, 92:17, 94:16, 95:6, 103:8, 105:15, 105:17, 105:24, 109:9, 112:23
looks [2] - 109:16, 112:19
love [1] - 86:2
lower [2] - 56:15, 56:21

lowered [1] - 102:23

# M

M.D [1] - 9:25
ma'am [11] - 5:11, 6:15, 9:19, 10:21, 16:13, 19:20, 41:24, 47:14, 86:21, 89:14, 103:14
mail [10] - 4:2, 4:4, 4:5, 16:17, 16:20, 16:25, 17:3, 17:7, 17:9, 32:19
mails [1] - 32:8
maintained [2] - 77:9, 108:20
maintenance [2] - 77:8, 108:4
major [2] - 42:13, 84:19
manager [4] - 21:14, 27:9, 29:20, 30:7
March [8] - 16:2, 16:5, 38:4, 38:11, 38:15, 44:1, 49:22, 52:19
mark [4] - 10:25, 13:2, 25:8, 112:1
marked [38] - 4:9, 11:2, 13:19, 13:25, 14:6, 14:14, 14:21, 15:2, 15:9, 15:16, 15:22, 16:5, 16:14, 16:21, 17:4, 17:10, 17:15, 17:21, 18:1, 18:6, 18:11, 18:13, 18:21, 18:24, 25:10, 25:13, 37:23, 85:3, 85:8, 88:23, 89:1, 89:16, 94:17, 94:20, 103:9, 103:12, 109:14, 112:4
market [1] - 21:24
marking [2] - 13:5, 18:17
Marlton [1] - 21:10
Marquess [11] - 15:19, 15:20, 22:23, 22:25, 23:8, 23:19, 30:16, 33:24, 34:4, 54:14, 75:23
MARQUESS [1] - 15:19
Marquesses [17] - 21:15, 27:10, 27:12, 27:20, 27:21, 29:6, 30:12, 30:21, 33:3, 74:23, 75:24, 80:2, 80:9, 81:10, 86:4, 99:18, 99:25

married [3] - 11:12, 11:15, 23:5
MARSHALL [1] - 2:9
masonry [1] - 109:21
massive [1] - 69:2
material [4] - 73:22, 74:10, 75:2, 76:9
math [1] - 12:22
matter [6] - 10:25, 13:15, 16:10, 80:8, 111:23, 116:21
McGill [1] - 10:10
mean [26] - 26:14, 26:19, 28:7, 28:10, 30:20, 31:7, 33:21, 37:2, 42:11, 45:12, 53:22, 54:12, 56:20, 60:24, 61:3, 61:7, 62:3, 62:7, 62:19, 64:10, 79:2, 86:17, 103:2, 109:21
means [3] - 6:20, 8:19, 92:3
meant [1] - 85:1
measure [1] - 115:1
media [1] - 32:8
Medical [1] - 9:20
medical [3] - 10:5, 12:12, 12:20
medication [1] - 9:13
meeting [1] - 73:10
MELL [5] - 67:7, 77:5, 81:24, 83:11
MELLUL [5] - 1:6, 1:10, 3:4, 5:8, 116:10
Mellul [43] - 11:5, 11:11, 11:13, 12:1, 14:4, 14:18, 15:20, 16:3, 16:18, 19:22, 21:4, 21:8, 24:23, 26:25, 28:6, 32:25, 35:5, 35:23, 36:13, 37:1, 38:3, 38:8, 39:14, 43:10, 44:2, 51:1, 51:3, 52:9, 73:3, 78:5, 81:10, 83:20, 86:11, 91:22, 92:18, 95:11, 96:2, 96:20, 97:4, 97:5, 100:7, 100:12, 106:12
Mellul's [3] - 44:22, 49:11, 49:24
Mellul-1 [2] - 10:25, 11:2
mellul-1 [1] - 3:11
Mellul-10 [3] - 3:23, 15:18, 15:21
Mellul-11 [3] - 3:24,

16:4, 37:23
Mellul-12 [3] - 4:1, 16:8, 16:14
Mellul-13 [2] - 4:2, 16:20
Mellul-14 [2] - 4:4, 17:3
Mellul-15 [3] - 4:5, 17:6, 17:9
Mellul-16 [2] - 4:6, 17:15
Mellul-17 [2] - 4:7, 17:20
Mellul-18 [2] - 4:8, 17:25
Mellul-19 [2] - 4:9, 18:10
Mellul-2 [2] - 3:12, 13:18
Mellul-20 [2] - 4:10, 18:20
Mellul-21 [2] - 4:11, 25:9
Mellul-22 [3] - 4:13, 85:3, 85:7
Mellul-23 [3] - 4:14, 88:24, 88:25
Mellul-24 [3] - 4:15, 89:13, 89:15
Mellul-25 [3] - 4:16, 94:18, 94:19
Mellul-26 [3] - 4:17, 103:10, 103:11
Mellul-27 [3] - 4:18, 109:9, 109:13
Mellul-28 [3] - 4:19, 112:2, 112:3
Mellul-3 [2] - 3:13, 13:24
Mellul-4 [2] - 3:14, 14:2, 14:5
Mellul-5 [2] - 3:15, 14:13
Mellul-6 [2] - 3:17, 14:20
Mellul-7 [2] - 3:18, 15:1
Mellul-8 [2] - 3:20, 15:8
Mellul-9 [2] - 3:21, 15:15
memory [13] - 20:6, 23:24, 25:6, 26:3, 26:6, 31:14, 53:25, 69:18, 71:14, 71:18, 74:14, 91:7, 100:11
mention [1] - 40:25
messages [1] - 32:8
MICHELE [1] - 1:4
Midlantic [1] - 2:10

might [5] - 50:6, 58:8, 86:8, 98:22, 110:6
mineral [1] - 82:20
minor [3] - 70:2, 70:5, 77:10
minutes [1] - 65:25
MKD [1] - 3:10
moisture [1] - 81:4
mold [21] - 66:13, 67:16, 68:10, 70:10, 70:14, 71:2, 71:17, 71:21, 72:1, 74:4, 74:9, 74:15, 75:10, 75:18, 75:20, 76:11, 76:15, 76:17, 79:23, 80:12
mold-like [6] - 66:13, 67:16, 70:10, 70:14, 76:15, 76:17
mold-related [1] - 75:18
molding [2] - 66:24, 67:2
monetary [1] - 28:11
money [1] - 113:24
monitored [1] - 77:9
month [1] - 20:23
monthly [1] - 20:24
months [4] - 24:15, 53:10, 55:17, 90:8, 96:13
Montreal [1] - 10:10
morning [2] - 5:11, 5:18
mortgage [12] - 20:1, 20:3, 20:4, 20:7, 20:11, 20:14, 20:18, 21:1, 21:2, 22:3, 22:4, 22:8
most [4] - 32:15, 60:18, 76:16, 86:12
motion [4] - 43:18, 43:21, 44:12, 46:3
motivated [1] - 49:22
Mount [1] - 2:11
move [3] - 24:14, 44:25, 96:12
moved [39] - 12:7, 12:10, 18:25, 21:9, 23:5, 23:12, 23:13, 23:17, 26:8, 53:9, 53:18, 53:21, 54:6, 55:8, 55:16, 56:11, 58:3, 59:25, 60:1, 60:10, 60:11, 61:15, 62:1, 67:22, 68:1, 75:9, 75:11, 79:18, 80:17, 87:12, 91:22, 92:24, 93:4, 93:10, 95:11, 95:17, 97:4,

99:1, 99:24
**moving** [9] - 22:1,
24:8, 25:25, 26:18,
53:13, 53:15, 53:22,
53:23, 54:22
**MR** [93] - 5:10, 11:4,
13:12, 13:20, 14:1,
14:8, 14:16, 14:22,
15:3, 15:10, 15:17,
15:23, 16:7, 16:13,
16:16, 16:23, 17:5,
17:11, 17:17, 17:22,
18:4, 18:5, 18:12,
18:22, 25:11, 26:10,
29:11, 32:6, 34:7,
35:17, 39:18, 39:24,
40:4, 40:16, 41:9,
41:21, 41:23, 43:2,
43:5, 43:12, 43:17,
43:20, 44:5, 44:9,
44:13, 44:21, 45:8,
45:15, 45:19, 46:4,
46:7, 46:8, 47:7,
47:9, 48:10, 49:3,
49:16, 49:19, 51:8,
56:17, 57:9, 59:1,
59:17, 61:4, 66:3,
72:11, 74:20, 75:6,
78:10, 84:1, 84:14,
85:11, 85:20, 87:1,
87:5, 89:2, 89:11,
89:12, 93:23, 94:13,
94:15, 94:21, 96:5,
96:22, 98:7, 98:15,
100:16, 103:13,
108:7, 108:23,
109:15, 112:5, 113:5
**MS** [76] - 13:10, 16:12,
18:2, 26:9, 29:9,
32:2, 34:6, 35:16,
40:3, 40:15, 40:23,
41:6, 41:14, 42:9,
42:25, 43:3, 43:7,
43:14, 43:19, 44:7,
44:11, 44:16, 44:19,
45:4, 45:10, 45:17,
45:22, 46:6, 46:23,
47:5, 47:12, 48:9,
49:1, 49:13, 51:7,
56:16, 57:8, 58:25,
59:16, 61:2, 67:4,
69:21, 72:9, 74:18,
75:5, 75:8, 78:9,
78:21, 83:25, 84:13,
84:21, 85:9, 85:19,
86:25, 87:3, 89:9,
91:18, 91:24, 92:1,
92:7, 93:19, 94:2,
94:5, 94:11, 94:14,
94:23, 95:8, 96:4,
96:21, 98:6, 98:14,

100:15, 103:4,
108:6, 108:22, 113:3
**multiple** [5] - 40:21,
113:22, 114:10,
114:12, 114:13
**must** [4] - 26:5, 70:10,
70:15

## N

**naive** [2] - 27:6, 84:24
**Name** [1] - 4:21
**name** [19] - 5:11, 11:7,
11:9, 11:24, 19:9,
19:18, 22:14, 30:1,
42:8, 47:11, 47:19,
48:5, 51:23, 52:3,
52:5, 58:11, 73:13,
73:14, 105:21
**names** [1] - 47:21
**nature** [1] - 53:2
**near** [2] - 12:9, 21:24
**need** [7] - 6:19, 8:19,
29:24, 42:8, 71:1,
73:22, 86:16
**needed** [1] - 39:14
**negative** [1] - 77:22
**negotiated** [2] - 42:18,
74:23, 106:16
**negotiating** [1] - 27:12
**negotiations** [1] -
31:21
**negotiator** [1] - 31:23
**nervous** [1] - 39:17
**never** [10] - 23:20,
33:21, 48:13, 51:23,
52:4, 54:14, 54:15,
54:25, 55:1, 59:8
**NEW** [3] - 1:1, 1:7,
116:3
**new** [1] - 53:17
**New** [12] - 1:15, 1:23,
2:4, 2:7, 2:11, 5:14,
10:8, 13:9, 14:3,
14:6, 15:6, 116:8
**next** [5] - 55:4, 60:22,
87:17, 87:18, 104:15
**nice** [1] - 34:16
**NIMEROFF** [77] - 2:3,
13:10, 16:12, 18:2,
26:9, 29:9, 32:2,
34:6, 35:16, 40:3,
40:15, 40:23, 41:6,
41:14, 42:9, 42:25,
43:3, 43:7, 43:14,
43:19, 44:7, 44:11,
44:16, 44:19, 45:4,
45:10, 45:17, 45:22,
46:6, 46:23, 47:5,
47:12, 48:9, 49:1,

49:13, 51:7, 56:16,
57:8, 58:25, 59:16,
61:2, 67:4, 69:21,
72:9, 74:18, 75:5,
75:8, 78:9, 78:21,
83:25, 84:13, 84:21,
85:9, 85:19, 86:25,
87:3, 89:9, 91:18,
89:12, 92:1, 92:7,
93:19, 94:2, 94:5,
94:11, 94:14, 94:23,
95:8, 96:4, 96:21,
98:6, 98:14, 100:15,
103:4, 108:6,
108:22, 113:3
**NJ** [2] - 2:11, 116:12
**NO** [3] - 1:2, 3:3, 3:10
**nobody** [1] - 27:5
**nonetheless** [1] - 54:7
**Notary** [3] - 1:13,
116:8, 116:20
**noted** [3] - 73:23,
77:23, 82:13
**nothing** [6] - 6:12,
7:23, 43:4, 46:18,
48:2, 68:19
**notice** [8] - 55:9, 56:5,
56:10, 56:14, 57:4,
57:13, 64:19, 100:12
**noticed** [3] - 56:23,
57:10, 60:11
**November** [2] - 25:15,
25:20
**number** [10] - 5:25,
6:15, 10:21, 17:12,
17:19, 18:7, 18:15,
22:14, 30:20, 85:17
**numerous** [1] - 45:13

## O

**O-C-U-L-O** [1] - 12:17
**oath** [2] - 6:5, 6:10
**object** [6] - 41:21,
45:20, 45:22, 45:23,
46:5, 94:24
**objection** [49] - 7:21,
8:1, 8:6, 8:9, 8:12,
26:9, 34:6, 35:16,
40:3, 40:15, 40:23,
42:9, 42:25, 43:13,
44:6, 46:23, 47:5,
48:9, 49:13, 51:7,
56:16, 57:8, 58:25,
59:16, 67:4, 69:21,
74:18, 75:5, 75:8,
78:9, 78:21, 83:25,
84:13, 84:21, 85:19,
86:25, 91:18, 91:24,
94:2, 94:23, 95:8,

96:4, 96:21, 98:6,
98:14, 100:15,
103:4, 108:6, 108:22
**objections** [1] - 5:5
**observation** [1] -
64:16
**observe** [1] - 56:14
**obtain** [1] - 35:23
**obtained** [2] - 36:14,
38:1
**obviously** [2] - 22:2,
61:18
**occasion** [1] - 89:22
**occurred** [1] - 61:18
**occurring** [1] - 33:14
**OCEAN** [1] - 116:5
**October** [3] - 1:15,
31:8, 116:12
**oculo** [1] - 12:17
**oculofacial** [2] -
11:21, 12:15
**OF** [4] - 1:1, 1:7,
116:3, 116:5
**offered** [1] - 27:23
**offers** [1] - 31:17
**office** [11] - 10:13,
14:11, 14:25, 18:3,
21:14, 27:9, 29:1,
29:14, 29:18, 29:20,
30:7
**Offices** [1] - 1:14
**offices** [1] - 116:10
**officials** [1] - 109:4
**often** [3] - 76:16,
82:20, 100:23
**old** [1] - 21:6
**omit** [1] - 27:14
**once** [2] - 79:4, 87:9
**one** [35] - 19:9, 22:14,
25:3, 25:4, 31:25,
38:9, 40:8, 45:24,
48:14, 48:15, 54:17,
56:1, 56:2, 56:3,
59:9, 62:13, 63:1,
64:24, 71:8, 78:18,
78:25, 79:13, 79:24,
80:25, 81:19, 83:5,
86:2, 104:12, 107:6,
107:17, 111:13,
111:14, 112:24,
114:16
**one-off** [1] - 54:17
**ones** [1] - 58:12
**ongoing** [1] - 100:8
**open** [1] - 68:22
**operated** [1] - 108:19
**opportunity** [1] -
62:17
**opposed** [1] - 84:7
**opted** [1] - 34:12

**order** [2] - 16:10,
87:16
**ordered** [1] - 104:6
**original** [2] - 19:5,
19:8
**originally** [3] - 42:18,
57:21, 57:24
**otherwise** [2] - 114:2,
116:23
**outright** [1] - 52:20
**outside** [2] - 62:18,
69:3
**overnight** [1] - 31:12
**own** [5] - 19:6, 24:24,
49:7, 62:25, 65:14
**owned** [1] - 108:19
**owner** [4] - 19:8,
38:12, 52:20, 100:20
**owner's** [1] - 19:5
**ownership** [2] - 54:24,
111:5

## P

**p.m** [1] - 115:10
**page** [4] - 38:1, 73:3,
76:11, 77:22
**PAGE** [2] - 3:3, 3:10
**Page** [13] - 4:21, 4:22,
4:23, 67:7, 72:22,
73:17, 74:4, 76:8,
77:4, 77:19, 77:20,
81:23
**paid** [2] - 20:1, 81:14
**Palladino** [19] - 39:10,
42:24, 51:1, 51:4,
52:9, 95:14, 95:25,
98:3, 98:12, 99:2,
100:2, 100:8,
100:14, 100:20,
100:23, 101:8,
104:17, 106:3,
106:14
**Palladino's** [3] - 45:2,
101:13, 106:19
**Palladinos** [7] - 96:24,
97:11, 97:19, 97:21,
100:4, 106:9, 110:18
**Palladinos'** [2] -
97:23, 97:24
**pardon** [10] - 23:10,
33:19, 50:17, 52:12,
60:19, 68:3, 72:19,
87:7, 87:23, 91:5
**parents** [1] - 47:18
**part** [12] - 40:7, 49:23,
55:18, 59:15, 65:4,
72:5, 80:13, 88:16,
104:18, 113:21,
114:9, 114:10

**particular** [1] - 39:13
**parties** [2] - 5:3, 116:19
**partner** [5] - 40:9, 46:11, 46:12, 46:13, 58:23
**partners** [2] - 39:8, 59:9
**passing** [1] - 51:20
**past** [2] - 107:24, 109:25
**path** [1] - 41:19
**PAUL** [1] - 2:10
**pay** [4] - 20:22, 28:11, 56:8, 108:13
**payment** [1] - 20:24
**pending** [2] - 8:22, 39:21
**penetration** [4] - 82:23, 83:7, 83:15, 83:22
**people** [1] - 107:24
**percent** [5] - 8:6, 20:8, 20:9, 83:14, 83:21
**percentage** [1] - 45:11
**performed** [1] - 25:5
**perhaps** [2] - 102:8, 108:9
**perimeter** [1] - 77:24
**period** [2] - 95:19, 96:12
**permitted** [1] - 43:11
**person** [1] - 31:20
**personal** [1] - 80:15
**perspective** [1] - 57:18
**phase** [4] - 87:13, 87:17, 88:14, 88:17
**phases** [1] - 88:18
**phenomenon** [1] - 54:21
**phone** [1] - 52:6
**photo** [34] - 4:13, 4:14, 4:15, 4:16, 4:17, 4:18, 4:19, 85:4, 87:22, 89:3, 89:4, 89:10, 90:6, 90:9, 90:13, 91:13, 92:4, 92:18, 95:2, 97:16, 97:17, 97:22, 104:11, 104:16, 104:21, 106:10, 106:21, 110:4, 110:15, 112:14, 113:6, 113:8, 114:5
**Photograph** [1] - 88:25
**Photographs** [1] - 17:15
**Photos** [1] - 4:6

**photos** [4] - 17:12, 79:24, 85:14, 105:9
**physical** [1] - 32:9
**physically** [2] - 53:22, 60:11
**physicians** [1] - 47:17
**picked** [1] - 7:8
**pitch** [5] - 77:22, 77:23, 78:7, 78:19
**place** [3] - 35:2, 99:19, 99:25
**placed** [2] - 6:4, 91:8
**placing** [1] - 8:9
**plaintiffs** [1] - 13:15
**Plaintiffs** [2] - 1:5, 2:4
**Plan** [2] - 3:21, 15:15
**plan** [4] - 15:11, 100:3, 101:21, 102:7
**plant** [1] - 91:10
**planted** [1] - 104:6
**Plastic** [1] - 12:1
**plastic** [1] - 12:13
**plastics** [1] - 11:21
**played** [1] - 45:12
**plumbing** [1] - 68:14
**point** [21] - 36:12, 40:9, 45:20, 54:5, 54:23, 56:10, 63:4, 63:24, 64:19, 66:12, 67:18, 70:12, 86:10, 92:12, 92:20, 92:22, 100:6, 106:1, 107:4, 115:3, 115:8
**pointing** [1] - 112:17
**pole** [2] - 91:19, 92:8
**ponding** [1] - 77:25
**Ponzio's** [1] - 12:10
**poor** [4] - 68:21, 68:22, 83:16, 83:23
**portion** [6] - 61:24, 78:13, 82:5, 104:12, 104:20, 104:23
**position** [1] - 7:25
**positive** [1] - 77:23
**possession** [1] - 19:2
**potential** [4] - 34:14, 35:1, 35:15, 40:21
**potentially** [2] - 30:25, 56:11
**pour** [1] - 55:11
**practice** [5] - 11:22, 11:25, 12:4, 12:8, 12:12
**pre** [1] - 111:8
**pre-existed** [1] - 111:8
**precisely** [1] - 32:1
**preference** [1] - 86:4
**pregnant** [1] - 75:10
**premises** [1] - 55:17

**prepared** [1] - 37:24
**presence** [1] - 82:22
**president** [1] - 108:1
**pressure** [1] - 63:21
**pretty** [4] - 45:8, 49:22, 55:15, 81:17
**previously** [1] - 76:9
**price** [4] - 19:23, 23:25, 27:13, 42:18
**primarily** [1] - 31:21
**primary** [1] - 31:23
**print** [1] - 116:16
**printed** [1] - 25:15
**printing** [1] - 17:1
**privy** [1] - 32:17
**problem** [8] - 40:1, 68:5, 79:8, 82:25, 84:19, 108:10
**problems** [5] - 40:13, 77:10, 80:4, 84:12, 98:1
**proceeding** [1] - 6:4
**process** [3] - 96:7, 104:3, 104:25
**produced** [5] - 16:9, 17:13, 17:23, 18:8, 18:15
**Production** [2] - 3:16, 14:14
**production** [1] - 14:10
**Professional** [3] - 1:12, 1:22, 116:7
**progress** [1] - 63:2
**project** [2] - 113:21, 114:9
**projects** [5] - 47:25, 48:8, 88:22, 113:22, 114:10
**proper** [1] - 44:6
**properties** [5] - 24:4, 50:2, 50:14, 78:24, 79:3
**property** [175] - 19:1, 19:23, 20:25, 21:4, 21:9, 21:12, 22:1, 22:4, 22:10, 23:17, 23:21, 23:25, 24:3, 24:8, 24:14, 25:21, 26:1, 26:7, 26:18, 26:20, 26:25, 27:2, 31:6, 31:15, 31:17, 32:12, 32:13, 32:22, 33:15, 34:3, 34:12, 34:20, 34:23, 35:22, 36:8, 36:13, 37:1, 37:8, 38:7, 39:15, 40:1, 40:10, 40:12, 40:20, 41:2, 41:5, 41:11, 42:5, 42:7, 42:14, 42:23, 43:25,

44:3, 44:23, 45:2, 45:3, 46:10, 46:13, 46:14, 46:17, 50:10, 50:15, 50:20, 51:6, 51:12, 52:10, 52:24, 52:25, 53:3, 53:10, 53:13, 53:22, 55:6, 55:21, 55:24, 56:14, 57:3, 57:5, 57:6, 57:17, 57:19, 57:21, 57:23, 58:1, 58:6, 58:10, 59:10, 59:14, 59:21, 59:23, 59:25, 60:2, 60:17, 60:24, 62:14, 62:16, 63:12, 63:17, 65:14, 66:17, 66:21, 66:24, 67:3, 67:22, 68:1, 68:21, 69:20, 78:6, 78:8, 78:17, 79:5, 79:6, 79:16, 80:18, 81:11, 84:12, 84:19, 84:20, 85:14, 85:18, 85:25, 86:3, 86:21, 90:1, 90:2, 90:3, 90:9, 90:10, 90:11, 90:20, 90:22, 91:22, 92:9, 92:13, 93:5, 93:11, 95:11, 95:15, 95:19, 95:25, 96:8, 96:14, 96:18, 97:4, 97:7, 97:18, 98:5, 98:13, 99:1, 99:16, 99:23, 100:4, 100:9, 100:14, 100:24, 101:12, 101:13, 101:19, 103:1, 105:14, 106:11, 108:12, 109:18, 110:10, 110:17, 110:23, 110:24, 111:6, 111:9, 112:20
**protect** [9] - 38:19, 39:15, 47:3, 47:15, 47:24, 49:6, 61:16, 99:23, 110:10
**protecting** [1] - 46:20
**protective** [1] - 115:1
**provide** [1] - 34:4
**provided** [1] - 108:13
**Public** [3] - 1:13, 116:8, 116:25
**public** [1] - 22:10
**publicly** [1] - 22:13
**pump** [4] - 68:13, 75:25, 76:4, 76:22
**purchase** [12] - 20:7, 31:5, 31:22, 32:12, 32:21, 46:13, 58:20, 61:11, 90:2, 90:11,

90:21, 111:8
**purchased** [14] - 19:22, 23:25, 26:16, 36:8, 42:24, 50:2, 50:23, 51:6, 59:10, 66:16, 68:21, 90:1, 90:3, 90:8
**purchasing** [2] - 24:2, 33:14
**purpose** [3] - 99:21, 101:25, 110:8
**purposes** [3] - 8:10, 13:5, 101:18
**put** [6] - 20:8, 20:9, 44:8, 98:25, 111:24, 113:24

---

**Q**

**questioning** [5] - 41:16, 43:1, 43:16, 45:24, 46:2
**questions** [10] - 5:6, 6:16, 6:17, 6:19, 7:15, 9:5, 9:16, 42:2, 42:3, 43:9
**quite** [1] - 31:3

---

**R**

**radar** [1] - 24:5
**rain** [7] - 55:10, 55:13, 56:24, 61:12, 62:13, 63:2, 65:2
**rained** [2] - 60:18, 60:20
**rains** [2] - 60:17, 63:18
**rainstorm** [2] - 62:8, 62:9
**raised** [4] - 23:4, 47:18, 104:3, 104:4
**ran** [1] - 39:25
**reach** [3] - 54:12, 54:13, 107:21
**reached** [2] - 107:23, 107:25
**read** [3] - 39:18, 39:22, 78:13
**reading** [12] - 5:4, 13:16, 67:19, 70:11, 70:16, 76:19, 77:15, 78:3, 81:7, 82:1, 82:8, 83:18
**ready** [1] - 44:25
**real** [3] - 27:10, 27:14, 49:24
**realized** [1] - 79:4
**really** [7] - 37:6, 42:12, 57:14, 68:5, 71:6,

80:25, 81:21
**realtor** [15] - 4:21,
19:3, 19:5, 19:6,
19:7, 19:15, 19:18,
27:8, 27:22, 28:8,
33:8, 35:6, 35:7,
35:12, 35:20
**realtors** [1] - 34:25
**reason** [11] - 6:18, 7:2,
7:6, 8:8, 8:14, 8:19,
27:7, 40:7, 47:1,
90:15, 90:19
**reasons** [3] - 86:7,
101:14, 101:18
**received** [1] - 15:25
**recent** [1] - 48:22
**recently** [1] - 37:10
**Recess** [1] - 66:2
**recognizing** [1] - 90:6
**recollected** [1] - 90:12
**recollection** [2] -
64:15, 90:10
**recommend** [1] - 81:5
**recommendation** [1] -
101:21
**recommended** [1] -
71:4
**record** [11] - 5:17,
7:25, 8:9, 11:1, 13:6,
44:8, 47:6, 81:24,
91:15, 104:9, 112:17
**rectified** [2] - 75:11,
79:20
**rectify** [1] - 79:8
**reduced** [1] - 116:16
**reference** [5] - 32:21,
67:8, 73:18, 77:5,
81:25
**references** [3] - 25:19,
73:3, 76:11
**referral** [1] - 73:7
**referring** [3] - 97:15,
97:17, 103:22
**regarding** [2] - 9:17,
71:9
**Registered** [3] - 1:11,
1:22, 116:6
**regrade** [1] - 100:4
**regraded** [2] - 103:2,
103:5
**regrading** [2] -
102:14, 103:7
**regrets** [1] - 35:4
**regular** [3] - 35:12,
60:12, 61:20
**related** [4] - 44:3,
75:18, 82:7, 116:19
**relating** [3] - 12:11,
83:13, 109:4
**relation** [1] - 107:8

**relationship** [1] -
30:14
**relevance** [1] - 41:22
**remain** [1] - 88:4
**remainder** [1] - 20:10
**remaining** [1] - 20:18
**remediated** [1] - 75:20
**remediation** [3] -
75:17, 75:18, 80:12
**remedy** [1] - 70:3
**remember** [35] - 9:14,
21:22, 22:15, 24:19,
24:25, 25:1, 28:3,
31:2, 31:10, 31:11,
32:19, 36:4, 52:25,
60:5, 60:22, 66:8,
66:10, 66:11, 71:20,
71:22, 73:10, 73:13,
73:14, 74:12, 75:14,
76:22, 79:25, 80:20,
81:9, 81:21, 81:22,
84:10, 90:24, 91:16,
107:4
**remembered** [1] -
80:14
**remembers** [1] - 32:1
**remind** [1] - 28:25
**removal** [2] - 81:5,
88:19
**remove** [2] - 61:13,
99:18
**removed** [24] - 86:8,
86:11, 86:24, 87:18,
91:23, 92:10, 92:19,
93:2, 93:9, 95:7,
95:10, 96:2, 96:9,
96:19, 97:5, 97:13,
97:25, 98:3, 98:12,
98:21, 101:13,
101:17, 101:18
**renovated** [1] - 53:4
**renovating** [2] - 24:15,
24:17
**renovations** [2] - 53:5,
55:19
**renting** [1] - 21:10
**repair** [5] - 67:8,
67:13, 74:5, 76:5,
76:8
**repair/has** [1] - 73:22
**repaired** [1] - 76:3
**repairs** [1] - 77:11
**repeat** [1] - 41:7
**replaced** [2] - 76:3,
76:23
**replacement** [1] -
77:13
**report** [26] - 26:7,
67:7, 67:15, 68:17,
69:16, 70:18, 72:2,

72:21, 74:16, 75:3,
76:7, 77:2, 77:4,
77:6, 77:21, 78:14,
79:20, 80:5, 80:10,
80:23, 81:2, 82:6,
82:11, 82:16, 82:19,
83:3
**reporter** [4] - 6:24,
7:9, 32:4, 39:22
**Reporter** [4] - 1:12,
116:7
**Reporters** [2] - 1:22,
1:22
**REPORTERS** [1] -
1:21
**represent** [6] - 5:12,
17:6, 25:18, 27:24,
74:2, 103:16
**represented** [1] -
19:19
**representing** [2] -
32:25, 33:3
**represents** [1] - 13:8
**requesting** [1] - 42:16
**Requests** [8] - 3:14,
3:16, 3:18, 3:20,
14:6, 14:13, 15:1,
15:8
**requests** [6] - 14:3,
14:9, 14:23, 14:24,
15:4, 15:5
**REQUESTS** [1] - 4:20
**require** [3] - 7:16,
76:10, 77:8
**requirement** [1] -
34:25
**requires** [1] - 6:10
**research** [4] - 21:12,
35:14, 58:5, 102:12
**researched** [1] - 79:11
**reserved** [1] - 5:6
**reside** [1] - 12:24
**residence** [4] - 60:25,
61:3, 61:7, 63:7
**resides** [1] - 21:3
**respect** [4] - 31:5,
33:5, 107:22, 109:4
**respective** [1] - 5:3
**response** [1] - 15:25,
76:10
**responses** [6] - 13:12,
14:2, 14:9, 14:18,
14:23, 15:4
**Responses** [10] -
3:14, 3:15, 3:17,
3:18, 3:20, 14:5,
14:13, 14:20, 15:1,
15:8
**responsibility** [1] -
6:16

**responsible** [2] -
31:21, 108:4
**restart** [1] - 65:25
**resume** [1] - 115:6
**retain** [2] - 28:9,
101:24
**retained** [6] - 24:23,
27:15, 28:7, 72:24,
102:5, 102:8
**retention** [1] - 28:6
**revealed** [1] - 66:13
**review** [2] - 32:10,
66:20
**reviewed** [2] - 26:4,
70:21
**riddled** [3] - 26:8,
26:14, 26:15
**right-hand** [1] -
104:15
**righteous** [1] - 34:10
**rise** [5] - 62:21, 63:13,
63:14, 63:19, 63:20
**rises** [1] - 63:11
**Road** [1] - 52:21
**road** [3] - 63:10,
104:1, 107:12
**role** [2] - 45:12, 45:25
**roof** [3] - 68:22, 76:18,
77:13
**roofing** [1] - 37:17
**roots** [1] - 93:16
**round** [1] - 20:19
**Route** [3] - 21:22,
21:23, 21:24
**row** [3] - 97:21,
105:10, 114:18
**RPR** [1] - 116:25
**rule** [2] - 8:21, 62:11
**Rule** [8] - 3:12, 3:13,
13:3, 13:12, 13:14,
13:18, 13:21, 13:24
**run** [1] - 61:12

**S**

**safe** [1] - 50:4
**sale** [1] - 21:16
**sales** [1] - 39:9
**sand** [3] - 61:11,
61:13, 61:14
**Sandmeyer** [1] - 16:18
**Schaeffer** [6] - 29:25,
30:2, 30:3, 30:10,
30:19
**screen** [3] - 25:12,
67:9, 103:19
**screenshot** [7] - 85:4,
89:13, 95:4, 103:9,
103:17, 109:10,
112:6

**Screenshot** [6] - 85:8,
89:16, 94:20,
103:11, 109:14,
112:4
**scrolling** [1] - 19:13
**seated** [1] - 13:8
**second** [4] - 9:2, 24:9,
53:6, 73:2
**section** [3] - 70:13,
83:12, 83:13
**secure** [1] - 47:18
**see** [58] - 19:12, 25:16,
35:14, 38:9, 45:7,
62:18, 62:21, 63:8,
63:18, 64:3, 64:7,
67:9, 67:13, 67:19,
70:11, 70:16, 73:5,
73:8, 73:19, 73:25,
74:5, 76:12, 76:19,
77:15, 78:3, 81:1,
81:7, 82:1, 82:8,
83:18, 85:5, 85:12,
89:6, 89:14, 89:19,
89:20, 89:22, 90:25,
94:22, 94:25, 95:4,
95:14, 95:24, 96:13,
97:21, 97:22, 97:24,
102:20, 103:14,
103:19, 104:1,
105:9, 106:23,
109:11, 109:16,
112:8, 112:14,
112:15
**seeing** [4] - 19:15,
85:24, 113:10,
114:20
**seeking** [1] - 40:2
**seem** [2] - 48:6, 70:7
**self** [1] - 11:23
**self-employed** [1] -
11:23
**sell** [2] - 34:12, 52:9
**seller** [1] - 34:14
**sellers** [1] - 25:2
**sent** [2] - 13:15, 15:25
**September** [22] - 4:2,
4:17, 4:18, 4:19,
16:19, 16:21,
103:12, 103:17,
105:16, 105:24,
109:11, 109:13,
110:5, 110:14,
110:15, 112:3,
112:6, 113:6, 113:9,
113:17, 114:5,
114:11
**sequence** [1] - 31:2
**series** [2] - 15:24, 16:8
**serious** [6] - 40:1,
44:2, 49:23, 49:25,

62:9, 75:2
**served** [3] - 10:2, 13:7, 13:11
**service** [4] - 67:8, 67:12, 74:5, 76:8
**service/repair** [2] - 73:18, 73:21
**several** [1] - 53:10
**severity** [1] - 82:25
**sewer** [1] - 68:14
**shape** [1] - 83:8
**share** [1] - 96:24
**sheathing** [2] - 67:2, 76:15
**Ship** [1] - 1:23
**shore** [1] - 101:5
**short** [1] - 90:8
**shorter** [1] - 31:10
**shoulders** [2] - 7:8, 51:25
**show** [6] - 10:20, 28:23, 74:2, 78:16, 88:23, 103:23
**showing** [4] - 28:19, 28:22, 37:22, 90:13
**shows** [1] - 78:15
**shrubbery** [6] - 56:12, 96:1, 96:17, 97:5, 101:12
**shrug** [1] - 7:7
**shrugged** [1] - 51:25
**sic)** [1] - 34:14
**side** [13] - 38:18, 38:20, 65:12, 96:24, 97:12, 97:15, 97:17, 104:11, 104:16, 105:25, 110:16, 110:17, 112:20
**sign** [1] - 89:6
**significant** [2] - 68:19, 70:1
**signing** [1] - 5:4
**signs** [1] - 22:15
**simple** [3] - 44:23, 55:10, 108:16
**simply** [3] - 7:25, 8:9, 114:3
**single** [2] - 113:21, 114:9
**sit** [2] - 56:14, 102:21
**sits** [4] - 56:21, 57:6, 57:17, 57:19
**sitting** [9] - 26:3, 35:4, 50:21, 58:9, 91:3, 91:4, 91:6, 93:24, 94:8
**situated** [2] - 91:2, 114:21
**situation** [2] - 35:8, 48:3

**situations** [1] - 61:23
**six** [1] - 38:1
**six-page** [1] - 38:1
**size** [1] - 106:6
**sloping** [1] - 81:5
**slowly** [1] - 88:22
**small** [8] - 17:2, 17:8, 68:25, 70:2, 78:15, 79:1, 104:2
**snap** [1] - 96:11
**snapshots** [1] - 95:22
**so..** [1] - 88:9
**social** [1] - 32:8
**sold** [7] - 50:23, 51:14, 51:15, 52:13, 52:14, 52:15, 52:16
**sole** [3] - 38:12, 52:20, 108:10
**sometime** [3] - 48:22, 54:4, 90:2
**sometimes** [3] - 32:3, 48:14, 63:20
**somewhere** [4] - 20:19, 20:21, 21:19, 21:23
**soon** [3] - 24:13, 55:16, 99:24
**sorry** [9] - 29:17, 30:9, 32:5, 55:18, 59:5, 69:11, 82:4, 89:10, 102:18
**sort** [9] - 22:11, 51:25, 62:8, 62:11, 64:16, 95:16, 97:11, 98:9, 105:17
**space** [5] - 81:25, 82:7, 82:12, 83:16, 83:23
**specific** [4] - 64:12, 81:18, 84:7, 95:21
**specifically** [1] - 75:18
**specifics** [1] - 48:3
**specify** [1] - 87:5
**speculate** [2] - 7:15, 7:16
**speed** [1] - 63:16
**spoken** [2] - 23:18, 109:3
**spring** [1] - 54:1
**SS** [1] - 116:4
**stage** [4] - 64:6, 87:18, 92:14, 105:18
**stages** [3] - 87:6, 87:8, 87:18
**standing** [4] - 42:6, 70:12, 77:25, 91:14
**start** [10] - 18:19, 28:15, 30:21, 63:2, 63:11, 64:4, 64:16, 64:17, 87:10, 109:23

**started** [12] - 9:3, 9:9, 31:4, 38:17, 47:22, 50:4, 55:9, 56:25, 87:12, 97:23, 103:25, 104:7
**starting** [1] - 64:18
**starts** [3] - 48:13, 62:21, 64:20
**State** [3] - 51:14, 51:18, 116:8
**STATE** [1] - 116:3
**state** [2] - 8:5, 101:2
**statement** [5] - 48:8, 57:16, 84:7, 98:2, 101:10
**STATES** [1] - 1:1
**states** [1] - 77:22
**stating** [1] - 7:24
**Station** [27] - 56:6, 57:6, 57:18, 59:15, 59:22, 63:8, 63:19, 64:8, 64:11, 64:17, 64:21, 65:11, 65:15, 65:17, 104:12, 105:25, 107:6, 107:9, 108:10, 108:18, 110:17, 112:8, 112:19, 113:1, 114:17
**stayed** [1] - 62:2
**Stenographic** [1] - 1:10
**stenographically** [1] - 116:15
**step** [3] - 24:9, 48:14, 48:15
**steps** [2] - 80:20, 105:14
**Steve** [1] - 73:3
**Steven** [4] - 11:12, 15:20, 16:2, 16:18
**still** [8] - 8:7, 8:12, 20:14, 23:8, 36:19, 48:18, 88:4, 88:9
**stipulated** [1] - 5:2
**stood** [1] - 62:20
**stop** [5] - 43:1, 43:15, 44:19, 115:4
**stopping** [1] - 115:3
**storm** [13] - 36:17, 64:19, 65:1, 65:3, 106:22, 106:25, 107:1, 107:9, 108:12, 112:15, 112:18, 112:19, 112:23
**stormwater** [3] - 110:23, 111:4, 111:12
**Street** [1] - 1:23

**street** [8] - 27:4, 56:15, 57:7, 57:17, 68:8, 94:17, 95:24, 107:22
**streets** [2] - 55:11, 65:2
**stressor** [1] - 62:3
**strike** [3] - 13:13, 28:14, 51:16
**struck** [1] - 57:15
**structure** [3] - 61:8, 91:11, 93:12
**stuff** [1] - 37:17
**subdivision** [4] - 15:11, 58:20, 59:10, 59:15
**Subdivision** [2] - 3:21, 15:15
**subfloor** [1] - 74:9
**subfloor/framing** [1] - 67:16
**subject** [2] - 40:20, 45:12
**submitted** [7] - 13:22, 14:10, 14:19, 15:5, 37:3, 37:8, 79:21
**subpoena** [1] - 15:25
**subsequent** [4] - 70:10, 70:14, 71:2, 71:17
**subsequently** [1] - 96:2
**substance** [2] - 66:13, 76:15
**substances** [4] - 67:16, 70:10, 70:15, 76:17
**substantive** [1] - 9:4
**suggesting** [1] - 114:2
**Suite** [1] - 2:10
**sum** [1] - 38:8
**summer** [3] - 54:2, 54:3, 54:5
**sump** [4] - 68:12, 75:25, 76:3, 76:22
**sunken** [1] - 58:2
**surface** [1] - 69:3
**surfaces** [3] - 67:17, 74:10, 76:16
**Surgery** [1] - 12:1
**surgery** [2] - 12:13, 12:15
**surprised** [2] - 107:25
**surrounded** [3] - 63:24, 91:19, 96:8
**surrounding** [2] - 96:18, 99:16
**sustained** [1] - 60:23
**sworn** [2] - 5:8, 116:13

**system** [11] - 98:9, 103:21, 104:13, 104:18, 104:24, 105:22, 107:4, 110:23, 111:4, 112:11, 113:9
**systems** [2] - 77:13, 111:13

### T

**Tarzy** [6] - 51:21, 51:23, 52:3, 52:4, 52:5, 52:7
**taxes** [2] - 21:2, 108:13
**TD** [3] - 20:5, 20:11, 20:16
**techniques** [3] - 68:22, 83:17, 83:24
**Tedesco** [3] - 58:19, 58:23, 59:8
**TEDESCO** [1] - 1:4
**Tedesco's** [2] - 59:14, 59:21
**temporary** [1] - 95:18
**ten** [7] - 29:22, 31:25, 65:25, 79:18, 88:21, 90:12, 111:23
**tend** [1] - 8:18
**tendered** [1] - 14:24
**terminate** [1] - 48:20
**terminated** [1] - 48:23
**terms** [4] - 20:9, 64:3, 65:8, 88:19
**terrible** [1] - 50:9
**testified** [2] - 46:24, 47:13
**testimony** [11] - 9:5, 9:6, 26:24, 27:2, 33:21, 43:21, 43:24, 53:21, 116:14, 116:18
**text** [2] - 32:8, 32:20
**THE** [2] - 32:5, 93:21
**theirs** [1] - 27:15
**theory** [1] - 43:23
**thereafter** [1] - 60:15
**therefore** [1] - 49:6
**third** [3] - 88:14, 88:16, 104:23
**threatened** [1] - 100:7
**three** [3] - 12:6, 97:7, 106:6
**Three** [5] - 15:13, 58:13, 58:24, 59:3, 59:6
**throughs** [1] - 56:5
**thumb** [1] - 62:12
**today** [20] - 5:16, 6:1,

6:5, 6:16, 6:24, 7:15, 7:21, 9:12, 10:22, 13:8, 26:4, 35:4, 36:2, 58:9, 58:22, 59:13, 59:20, 99:15, 104:4, 115:6
**ton** [4] - 98:3, 98:12, 98:17, 98:18
**took** [7] - 19:2, 69:24, 72:5, 79:5, 79:19, 87:19, 88:5
**top** [5] - 63:17, 76:11, 77:21, 91:10, 103:18
**Torrence** [1] - 73:11
**TORRENCE** [1] - 73:12
**tort** [1] - 100:12
**towards** [2] - 91:13, 111:15
**town** [2] - 22:14, 111:19
**Township** [3] - 98:1, 107:18, 108:13
**trailing** [1] - 32:3
**transaction** [5] - 19:4, 33:1, 35:6, 49:9, 49:21
**transcription** [2] - 116:17, 116:18
**transfer** [4] - 38:15, 40:7, 46:18, 50:7
**transferred** [3] - 38:7, 42:7, 47:10
**tree** [2] - 88:2, 91:17
**trees** [29] - 85:17, 85:24, 86:1, 86:7, 86:12, 86:24, 87:3, 87:19, 88:3, 88:5, 88:7, 88:19, 89:5, 93:16, 96:1, 96:9, 96:19, 97:6, 97:8, 97:12, 97:22, 98:3, 98:11, 98:13, 99:3, 99:4, 99:5, 101:11, 104:5
**Tri** [2] - 51:14, 51:18
**Tri-State** [2] - 51:14, 51:18
**trial** [2] - 5:6, 8:10
**true** [5] - 39:25, 97:3, 100:6, 107:20, 116:17
**truth** [4] - 6:11, 6:12, 9:14
**try** [2] - 63:15, 107:18
**trying** [7] - 44:13, 45:1, 61:15, 93:17, 99:11, 99:12, 110:20
**tsunami** [1] - 63:16
**turn** [1] - 77:19

turning [3] - 18:23, 72:21, 77:1
**TV** [1] - 52:6
**two** [19] - 12:6, 12:7, 21:5, 39:7, 50:2, 50:7, 50:13, 56:3, 87:11, 88:9, 88:10, 93:6, 93:10, 97:7, 109:25, 110:2, 111:13, 112:19
**type** [5] - 9:23, 11:20, 17:7, 62:7, 91:10
**types** [1] - 64:7

## U

**unaware** [1] - 33:13
**uncertainty** [2] - 49:10, 49:23
**unclear** [1] - 95:20
**under** [18] - 6:4, 9:12, 67:6, 67:15, 70:13, 73:7, 73:16, 74:5, 76:8, 76:14, 77:1, 77:3, 77:6, 77:21, 83:11, 83:13, 83:14, 93:16
**undergrad** [1] - 10:9
**understandable** [1] - 45:9
**understood** [3] - 12:11, 33:2, 74:11
**undertake** [1] - 106:13
**undertaken** [5] - 21:19, 24:20, 25:20, 25:25, 113:8
**undertook** [2] - 79:14, 110:11
**unfold** [2] - 62:18, 64:4
**UNITED** [1] - 1:1
**University** [3] - 10:7, 10:8, 10:10
**unless** [1] - 8:13
**unreasonable** [1] - 42:19
**up** [30] - 7:8, 19:17, 32:3, 36:10, 44:21, 45:6, 50:5, 62:22, 63:8, 63:9, 69:6, 70:12, 70:24, 71:15, 73:2, 83:8, 90:21, 91:14, 94:4, 102:24, 105:5, 105:14, 105:18, 110:20, 111:22, 111:23, 111:24, 111:25
**US** [1] - 5:14
**utilized** [1] - 79:14

## V

**vacant** [2] - 50:21, 50:22
**various** [1] - 85:14
**ventilation** [1] - 76:17
**ventured** [1] - 38:17
**ventures** [1] - 50:11
**venturing** [1] - 50:3
**verbal** [2] - 7:3, 7:11
**versus** [2] - 31:1, 64:17
**veteran** [1] - 10:18
**Victor** [1] - 39:10
**videos** [1] - 17:19
**Videos** [2] - 4:7, 17:20
**view** [1] - 94:16
**viewing** [1] - 30:25
**voice** [1] - 32:3
**Voorhees** [1] - 24:7
**vs** [1] - 1:6

## W

**wait** [2] - 8:1, 69:9
**waived** [1] - 5:4
**walk** [3] - 55:23, 56:1, 56:5
**walk-through** [2] - 55:23, 56:1
**walk-throughs** [1] - 56:5
**wall** [16] - 68:23, 91:11, 96:14, 97:14, 105:11, 110:9, 112:11, 113:11, 113:16, 113:20, 114:4, 114:6, 114:15, 114:21, 114:24
**walls** [7] - 53:5, 68:15, 81:25, 82:13, 82:14, 82:21, 111:24
**WATER** [1] - 1:8
**water** [45] - 55:11, 55:14, 57:2, 61:24, 62:9, 62:21, 63:5, 63:9, 63:11, 63:19, 63:23, 63:25, 64:7, 64:20, 64:25, 65:6, 67:17, 68:13, 68:14, 68:23, 69:2, 69:18, 70:9, 70:14, 71:1, 71:17, 74:14, 76:18, 78:1, 82:23, 83:7, 83:15, 83:22, 97:25, 99:10, 99:24, 101:19, 107:3, 108:11, 110:10, 111:19, 113:13

**Water** [5] - 2:11, 13:9, 14:3, 14:6, 15:7
**ways** [1] - 45:5
**weight** [1] - 6:6
**WEIR** [1] - 2:2
**West** [1] - 1:23
**Westmont** [3] - 1:15, 2:7, 116:11
**wet** [1] - 68:2
**whatsoever** [1] - 27:1
**whitish** [1] - 82:20
**whole** [4] - 6:11, 41:16, 45:23, 99:1
**wife** [3] - 23:1, 38:8, 47:3
**wife's** [1] - 47:19
**wild** [1] - 86:9
**WILLIAM** [1] - 2:6
**Williams** [1] - 73:4
**window** [2] - 62:20, 78:16
**witness** [6] - 44:14, 45:16, 49:17, 115:9, 116:13, 116:15
**WITNESS** [3] - 3:3, 32:5, 93:21
**Witness** [2] - 29:15, 37:14, 51:24
**Wolschina** [17] - 22:16, 22:20, 27:18, 27:25, 28:7, 28:8, 28:16, 28:22, 32:21, 32:25, 33:17, 34:19, 54:13, 54:25, 72:24, 73:4, 80:2
**woman** [1] - 48:4
**word** [2] - 8:11, 28:9
**words** [5] - 31:16, 63:1, 64:18, 65:14, 91:8
**writing** [1] - 55:15
**writings** [1] - 32:10

## Y

**year** [10] - 50:6, 60:14, 87:11, 89:9, 89:17, 93:4, 109:25, 110:2, 114:18
**years** [18] - 10:4, 12:6, 12:7, 29:22, 30:8, 31:25, 36:15, 39:7, 50:21, 62:17, 79:18, 88:22, 90:12, 93:6, 93:10, 109:25, 111:23
**York** [1] - 10:8
**Yorkway** [1] - 37:25
**yourself** [4] - 38:3, 66:6, 72:15, 80:1

## Z

**zero** [1] - 64:19
**Zillow** [1] - 21:13
**zooming** [1] - 113:7